1  Susan E. Coleman (SBN 171832)
   E-mail: scoleman@bwslaw.com
2  Kristina Doan Gruenberg (SBN 268188)
   E-mail: kgruenberg@bwslaw.com
3  BURKE, WILLIAMS & SORENSEN, LLP
   444 South Flower Street, Suite 2400
4  Los Angeles, CA 90071-2953
   Tel: 213.236.0600     Fax: 213.236.2700
5
6  Attorneys for Defendants
   CITY OF LOS ANGELES, P. RAZANSKAS AND
   M. WINN
7

8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10

11 REGGIE D. COLE,                    Case No. CV-11-3241-CBM (AJWx)
                                      (Master File)
12            Plaintiff,
                                      Consolidated Case Nos. EDCV 12-
13 v.                                 01332-CBM (AJWx); and CV13-07224-
                                      CBM (AJWx)
14 CITY OF LOS ANGELES;
   MARCELLA WINN; PETE               **DEFENDANTS CITY OF LOS
15 RAZANSKAS; and DOES 1-45,         ANGELES, P. RAZANSKAS AND
   Inclusive,                        M. WINN'S NOTICE OF MOTION
16                                   AND MOTION FOR SUMMARY
              Defendants.            JUDGMENT, OR IN THE
17                                   ALTERNATIVE, PARTIAL
                                     SUMMARY JUDGMENT;
18                                   MEMORANDUM OF POINTS AND
                                     AUTHORITIES IN SUPPORT
19                                   THEREOF**

20                                   *[Defendants' Separate Statement of
                                     Uncontroverted Facts and Conclusions
21                                   of Law, Evidentiary Support, Appendix
                                     of Evidence, and Proposed Order Filed
22                                   Concurrently Herewith]*

23                                   Date:      January 13, 2015
   OBIE S. ANTHONY, III,             Time:      10:00 a.m.
24
              Plaintiff,             Judge:     Hon. Consuelo B. Marshall
25
   v.
26
   CITY OF LOS ANGELES, et al.,
27
              Defendants.
28

Burke, Williams &
Sorensen, LLP
Attorneys At Law
Los Angeles

LA #4847-5646-5696 v1          - 1 -          CV-11-3241-CBM-AJW
                                              DEFTS' MSJ

OBIE S. ANTHONY, III,

                Plaintiff,

v.

COUNTY OF LOS ANGELES, et al.,

                Defendants.

**TO PLAINTIFFS OBIE ANTHONY AND REGGIE COLE, AND THEIR RESPECTIVE ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on January 13, 2015 at 10:00 a.m., or as soon thereafter as this matter may be heard in Courtroom 2 of the above-captioned Court, located at 312 N. Spring Street, Los Angeles, CA 90012, Defendants CITY OF LOS ANGELES, P. RAZANSKAS AND M. WINN will and hereby do move this Court for summary judgment, or in the alternative partial summary judgment, on the grounds that there are no genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law for the reasons that:

1)     Cole's claims are barred by collateral estoppel.

2)     Detectives Winn and Razanskas did not withhold material or exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

3)     Detectives Winn or Razanskas did not influence the identifications of Trejo, Arthur Jones, or John Jones, in violation of Plaintiffs' rights under *Manson v. Brathwaite*, 432 U.S. 98 (1977) or *Neil v. Biggers*, 409 U.S. 189 (1972).

4)     Detectives Winn or Razanskas did not deliberately fabricate evidence by using coercive and abusive techniques which elicited false information from witnesses.

5)     Detectives Winn or Razanskas were not engaged in a conspiracy, and there was no evidence of a constitutional violation or evidence of a meeting of the minds to violate Plaintiffs' rights.

///

BURKE, WILLIAMS & SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4847-5646-5696 v1

- 2 -

CV-11-3241-CBM-AJW
DEFTS' MSJ

1    6)    Plaintiffs' claim for supervisorial liability fails because Detective

2 Winn received proper training and Detective Razanskas did not participate in or

3 direct the violations of Plaintiffs' rights, nor knew of the violations and failed to act

4 to prevent them.

5    7)    Plaintiffs' claim for municipal liability under *Monell v. Dept. of Social*

6 *Services*, 436 U.S. 658, 56 L. Ed. 2d 611, 98 S. Ct. 2018 (1978) fails because they

7 suffered no constitutional violation and there is no evidence of an unconstitutional

8 policy, practice, custom, lack of training, or ratification.

9    8)    Defendants are entitled to qualified immunity as they reasonably

10 believed their actions were lawful, and would not have been on notice that their

11 actions were unlawful.

12    This Motion is made following the conference of counsel pursuant to Local

13 Rule 7-3, which was commenced on October 24, 2014, when defense counsel sent

14 an 11-page letter detailing the factual and legal basis for this motion to Anthony's

15 counsel, and a 9-page letter to Cole's counsel.  The parties also held a telephonic

16 conference for approximately one hour on November 26, 2014.  Although Cole

17 agreed to dismiss the Unruh and Bane Act claims against Defendants,[1] the meet and

18 confer process was unsuccessful in resolving any of the remaining claims against

19 Defendants City of Los Angeles, Razanskas, or Winn.

20 ///

21 ///

22 ///

23 ///

24 ///

25 ///

26 ///

27

28

---

[1] The parties will file a joint dismissal of those claims.

This Motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the attached Declarations of Detective Winn, Detective Razanskas, Detective LaBarbera, John Jones, Arthur Jones, Ronald Brock, Carol Canty, and Kristina Gruenberg, with exhibits, the Separate Statement of Uncontroverted Facts and Conclusions of Law, all papers and pleadings on file in this matter, and any evidence and argument the Court may require or allow at the hearing on this motion.

Dated:  December 8, 2014          BURKE, WILLIAMS & SORENSEN, LLP


By:   /s/ Susan E. Coleman
        Susan E. Coleman
        Kristina Doan Gruenberg

Attorneys for Defendants
CITY OF LOS ANGELES, P.
RAZANSKAS AND M. WINN

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ...................................................................................... 1

II.     RELEVANT PROCEDURAL HISTORY ................................................. 2

III.    STATEMENT OF FACTS ......................................................................... 3

    A.    Gonzales Murder and Attempted Murder of Trejo and Jimenez .......... 3

    B.    Murder and Attempted Murder Investigation ...................................... 3

        1.    Inspection of Crime Scene & Witness Statements .................... 3

        2.    Interactions with John Jones ....................................................... 4

        3.    Rooftop Visit ................................................................................ 4

        4.    Witness Interviews and Statements ............................................ 5

    C.    Anonymous Tip and Connection to Carjacking Investigation ............. 6

    D.    Additional Witness Statements and Identifications ............................. 6

    E.    Charges Filed ...................................................................................... 7

    F.    Identifications at Live Line-ups ........................................................... 8

    G.    1995 Trial ............................................................................................ 8

        1.    John Jones Testimony and Cross-Examination .......................... 8

        2.    Anthony's Untruthful Testimony and Contradicting Alibis ....... 9

    H.    Post-Conviction Proceedings ............................................................. 10

        1.    Cole's Imperial County Proceedings ....................................... 10

        2.    Anthony's Habeas Proceedings ................................................ 11

IV.     STANDARD FOR SUMMARY JUDGMENT ....................................... 11

V.      COLE'S CLAIMS ARE BARRED BY COLLATERAL ESTOPPEL ........ 12

VI.     PLAINTIFFS CANNOT ESTABLISH BRADY VIOLATIONS ................ 13

    A.    Legal Standard ................................................................................... 13

    B.    Defendants Did not Influence or Conceal Identifications ................... 14

        1.    Carol Canty Jones' Witness Statement and Identification ....... 14

        2.    Victor Trejo Identification ......................................................... 15

        3.    MLK Security and Medical Staff .............................................. 15

        4.    John Jones' Identification .......................................................... 16

    C.    Defendants Did Not Conceal John Jones' Plea ................................. 17

    D.    Detectives Did not Conceal Evidence Regarding John Jones ............ 18

    Being the Third Shooter Because There was No Such Evidence ................ 18

    E.    Detectives did not Conceal the number of Baby Day Day's ............. 20

VII.    PLAINTIFF'S MANSON/BIGGERS CLAIMS ARE UNSUSTAINABLE ................................................................................... 21

Burke, Williams & Sorensen, LLP
Attorneys At Law
Los Angeles

# TABLE OF CONTENTS
## (continued)

**Page**

VIII.  PLAINTIFFS FALSE EVIDENCE CLAIMS ARE UNSUSTAINABLE .................................................................... 23

IX.  PLAINTIFF'S CONSPIRACY TO COMMITT BRADY VIOLATIONS ............................................................................ 26

& CONSPIRACY FOR FALSE EVIDENCE CLAIMS FAIL ............ 26

X.  PLAINTIFF CANNOT ESTABLISH SUPERVISORIAL LIABILITY ..... 27

XI.  PLAINTIFFS CANNOT ESTABLISH MONELL LIABILITY ................ 29

XII.  DEFENDANTS ARE ENTITLED TO QUALIFIFED IMMUNITY ......... 31

 A.  The Standard for Finding Qualified Immunity. ................... 31

 B.  Plaintiffs Cannot Show Defendants Violated a Constitutional Right or Knew That Their Conduct was Unlawful ............................ 32

  1.  Expended Bullet Slugs ................................................. 32

  2.  John Jones' Testimony ................................................. 34

  3.  Arthur Jones Identification ......................................... 35

  4.  John Jones' Daughters ................................................. 35

  5.  MLK Safety Officers and Medical Staff ..................... 36

  6.  Gang Monikers ........................................................... 36

XIII.  CONCLUSION ............................................................................ 37

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### Federal Cases

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) .................................................................. 11, 12

*United States v. Bagley*,
  473 U.S. 667 (1985) ......................................................................... 19

*Banks v. Dretke*,
  540 U.S. 668 (2004) .............................................................. 14, 15, 19

*United States v. Barrett*,
  703 F.2d 1076 (9th Cir. 1983) ......................................................... 22

*United States v. Carbajal*,
  956 F.2d 924 (9th Cir. 1992) ........................................................... 22

*Celotex Corporation v. Catrett*,
  477 U.S. 317 (1986) ......................................................................... 11

*City of Canton, Ohio vs. Harris*, 489 U.S. 378 (1989)........................... 29

*Cooper v. Dupnik*,
  963 F.2d 1220 (9th Cir. 1992) (en banc)........................................... 24

*Daniels v. Williams*,
  474 U.S. 327 (1981) ................................................................. 20, 37

*Denham v. Deeds*,
  954 F.2d 1501 (9th Cir. 1992)........................................................... 22

*Devenpeck v. Vialfund*,
  543 U.S. 146 (2004) ......................................................................... 20

*Devereaux v. Abbey*,
  263 F.3d 1070 (9th Cir. 2001)..................................................... 23, 24

*United States v. Duran-Orozco*,
  192 F.3d 1277 (9th Cir. 1999)........................................................... 22

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4847-5646-5696 v1                     - 1 -                    CV-11-3241-CBM-AJW
DEFTS' MSJ

*Eisenberg v. Insurance Company of North America*,
    815 F.2d 1285 (9th Cir. 1987) ................................................................ 12

*Franklin v. Fox*,
    312 F. 3d 423 (9th Cir. 2001) ................................................................ 26

*Harlow v. Fitzgerald*,
    457 U.S. 800 (1982) ................................................................ 31, 32

*Hart v. Parks*,
    450 F.3d 1059 (9th Cir. 2006) ................................................................ 26

*Henkle v. City of Clarksburg*,
    81 F.3d 416 (4th Cir. 1996) ................................................................ 26

*Hunter v. Bryant*,
    502 U.S. 224 (1991) ................................................................ 31

*Jean v. Collins*,
    221 F.3d 656 (4th Cir. 2000)(en banc) ................................................................ 34

*Jeffers v. Gomez*,
    240 F.3d 845 (9th Cir. 2001) ................................................................ 32

*John v. City of El Monte*,
    515 F.3d 936 (9th Cir. 2008) ................................................................ 19

*Johnson v. Sublett*,
    63 F.3d 926 (9th Cir. 1995) ................................................................ 22

*Manson v. Brathwaite*,
    432 U.S. 98 (1977) ................................................................ 22

*Monell v. New York City Department of Social Services*,
    436 U.S. 658 (1978) ................................................................ 29, 30

*Neil v. Biggers*,
    409 U.S. 189 (1972) ................................................................ 22

*Oklahoma City v. Tuttle*,
    471 U.S. 808 (1985) ................................................................ 30

*Pearson v. Callahan*,
    555 U.S. 223 (2009) ................................................................ 31, 32

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4847-5646-5696 v1                        - 2 -                        CV-11-3241-CBM-AJW
                                                                          DEFTS' MSJ

*Radcliff v. Rainbow Constr. Co.*,
    254 F.3d 772 (9th Cir. 2001) ........................................................ 26, 27

*Redman v. County of San Diego*,
    942 F.2d 1435 (9th Cir.1991) (en banc) ............................................ 28

*Sanders v. Kennedy*,
    794 F.2d 478 (9th Cir.1986) ........................................................... 28

*Saucier v. Katz*,
    533 U.S. 194 (2001) ...................................................................... 32

*Silva v. Brown*,
    416 F.3d 980 (9th Cir. 2005) .......................................................... 14

*Stoot v. City of Everett*,
    582 F.3d 910 (9th Cir. 2009) .......................................................... 24

*Tennison v. City and County of San Francisco*,
    570 F.4d 1078 (9th Cir. 2009.) ....................................................... 35

*Town of North Bonneville v. Callaway*,
    10 F.3d 1505 (9th Cir.1993) ........................................................... 12

*Tsao v. Desert Palace, Inc.*,
    698 F.3d 1128 (9th Cir. 2012) ........................................................ 29

*Montana v. United States*,
    440 U.S. 147 (1979) ...................................................................... 12

*Woodrum v. Woodward County, Oklahoma*,
    866 F.2d 1121 (9th Cir. 1989) ........................................................ 27

*Ybarra v. Reno Thunderbird Mobile Home Village*,
    723 F.2d 675 (9th Cir. 1984) ......................................................... 27

*Youngblood v. West Virginia*,
    547 U.S. 867 (2006) ...................................................................... 14

**Federal Statutes**

42 U.S.C. § 1983 ................................................................ 2, 26, 27, 29, 30

Burke, Williams &
Sorensen, LLP
Attorneys At Law
Los Angeles

LA #4847-5646-5696 v1                - 3 -                CV-11-3241-CBM-AJW
DEFTS' MSJ

## State Statutes

Penal Code § 132 .................................................................................................... 8

## Other Authorities

Fed. Rule Civ. P. Rule 56 ...................................................................................... 11

*People v. Reggie Cole*,
   Superior Court Case No. CF-8268 ................................................................... 12

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4847-5646-5696 v1                    - 4 -                    CV-11-3241-CBM-AJW
                                                                  DEFTS' MSJ

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.  <u>INTRODUCTION</u>

On March 27, 1994, Felipe Gonzales Angeles (hereinafter "Gonzales") was murdered on the corner of 49th Street and Figueroa.  Plaintiffs Obie Anthony and Reggie Cole were arrested and charged with Gonzales' murder.  During the trial, Anthony took the stand and lied about knowing his criminal co-defendant Cole.  Anthony also lied about using the gang moniker "Day Day."  Both of Anthony's lies were easily disproved in open court.   Anthony and Cole were convicted of murder.  After the trial, Cole's attorney Dick Tom spoke to the jury.  Dick Tom stated that Anthony's lying "swung [the jury] heavily as opposed to whatever evidence there was that we had established, any doubt that we had established was basically thrown out the window by Mr. Anthony getting up and, and you know…."

In 2000, while still in custody for Gonzalez's murder, Reggie Cole killed fellow inmate Eddie Clark at Corcoran State Prison.  Cole's attorneys moved to strike the 1994/1995 murder conviction so that Cole could avoid the death penalty.  In 2009, Judge Donnelly reversed Cole's conviction on grounds of ineffective assistance.  Anthony subsequently followed the same course, and in 2011, after an evidentiary hearing for Plaintiff's writ of habeas corpus, Judge Filer reversed Anthony's conviction on various grounds.

Anthony and Cole have now filed complaints alleging that Defendants violated their civil rights.  Specifically, Plaintiffs claim that Detectives Winn and Razanskas suppressed evidence and knowingly presented false evidence in order to target them as suspects for the Gonzalez murder.  Plaintiffs also allege that the City of Los Angeles failed to adequately train, supervise, and control its homicide detectives.  Plaintiffs allege that these things—and not Anthony's lying at trial or their criminal defense counsels' alleged ineffective assistance of counsel, which they had both argued in their separate habeas proceedings—led to their conviction for the murder of Gonzales.

However, Defendants are entitled to summary judgment because Cole's claims are barred by collateral estoppel, Plaintiffs lack preponderating evidence to prevail on their claims, and/or Defendants are entitled to qualified immunity.

## II.    **RELEVANT PROCEDURAL HISTORY**

On March 17, 2011, Plaintiff Cole filed his complaint in Los Angeles Superior Court. Cole alleges that Detectives Winn, Razanskas, and the Los Angeles Police Department ("City Defendants") violated his rights under Section 1983, *Monell*, and the Unruh and Bane Acts. (Cole Compl.) On April 15, 2011, City Defendants removed the case to federal court.

On November 30, 2011, Plaintiff Cole and City Defendants filed a stipulation to stay the Cole Action based on the anticipation that Anthony's case would be filed, which Plaintiff Cole and City Defendants agreed would need to be consolidated with the Cole Action since both cases would involve similar legal and factual issues. On December 1, 2011, the Court granted Plaintiff Cole and City Defendants' stipulation to stay the Cole Action and vacated all trial and pre-trial dates.

On August 10, 2012, Plaintiff Anthony filed his complaint in the United States District Court, Central District. Plaintiff Anthony brought claims for: 1) *Brady* Violations; 2) Conspiracy to Commit *Brady* Violations; 3) *Manson/Biggers* Violations; 4) False Evidence; 5) Conspiracy for False Evidence; 6) Supervisorial Liability; and 7) *Monell* Violations.

On May 7, 2013, Plaintiff Cole, Plaintiff Anthony, and City Defendants filed a stipulation to consolidate the Cole and Anthony actions.  On May 9, 2013, the Court issued an Order consolidating these cases for all purposes.

On September 30, 2013, Plaintiff Anthony filed a Complaint against the County of Los Angeles and the District Attorney's Office in the Anthony County Action.  On April 3, 2014, the Court consolidated all three cases for all purposes except pretrial and trial.

Defendants now move for summary judgment.

III. **STATEMENT OF FACTS**

    A.     **Gonzales Murder and Attempted Murder of Trejo and Jimenez**

On March 27, 1994, Gonzales was shot and killed at the corner of 49th Street and Figueroa. (SSUF # 1.) Victor Trejo, Luis Jimenez, and Gonzales had driven to the corner of 49th Street and Figueroa to drop off Gonzales so that he could find a woman named Melinda. (SSUF #2.) When Gonzales was walking back towards Trejo's car, he was approached by multiple black male suspects who demanded money. (SSUF #3.) The suspects shot at Trejo and Jimenez after they tried to stop Trejo and Jimenez's car and rob them. Trejo and Jimenez sustained multiple gunshot wounds before driving away without Gonzales. (SSUF #4.) Victor could see from the mirror that Gonzalez was being pushed, and he heard more shots fired. (SSUF #5.) Gonzales was subsequently found dead by MTA officers.

    B.     **Murder and Attempted Murder Investigation**

Detectives Winn and Razanskas were the detectives assigned to investigate the Gonzales homicide case. (SSUF #6.) Detectives Winn and Razanskas arrived at the crime scene on March 28, 1994, at approximately 1:00 a.m. (SSUF #7.) The Detectives were accompanied by Los Angeles Times journalist Miles Corwin, who had requested to shadow LAPD detectives in 1994. (SSUF #8.)

    1.     **Inspection of Crime Scene & Witness Statements**

Detectives Winn and Razanskas inspected the scene and logged evidence that they found at the crime scene in an Evidence Log. (SSUF #9.) Detectives Winn and Razanskas received a Field Interview Card for a witness named Ray Anthony Becerra. (SSUF #10.) Becerra indicated that he observed three males on the northeast corner of 49th Place and Figueroa, two male Hispanics on the sidewalk, heard numerous shots, and he saw vehicle fled westbound 49th Place. (SSUF #11.)

Detectives Winn and Razanskas received a witness statement form for witness Gabriel Cedillo Munoz (hereinafter "Cedillo.") (SSUF #12.) Cedillo stated that he had seen three black males approach and shoot a Hispanic male. (SSUF

Burke, Williams & Sorensen, LLP
Attorneys At Law
Los Angeles

LA #4847-5646-5696 v1

- 3 -

CV-11-3241-CBM-AJW
DEFTS' MSJ

1  #13.)  Neither statement from Munoz or Becerra indicated that there were any shots

2  fired from above. (SSUF #14.)

3              **2.      Interactions with John Jones**

4         At approximately 4:00 a.m., Detectives Winn and Razanskas spoke to

5  victim-witness John Jones. (SSUF #15.)  John Jones said that "youngsters" came

6  across the street and someone yelled "give me your money, give me all the money,

7  get out of the car."  He also told me that someone said "Kill him, kill him." (SSUF

8  #16.)  John Jones never told the Detectives that his daughters were eye witnesses.

9  (SSUF #17.)  John Jones said that he saw the suspects shoot at him. (SSUF #18.)

10  John Jones gave a description of the suspects and said that he could positively

11  identify them. (SSUF #19.)

12         On March 28, 1994, at approximately 11:30 a.m., Detectives Winn and

13  Razanskas and Corwin returned to the scene for further investigation.  (SSUF #21.)

14  Detectives Winn and Razanskas noticed that there was a video camera just inside

15  the door, and asked John Jones for the surveillance videotape. (SSUF #22.)  John

16  Jones provided the surveillance tape. (SSUF #23.)  John Jones stated that an

17  unknown citizen began shooting at suspects and may have wounded one of the

18  shooters in the leg. (SSUF #24.)  Detectives Winn and Razanskas saw that there

19  was a projectile point of impact (bullet hole) right near the bathroom window where

20  John Jones said he had been standing and yelling. (SSUF #25.)

21              **3.      Rooftop Visit**

22         Detectives Winn and Razanskas went to the rooftop with Corwin to obtain a

23  high ground (or aerial) view of the crime scene. John Jones did not go with them.

24  (SSUF #26.)  On the rooftop, Detective Razanskas picked up some expended bullet

25  slugs on the roof that appeared to be weathered, oxidized, and soiled, and showed

26  them to Corwin and Detective Winn. (SSUF #27.)  Detectives Winn and Razanskas

27  thought the expended bullet slugs looked like that had been shot up in the air for

28  New Year's Eve, Fourth of July, or another festive celebration. (SSUF #28.)

Burke, Williams &
Sorensen, LLP
Attorneys At Law
Los Angeles

LA #4847-5646-5696 v1                    - 4 -                    CV-11-3241-CBM-AJW
                                                                  DEFTS' MSJ

Detectives Winn and Razanskas also thought the bullets looked older because they were weathered and oxidized. Detectives Winn and Razanskas did not believe that the slugs appeared like projectiles or bullets that had been recently fired. (SSUF #29.) Because Detective Razanskas did not believe that the expended bullet slugs had evidentiary value, he gave them to Miles Corwin as a souvenir. (SSUF #36.)

#### 4.    Witness Interviews and Statements

On March 29, 1994, Jimenez gave a statement in which he stated that he, Trejo, and Gonzalez were attacked and shot at by three black males. (SSUF #38.)

On March 31, 1994, Detectives Winn and Razanskas met with John Jones again at the station to obtain a signed statement of what he had seen. John Jones description indicated that he thought the man in the black coat "went down" because the man in the gray coat helped him. (SSUF #39.)

On or around March 31, 1994, the Detectives notified Officer Dulgerian, of Detective Headquarters Division, to issue a medical alert City- and County-wide for any persons seeking medical attention and matching the description we were provided by various witnesses. Detectives Winn and Razanskas then received a phone call from Officer Arthur Jones of the Los Angeles County Safety Police on or around March 31, 1994. (SSUF #40.) When Detectives went to see Officer Arthur Jones on March 31, 1994, he stated that he recently saw a person matching the description of the suspect attempting to seek medical treatment at Martin Luther King Jr. (MLK) Hospital. (SSUF #41.) Officer Jones further stated that, when the possible suspect was questioned as to how he received the injury to his left leg, he became agitated and would not answer questions. Officer Jones stated that, about that same time, he received an emergency call of a major disturbance in one of the medical wards, and had to leave without detaining the possible suspect. As he was leaving, Officer Jones observed the possible suspect being assisted out of the hospital by two other unknown male blacks. The suspects departed in a late model white Toyota with damage to the right fender. Officer Arthur Jones also stated that

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4847-5646-5696 v1                - 5 -                CV-11-3241-CBM-AJW
DEFTS' MSJ

the person seeking medical treatment had his left leg wrapped in white gauze, and he was limping and unable to walk without assistance. (SSUF #42.)

### C.   Anonymous Tip and Connection to Carjacking Investigation

On April 28, 1994, at 11:30 a.m., Detective Winn received an anonymous telephone call from a person who stated that "Baby Day from Five Deuce Avalon Crips made a move on 49th street with two guys, and it went wrong." (SSUF #43.)

Detectives Winn and Razanskas checked department resources and received information that "Baby Day" was also known as Michael Miller, and was an active 92nd Street Hoover Crip (SSUF #44.)  Detectives Winn and Razanskas learned that Michael Miller and two associates Reggie Cole and Obie Anthony had all been arrested on April 20, 1994 for the kidnapping and robbery of victim Elliot Santana. (SSUF #45.)  Cole and Anthony were also members of the 92nd Street Hoover Crips. (SSUF #47, 49.)  Detectives Winn and Razanskas were informed that all three suspects were currently in custody and a TEC 9 mm gun was recovered during the arrest of Reggie Cole. (SSUF #53.)

### D.   Additional Witness Statements and Identifications

Detectives Winn and Razanskas ordered the booking photos from the April 20, 1994 arrest of Anthony, Cole, and Miller, to use in six-packs. (SSUF #55.)

On May 3, 1994, Carol Canty Jones provided a statement about the March 27, 1994 incident. Carol Canty Jones' statement was placed in the Murder Book. (SSUF #59.)  Canty Jones saw and heard the incident personally.  She was not relayed the information by her daughters. (SSUF #60.)  John Jones and Carol Canty Jones' daughters were not looking out the window during any point of the shooting. (SSUF #61.)  Carol Canty Jones never saw or heard John Jones shoot at any men on the street on March 27, 1994. (SSUF #64.)

On May 3, 1994, Detective Winn read an admonishment and showed Carol Jones photo lineup cards "A," B," and "C."  Carol Jones was unable to make any identification.  Instead, she chose suspect #6 from Card A.  Person #6 was a filler

1   named Ray Peoples, who had been in custody since February 1994.   (SSUF #65.)

2   Detective Winn read an admonishment and showed John Jones the photo

3   lineup cards.  John Jones said that "Suspect one [Anthony] on card 'A', a male

4   Black, approximately 5'8" in a gray ¾ length coat with a chrome handle gun was

5   shooting at me and the Mexican guys.  When the shooting stopped, I saw a male

6   Hispanic laying on the ground."  Jones also stated that "suspect #2 [Cole] on card

7   'B' was running and shooting at me. He was wearing a ¾ length black jacket, if it's

8   not him, it could be his twin brother." (SSUF #66.)

9   On June 24, 1994, Detective Winn admonished and showed witness Officer

10  Arthur Jones photo lineup cards.  On Card A, Officer Jones picked out number 1

11  (Anthony) and stated "Number one is the one who come (sic) close to look like

12  subject, who came (sic) MLK hospital for medical treatment to left leg. He did not

13  receive treatment because he was ask (sic) how did he obtain his injury. He left

14  location." On Card B, Arthur Jones picked number 1 again (a filler), stating

15  "Number One looks like subject who was carring (sic) the other subject in the MLK

16  hospital and the both left together in a white toyota." (SSUF #69.)

17  On June 24, 1994, at 8:35 p.m., Detective Razanskas interviewed victim

18  Trejo in Spanish. (SSUF #74.)  Detective Razanskas also admonished Trejo and

19  showed Trejo photo lineup cards "A," B," and "C."  Trejo chose number 1

20  (Anthony) on card "A' and said, "That number one on Card "A" looked like the

21  guy who opened the car door and shot me and [Jimenez]." (SSUF #77.)  The same

22  day, Detective Razanskas admonished Jimenez and showed him photo lineup cards

23  "A," B," and "C."  Jimenez was unable to make an identification. (SSUF #78.)

24  **E.    Charges Filed**

25  On June 28, 1994, the case was presented to Deputy District Attorney Liz

26  Ratinoff, who filed one (1) count of 187 P.C. murder with special allegations, three

27  (3) counts of 664/187 P.C. Attempted Murder, and two (2) counts of 664/211 P.C.

28  Attempted Robbery against Anthony and Cole. (SSUF #80.)  No witnesses

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4847-5646-5696 v1                    - 7 -                    CV-11-3241-CBM-AJW
                                                                  DEFTS' MSJ

1  identified Michael Miller, and he was not charged in the Gonzales incident.

2  **F.    Identifications at Live Line-ups**

3  Live lineups were conducted by the LA County Sheriffs.  At the live line-up,

4  John Jones identified Anthony and Cole. (SSUF #81.)  Arthur Jones was also able

5  to identify both suspects. (SSUF #82.)  Victor Trejo was unable to make an

6  identification during lineup 1 and identified a filler in lineup 2. (SSUF #83.)  Luis

7  Jimenez was unable to make identifications during either lineup. (SSUF #84.)

8  **G.    1995 Trial**

9  On July 13, 1995, the trial of Anthony and Cole began for the Santana

10  carjacking and Gonzales murder.  Miller was also originally a defendant, but only

11  for the Santana carjacking.  All charges relating to the Santana carjacking were

12  dismissed when Santana recanted. (SSUF #91.)

13  **1.    John Jones Testimony and Cross-Examination**

14  John Jones was called as a witness.   During a bench conference, the lawyers

15  extensively debated whether John Jones received a deal. (SSUF #97.)  At that same

16  bench conference, District Attorney Castello asserted that John Jones gave two

17  statements and identified Anthony and Cole from a six-pack <u>before</u> he was arrested

18  for pandering.  (SSUF #98.)  John Jones was then cross examined in front of the

19  jury about whether he received a benefit in exchange for testifying.  He was

20  presented with and specifically asked about the two letters that the LAPD had

21  written on his behalf. (SSUF #104.)  John Jones was asked if he was able to avoid a

22  minimum prison term under the law. (SSUF #105.)  A motion to dismiss was filed

23  based on Penal Code Section 132.  The defense argued that the plea agreement

24  received by John Jones for his pandering case was consideration for his testimony.

25  The motion was denied, which the Court of Appeal affirmed. (SSUF #108.)

26  During a bench conference at trial, Anthony's attorney said, "everybody and

27  their uncle knows that Mr. Jones indeed was the man firing that gun." (SSUF

28  #111.)  Yet the defense failed to present any evidence to support this conjecture,

Burke, Williams &
Sorensen, LLP
Attorneys At Law
Los Angeles

LA #4847-5646-5696 v1                          - 8 -                          CV-11-3241-CBM-AJW
DEFTS' MSJ

such asking John Jones about whether he was the shooter or calling any witnesses. (SSUF #112.)  For example, even though Anthony conveyed to his attorney that Jeremy Age (aka "C-Note") had witnessed the shooting and knew that John Jones was involved, C-Note was not called as a witness during trial. (SSUF #115.) Additionally, the defense did not provide an expert with respect to bullet trajectories. (SSUF #116.)  Anthony's attorney was concerned about focusing on the forty degree angle of the bullet because he thought that the prosecution would respond that Anthony and Cole had killed Gonzales execution-style. (SSUF #117.)

### 2.    Anthony's Untruthful Testimony and Contradicting Alibis

During the trial, Anthony took the stand and lied about knowing Cole. (SSUF #118.)  This was disproven in open court by witness Valerie Holt who said that Anthony and Cole were friends and they were always together. (SSUF #119.) Anthony also lied about being called "Day Day." District Attorney Castello had Anthony show his arm tattoo with his gang moniker "Day Day." (SSUF #121.)

During trial, Anthony's alibi witnesses provided contradictory alibis.  For example, Andre Williams said that Anthony helped him move on March 27, while Anthony and his other witnesses said he stayed home sick all day. (SSUF #122.) Andre Williams also testified that if Anthony said he was too sick to leave the house on March 27, 1994, that he was wrong. (SSUF #123.)  Dick Tom indicated in 31 years, this trial was the only time he has ever seen a defense attorney put his client on the stand to establish an alibi and then call an alibi witness that would contradict his client. Dick Tom indicated that he could not believe it. (SSUF #124.)

During trial, Cole's alibi witnesses also provided contradictory alibis.  For example, Leathyl Cuse testified that Cole was in the back house (a converted garage) on March 27, 1994 and that she visited him several times.  Conversely, Cole's mother, who testified directly after Ms. Cuse, said Cole was in the main house all day and she didn't know who Leathyl Cuse was. (SSUF #125.)

Anthony and Cole were found guilty by jury. (SSUF #126.)  After the trial,

1   the jurors told Dick Tom that the defendants lied.   (SSUF #127.)  Dick Tom stated

2   that Anthony's lying "swung [the jury] heavily as opposed to whatever evidence

3   there was that we had established, any doubt that we had established was basically

4   thrown out the window by Mr. Anthony getting up and, and you know..." (SSUF

5   #128.)  Dick Tom testified that there wasn't any question that Anthony's perjury

6   hurt Cole. (SSUF #129.)

7   **H.   Post-Conviction Proceedings**

8   **1.   Cole's Imperial County Proceedings**

9      Cole killed Eddie Clark at Calipatria State Prison in 2000. (SSUF #130.)

10  Cole was charged with a "Special Circumstance Murder," and in order to avoid the

11  death penalty, Cole's attorney's moved to strike his 1994/1995 conviction.  Cole

12  had an evidentiary hearing to overturn his conviction beginning in October 2007

13  before Judge Donnelly in Imperial Valley. (SSUF #131.)  Cole's attorneys argued

14  that his conviction should be overturned based on false evidence, false testimony,

15  and *Brady* violations, in addition to ineffective assistance of counsel.

16     Cole presented an expert witness to say that his attorney, Dick Tom's

17  representation fell below the standard of care. (SSUF #132.)  Cole's witness stated

18  that Tom failed to visit the scene, failed to make inquiries about potential witnesses,

19  failed to fully investigate information about John Jones, failed to fully investigate

20  Arthur Jones, and did not pursue potential forensic evidence that was available,

21  such as the angle at which Gonzalez was shot. (SSUF #133.)

22     Cole's conviction was overturned based on ineffective assistance.  The Court

23  denied the motion to strike the conviction based on false evidence, false testimony,

24  or *Brady* violations, stating that it was unable to find that Cole is probably innocent

25  of the charges or that no rational trier of fact could find him guilty. (SSUF #135.)

26     In 2008, Cole eventually pled guilty to voluntary manslaughter as a lesser

27  offense to Capital murder for the Clark incident. (SSUF #130.)

28

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4847-5646-5696 v1                    - 10 -                    CV-11-3241-CBM-AJW
                                                                    DEFTS' MSJ

## 2. Anthony's Habeas Proceedings

Anthony's habeas hearings were before Judge Filer in Los Angeles County in 2011. In addition to alleging police misconduct, Anthony argued ineffective assistance of counsel. At the hearing, Anthony presented an expert witness at his evidentiary hearing to say that his attorney, Patrick Thomason's representation fell below the standard of care. Specifically his expert stated that every good idea that Thomason had was not followed up and his client suffered grievously as a result. (SSUF 137.) Anthony's own expert at his evidentiary hearing admitted that if a defendant takes the stand, lies to the jury, and The People prove it's a lie, and they impeach defendant with the lie, things would be very bad for the criminal defendant. (SSUF #138). Anthony's conviction was also overturned.

## IV. STANDARD FOR SUMMARY JUDGMENT

Rule 56 of the Federal Rules of Civil Procedure states that summary judgment shall be granted when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. In *Celotex Corporation v. Catrett*, 477 U.S. 317 (1986), the Supreme Court stated that:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial.

*Id*. at 322-323. The failure of the non-moving party to prove an essential element of its claim renders all other facts immaterial. *Id*. at 323.

In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (decided on the same day as *Celotex*), the Supreme Court made it clear that a party opposing a motion for summary judgment must affirmatively show that a dispute about a material fact is genuine, such that a reasonable jury could return a verdict for the non-moving party. *Id*. at 248. This standard requires that this Court grant this motion if the evidence produced against defendants' motion is "merely colorable"

1  or "not significantly probative." *Id*. at 249; *Eisenberg v. Insurance Company of*

2  *North America*, 815 F.2d 1285, 1288 (9th Cir. 1987).

3  ## V.   COLE'S CLAIMS ARE BARRED BY COLLATERAL ESTOPPEL

4  As an initial matter, the doctrine of collateral estoppel precludes Cole from

5  relitigating his *Brady*, false testimony, and false evidence claims because they was

6  actually and necessarily decided in a prior proceeding. *See Montana v. United*

7  *States*, 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979) (holding that

8  collateral estoppel applies if an issue is decided in a prior proceeding based on the

9  same or a different cause of action).

10  To foreclose relitigation of an issue under federal law, the following elements

11  must be met: (1) the issue at stake must be identical to the one alleged in the prior

12  litigation; (2) the issue must have been actually litigated by the party against whom

13  preclusion is asserted in the prior litigation; and (3) the determination of the issue in

14  the prior litigation must have been a critical and necessary part of the judgment in

15  the earlier action. *Town of North Bonneville v. Callaway*, 10 F.3d 1505, 1508 (9th

16  Cir.1993). The elements for collateral estoppel are met here.

17  First, Cole's attorneys already litigated the issues of *Brady* violations, false

18  testimony, and false evidence, which are the same issues brought in this case, at

19  Cole's Imperial County proceedings in 2007 before Judge Donnelly. (*People v.*

20  *Reggie Cole*, Superior Court Case No. CF-8268.)

21  Second, the issues were actually litigated by Cole. Cole was able to call

22  numerous witnesses and submit evidence to try to prove that his conviction should

23  be overturned based on alleged police misconduct over the course of ten days of

24  hearings. These witnesses included, but were not limited to Anthony, Cole,

25  Detective Winn, Corwin, John Jones, Arthur Jones, Carol Canty Jones, Michael

26  Miller, Cole's attorney Dick Tom, and several expert witnesses. (SSUF # 131.)

27  Third, the Court did find that the determination of the issues was a critical

28  and necessary part of the judgment in Cole's hearing, and addressed them at length

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4847-5646-5696 v1          - 12 -          CV-11-3241-CBM-AJW
DEFTS' MSJ

when issuing his final order on January 29, 2008.   The Court found that to the extent that the court was the proper forum to litigate *Brady* and false evidence claims, Cole failed to meets his burden to show that defendant is probably innocent or that no rational trier of fact could find him guilty of the crimes for which he was convicted.  The Court also found that Cole failed to meet his burden of showing that false evidence and false testimony was presented at his trial that resulted in a fundamental constitutional flaw.  The Court found that at trial, eyewitnesses did identify the defendant, and based on the entire record, a jury of 12 determined that his guilt was proved beyond a reasonable doubt.  Finally, the Court found that Cole failed to meet his burden to show that the alleged *Brady* violations constituted a fatal fundamental constitutional defect. The Court found Detective Winn to be credible.  The Court found that that the Murder Book was provided and it was ultimately the defense's burden at the time to seek additional discovery and information.  The Court found that Cole failed to establish that any alleged *Brady* violation occurred or that it resulted in a fatal fundamental constitutional flaw. (SSUF #135.)

Because all the elements of collateral estoppel are met, and Cole has already litigated his *Brady,* false testimony, and false evidence claims, Cole's complaint must be dismissed in its entirety.

## VI.   PLAINTIFFS CANNOT ESTABLISH BRADY VIOLATIONS

Plaintiffs allege that Detectives Winn and Razanskas deprived them of their civil rights by violating their right to have material exculpatory evidence and information as required by *Brady* turned over to the prosecutors handling the prosecution so that it could in turn be provided to Anthony and Cole's criminal defense attorneys. (*See generally*, Anthony Compl. and Cole Compl.)  However, the evidence demonstrates that material and exculpatory evidence was turned over.

### A.   Legal Standard

To prevail on a Brady claim, "[t]he evidence at issue must be favorable to the

1   accused, either because it is exculpatory, or because it is impeaching; that evidence

2   must have been suppressed by the State, either willfully or inadvertently; and

3   prejudice must have ensued." *Banks v. Dretke*, 540 U.S. 668, 691, 124 S.Ct. 1256,

4   157 L.Ed.2d 1166 (2004) (internal quotation marks omitted). Prejudice occurs if the

5   evidence is "material." *Silva v. Brown*, 416 F.3d 980, 985 (9th Cir. 2005).

6          Such evidence is material if there is a reasonable probability that, had the

7   evidence been disclosed to the defense, the result of the proceeding would have

8   been different although a showing of materiality does not require demonstration by

9   a preponderance that disclosure of the suppressed evidence would have resulted

10  ultimately in the defendant's acquittal. The reversal of a conviction is required upon

11  a showing that the favorable evidence could reasonably be taken to put the whole

12  case in such a different light as to undermine confidence in the verdict. *Youngblood*

13  *v. West Virginia*, 547 U.S. 867, 870 (2006).

14          **B.     Defendants Did not Influence or Conceal Identifications**

15                   **1.     Carol Canty Jones' Witness Statement and Identification**

16          Plaintiffs contend that Detectives Winn and Razanskas concealed reports

17  including any description of the suspects provided by Carol Canty Jones.  They also

18  assert that there was no any indication in any report detailing the person who Ms.

19  Canty chose. (Anthony Compl. ¶ 43.)  However, the undisputed evidence disproves

20  these allegations.

21          Carol Canty Jones' witness statement from May 3, 1994, with descriptions of

22  the suspects, was in the file of Anthony's criminal defense attorney Patrick

23  Thomason, and there is no evidence that either defense attorney did not receive this

24  statement. (SSUF #65.)  Further, Carol Canty Jones' identification after looking in

25  six-packs was in the murder book, and she was cross-examined during trial by the

26  defense attorneys about selecting a filler. (SSUF #96.)  Thus, there is no evidence

27  that defendants concealed any documents relating to Carol Canty Jones.

28

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4847-5646-5696 v1                        - 14 -                        CV-11-3241-CBM-AJW
DEFTS' MSJ

### 2. Victor Trejo Identification

Victor Trejo identified the suspects in court. (SSUF #95.) Plaintiffs assert that Detectives "fed" Victor Trejo information that they had caught the men who had shot and killed his friend. (Anthony Compl. ¶ 63.) Yet, there is no competent evidence that the Detectives said anything to Trejo to influence his identification.

In addition to the fact that defendants deny these allegations (SSUF #76), Trejo testified at his deposition that neither Detective Razanskas nor Detective Winn told Trejo that the bullet that was fired from above in the building was the one that killed Gonzales (and indeed there is no evidence that any shot was fired from above). (SSUF #92.) Moreover, Detective Razanskas never told Trejo that Anthony and Cole were gang members or that one of them had been shot before. (SSUF #93.) As Trejo explained at his deposition, the only thing that Detective Razanskas told him was that the brother of Melinda (the woman Gonzales was looking for on March 27, 1994) was shot. This was a completely unrelated incident. (SSUF #94.)

Because neither Detective influenced Trejo's identification, they did not suppress evidence that they did so. As such, neither Plaintiff can establish a *Brady* claim with respect to Trejo's identifications.

### 3. MLK Security and Medical Staff

Plaintiffs allege that Defendants improperly concealed the fact that the Detectives spoke to MLK Safety Officers Ronald Brock, Al Wilson, and an unidentified nurse. Although Detectives may have spoken to Ronald Brock and Al Wilson, neither officer indicated that they recalled suspects coming in and no one else could make or even attempt an identification. Therefore, this information would not have been exculpatory or used for impeachment, which is required to state a claim under *Brady. See Banks v. Dretke*, 540 U.S. at 668.

Further, Plaintiffs cannot show that such evidence is material, because they cannot show that there was a reasonable probability that, had the evidence been

BURKE, WILLIAMS & SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4847-5646-5696 v1

CV-11-3241-CBM-AJW
DEFTS' MSJ

1   disclosed to the defense, the result of the proceeding would have been different.  As

2   stated above, there is no evidence that either the safety officers or a nurse recalled

3   anything that would have been helpful to the investigation.  Moreover, the presence

4   of other individuals at MLK hospital was no secret before trial.  Cole's attorney

5   Dick Tom sent an investigator to speak to people at MLK after Arthur Jones

6   testified at the evidentiary hearing, and no one was able to provide any information

7   that was helpful to the prosecution of defense.  (SSUF #70.)

### 4.    John Jones' Identification

9        Plaintiffs allege that Detectives tainted identifications by giving information

10   to John Jones and pointing out Anthony and Cole's pictures.  (Anthony Compl. ¶

11   132.)  Plaintiffs thus assert that the Detectives concealed their improper influence.

12        First, there is no evidence that Detective Winn tapped on the photos of

13   Anthony and Cole when showing the six-packs to John Jones, as Plaintiff alleges.

14   Although Anthony's investigator Deborah Crawford claims that John Jones told her

15   that Detective Winn pointed to pictures, this is hearsay and she was not there when

16   John Jones was originally shown the six-packs.  Conversely, John Jones was

17   directly questioned about this at Anthony and Cole's habeas hearings and denied

18   allegations that Winn tapped or did anything suggestive while showing him the six-

19   packs.  (SSUF #134, #136.)  At Cole's evidentiary hearing, John Jones only said

20   that Detective Winn "tapped on them all when she showed them to me. But she

21   didn't need to tap on it, like, to show me." (SSUF #136.)

22        Furthermore, there is no evidence that Detective Winn or Detective

23   Razanskas told John Jones that Anthony and Cole were arrested together, that they

24   were partners, or that they were confident that they had the right men. There is also

25   no evidence that anyone told John Jones that Anthony went by the moniker "Baby

26   Day" or that he had a Baby Day tattoo.  John Jones denied that any of these things

27   were said to him. (SSUF #52, 58, 143.)  Rather, he made his identification based on

28   his own observations. (SSUF #144.)

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4847-5646-5696 v1                 - 16 -                 CV-11-3241-CBM-AJW
                                                            DEFTS' MSJ

1   The Detectives did not improperly influence John Jones' identifications.

2   Thus, they could not conceal information regarding something they did not do.

3   **C.      Defendants Did Not Conceal John Jones' Plea**

4      Plaintiffs allege that Defendants concealed facts and evidence regarding John

5   Jones' sentence for his pandering conviction. (*See* Anthony Compl. Section IV.D.)

6      However, the evidence demonstrates that the Detectives provided

7   information about John Jones' case, and that this matter was fully litigated in court.

8   It is undisputed that Cole and Anthony's defense attorneys, as well as the District

9   Attorney, knew about John Jones' case and his sentence. For example, prior to trial,

10   Anthony's attorney had the November 8, 1994 transcript of John Jones' plea, the

11   January 24, 1995 transcript of the sentencing, 1994 Jones' probation report, and the

12   felony complaint in Jones' pandering case. (SSUF #100.)

13      Further, LAPD and Detective Winn's involvement in John Jones' case was

14   also disclosed.  The Murder Book had the letter which was written by Detective

15   Winn requesting that John Jones receive leniency for his pandering charge. (SSUF

16   #87.)  The defense attorneys obtained a copy of a second letter written by the Vice

17   division requesting leniency, and both letters were presented to the court and jury

18   during the Gonzales murder trial. (SSUF #99, 100, 104.)  Anthony's attorney

19   believed that he made it clear to the jury that LAPD asked for leniency for John

20   Jones. (SSUF #107.)  Although Plaintiffs may argue that Winn did not disclose that

21   she spoke to Commander Kato of the Vice Unit or District Attorney Kelly Chun

22   about John Jones' case, this is cumulative of the letter that District Attorney Chun

23   asked Winn to write.  Thus, Winn's involvement was not concealed because she

24   placed this letter in the Murder Book.

25      Moreover, Thomason sent his someone to watch John Jones' proceedings,

26   and Thomason had the Judge's notes regarding John Jones' plea bargain. (SSUF

27   #101-102.)  The defense attorneys knew that John Jones received probation instead

28   of a mandatory prison sentence, and Thomason argued to the Court during a sidebar

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4847-5646-5696 v1                    - 17 -                    CV-11-3241-CBM-AJW
DEFTS' MSJ

1   that John Jones received a "sweetheart deal." (SSUF #103.)  In fact, defense

2   attorneys filed a motion to dismiss the case based on John Jones' alleged quid pro

3   quo deal, which was denied by the Court, and the Court of Appeals affirmed the

4   denial of the motion. (SSUF #108.)

5        Finally, John Jones was cross-examined about whether he was able to avoid a

6   mandatory prison term and whether he received "special treatment." (SSUF #105.)

7   In response, John Jones stated "what do you mean special treatment?"  After Dick

8   Tom repeated the question, John Jones responded "I was arrested, hauled into court,

9   no."  Though Plaintiffs argue that Detective Winn had a duty to correct John Jones'

10   testimony, Detective Winn did not know the details about John Jones' sentence;

11   whereas both the District Attorney and defense attorneys did. (SSUF #109.)  They

12   extensively cross-examined Jones about the deal he received, and argued to the jury

13   in closing about whether John Jones could be considered a reliable witness.

14        In sum, the Detectives did not conceal information about John Jones'

15   pandering case, his sentence, or LAPD's involvement.  This information was

16   provided and/or elicited during trial by Anthony and Cole's attorney, and as such,

17   the *Brady* claim based on this argument should be dismissed.

18       **D.**    **Detectives Did not Conceal Evidence Regarding John Jones**

19            **Being the Third Shooter Because There was No Such Evidence**

20        Plaintiffs allege that Detectives Winn and Razanskas suppressed an

21   alternative theory to the murder of Gonzales and that they knew or should have

22   known that John Jones was the third shooter.  Specifically, Plaintiffs alleges that

23   Defendants concealed the fact that there were expended bullets on the roof.

24   Plaintiffs also allege that after watching the surveillance tape with Jones, they asked

25   him if he had seen the third shooter.  He said no and said that he had told them

26   everything they knew.  Plaintiffs allege that Detectives Winn and Razanskas failed

27   to report this statement or their theory that Jones might be the "third shooter." (*See*

28   Anthony Compl. ¶ 132(G); Cole Compl. ¶ 34-35.)   This argument lacks merit.

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4847-5646-5696 v1       - 18 -       CV-11-3241-CBM-AJW
DEFTS' MSJ

1    First, there is no law stating that law enforcement is required to turn over

2  every theory.  Rather, the standard is turning over exculpatory <u>evidence</u>. *Banks,* 540

3  U.S. at 668.  Here, there was no exculpatory evidence that John Jones was the third

4  shooter.  Although Plaintiffs assert that Detectives concealed the bullet slugs that

5  were found on the roof of John Jones' building, the expended bullet slugs on the

6  roof did not have evidentiary value because they were weathered, oxidized, and

7  soiled. (SSUF #27.)  They were expended bullets, which is more suggestive of

8  someone shooting up in the air on New Year's Eve, Fourth of July, or another

9  festive celebration. (SSUF #28.)

10    Moreover, at the time Detectives Winn, Razanskas, and Corwin were at the

11  roof to get an aerial view of the crime scene, there was no evidence to suggest that

12  there had been a shooter on the rooftop or that John Jones was on the rooftop.

13  (SSUF #31.)  No witnesses reported that there were any shots fired from above, and

14  instead everyone reported suspects and shooting on ground level. (SSUF #14.)

15  Additionally, when Detective Razanskas was walking around the rooftop, he did

16  not see any shell casings. (SSUF #32.)

17    The fact that the Detectives allegedly did not report John Jones' statement

18  that he denied being the third shooter and that "he had said everything he knew" is

19  neither material nor exculpatory, as it does not help the defense. Suppressed

20  evidence is considered "material," and prejudice results from suppression "if there

21  is a reasonable probability that, had the evidence been disclosed to the defense, the

22  result of the proceeding would have been different" as to either guilt or punishment.

23  *United States v. Bagley*, 473 U.S. 667, 682 (1985).  Here, there is no evidence that

24  had this information been disclosed to the defense, the proceeding would have been

25  different.  John Jones' alleged statement was the same thing that he said to the jury:

26  he was not the third shooter and he had told the police everything that he knew.

27    The relevant inquiry is not to engage in a "hindsight analysis," but rather

28  what was known to the officer at the moment. *John v. City of El Monte*, 515 F.3d

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4847-5646-5696 v1                    - 19 -                    CV-11-3241-CBM-AJW
DEFTS' MSJ

936, 940 (9th Cir. 2008); *Devenpeck v. Vialfund*, 543 U.S. 146, 152 (2004). Based on what Detectives knew at the time, they did not believe that John Jones was the third shooter because his testimony was consistent and corroborated.  For example, there was a bullet hole near the window where he said he was yelling out of (SSUF # 25), and no other witnesses reported shooting coming from above. (SSUF #14.) This is also supported by Carol Canty who said that John Jones was in the next room, not on the roof. (SSUF #63.)  Police have no obligation to investigate every notion of a case. Moreover, a negligent investigation does not rise to a level of a constitutional tort. *Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662 (1981) ("The Due Process Clause is simply not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty or property.").

Finally, there is nothing else that the Detectives allegedly withheld from Anthony or Cole's attorneys about John Jones that would have been material to the case.  Anthony and Cole's attorneys knew about John Jones. They knew about his full criminal record (SSUF #100), which they tried unsuccessfully to enter into the records based on Judge Suzukawa's rulings. They had evidence to develop a theory about the 40-degree trajectory, but chose not to pursue that defense because it could be interpreted by the jury that Anthony and/or Cole shot Gonzalez execution-style. (SSUF #117.)  They had evidence from Jeremy Age (aka "C-Note") that even the Detectives did not know: Jeremy Age allegedly had information that John Jones was involved in the shooting.  (SSUF #115.)  Finally, during trial Thomason said "everybody and their uncle knows that Mr. Jones indeed was the man firing that gun." (SSUF #111.)  In short, the Detectives did not conceal information about John Jones.  Anthony and Cole's attorneys' failure to pursue the John Jones theory more fully, whether by their strategic choice or by their negligence, cannot be attributed to Detectives Winn and Razanskas.

### E.  Detectives did not Conceal the number of Baby Day Day's

Plaintiffs focus on the fact that the anonymous tip that came in was for "Baby

Burke, Williams &
Sorensen, LLP
Attorneys At Law
Los Angeles

LA #4847-5646-5696 v1                 - 20 -                 CV-11-3241-CBM-AJW
DEFTS' MSJ

Day" from the 53rd Hoover Crips when Anthony actually was "Little Day Day" from the 92nd Hoover Crips. Plaintiffs also allege that the Detectives concealed the number of people who went by the gang moniker "Baby Day." However, these arguments are not enough to establish a *Brady* violation for several reasons.

First, it is undisputed that Anthony and Cole are friends with Michael Miller. Anthony and Cole also verified that Michael Miller went by both gang monikers "Baby Day Day" and "Baby Day." (SSUF #45.) Thus, it was not unreasonable for Detectives Winn and Razanskas to tie Anthony and Cole to the Gonzales murder based on the anonymous tip about "Baby Day," combined with the fact that all three were in custody as crime partners on a kidnapping/car jacking charge.

Second, there is no evidence that the Detectives ever told anyone that Anthony went by the name "Baby Day" or "Baby Day Day." The only person who ever said this was Valerie Holt, and there is no evidence that detectives "fed" her false information. (SSUF #120.)

Third, there is no evidence that either Detective Winn or Detective Razanskas found the list of names for every person who went by the name "Baby Day" or "Baby Day Day," and then failed to disclose this information to the defense. Rather, Detective Winn and Razanskas were able to find someone with the same gang moniker, who was involved and arrested in a recent incident with a similar set of facts as the Gonzales case—namely a group of younger black males involved in a carjacking/robbery of a Hispanic male in the same vicinity.

Plaintiffs therefore fail to establish that Detectives failed to disclose enough information relating to gang monikers to constitute a *Brady* violation.

## VII. **PLAINTIFF'S *MANSON/BIGGERS* CLAIMS ARE UNSUSTAINABLE**

Plaintiff Anthony alleges that identifications of Trejo, Arthur Jones, and John Jones were not free from suggestive influence. [2] (*See* Anthony Compl. at ¶¶ 148-

---

[2] Plaintiff Cole does not specifically identify *Manson/Biggers* violations in his complaint.

151.)  However, there is no evidence that Detectives Winn or Razanskas violated plaintiff's rights under *Manson v. Brathwaite*, 432 U.S. 98 (1977) or *Neil v. Biggers*, 409 U.S. 189 (1972).

The Ninth Circuit has stated: "To constitute a due process violation, the photographic identification procedure must be so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Denham v. Deeds*, 954 F.2d 1501, 1504 (9th Cir. 1992) (*citing Simmons v. United States*, 390 U.S. 377, 384 (1968)); *United States v. Carbajal*, 956 F.2d 924, 929 (9th Cir. 1992). The identification procedure must be impermissibly or unduly suggestive under the totality of the circumstances. *Johnson v. Sublett*, 63 F.3d 926, 929 (9th Cir. 1995) (*citing Biggers*, 409 U.S. at 196). "[R]eliability is the linchpin in determining the admissibility of identification testimony. . . ." *Manson*, 432 U.S. at 114. There are five factors among the totality of circumstances to be considered by the court is assessing the reliability of the identification procedures:

> 1) the witness' opportunity to view the suspect at the time of the crime, 2) the witness' degree of attention to the perpetrator at the time of the crime, 3) the accuracy of any earlier description of the suspect, 4) the level of certainty demonstrated at the confrontation, and, 5) the lapse of time between the time of the crime and the confrontation.

*Denham*, 954 F.2d at 1504 (citing *Biggers*, 409 U.S. at 196); *United States v. Barrett*, 703 F.2d 1076, 1085 (9th Cir. 1983) (same); *Manson*, 432 U.S. at 114 (same); *see United States v. Duran-Orozco*, 192 F.3d 1277, 1282 (9th Cir. 1999) (automatic exclusion of identification testimony is not required even if the procedure is impermissibly suggestive, if totality of circumstances show testimony is reliable under factors identified in *Biggers*).

Here, the Detectives who assembled the six-packs attempted to make the photographs consistent in size, shape, and background. In creating the photo lineup, the Detectives attempted, to the best of their ability and with the resources available to them, to include similar looking individuals with the photograph of plaintiff.

1  The Detectives did not select photos or place them in any particular order to try to

2  influence any witness. (SSUF #57.)

3      Although Plaintiffs may argue that the placement of the photos or the photos

4  that were chosen were suggestive, there is no proof that how the six-packs were

5  assembled caused any individual to make an improper identification.  Moreover,

6  Plaintiffs ignore the fact that several witnesses were not able to make an

7  identification or chose fillers.

8      Finally, as stated above, there is no evidence that Detectives said or did

9  anything (such as suggestive finger tapping) in order to secure an improper

10  identification. (*See infra* Sec. V.B.)  Therefore, Plaintiffs do not have evidence to

11  establish a *Manson/Biggers* claim.

12  **VIII.  PLAINTIFFS FALSE EVIDENCE CLAIMS ARE UNSUSTAINABLE**

13      Plaintiffs allege that Detectives Winn and Razanskas falsified evidence

14  against them, violating the Fifth and Fourteenth Amendments.  (*See* Anthony

15  Compl. ¶¶ 153-159; Cole Compl. at 51.)  Specifically, Plaintiffs allege that

16  Detectives mischaracterized eyewitness identifications and used interviewing and

17  investigative techniques that would yield false evidence.

18      A person has a due process right "not to be subject to criminal charges on the

19  basis of false evidence that was deliberately fabricated by the government."

20  *Devereaux v. Abbey*, 263 F.3d 1070, 1074-75 (9th Cir. 2001). This is tantamount to

21  the right not to have the prosecution use perjured testimony to secure a conviction.

22  *See id*. at 1075 (citing *Pyle v. Kansas*, 317 U.S. 213, 216, 63 S.Ct. 177 (1942).

23  Intentional fabrication of evidence is required, it is not enough that the police failed

24  "to follow guidelines or carry out an investigation in a manner that will ensure an

25  error – free result." *Id*. at 1076-77. Under the two prong *Deveraux* test, a plaintiff

26  must show that 1) the officer continued his investigation "despite the fact [he] knew

27  or should have known that [plaintiff] was innocent or [2], [the officer] used

28  investigative techniques that were so coercive and abusive that [he] knew or should

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4847-5646-5696 v1                - 23 -                CV-11-3241-CBM-AJW
                                                          DEFTS' MSJ

1  have known those techniques would yield false information." *Id* at 1076.

2  In deciding what conduct would rise to the level of coercion and abuse

3  sufficiently severe that interrogators "knew or should have known" that any

4  resulting [information] was false, the Court is guided by recent case law addressing

5  coerced interrogation claims brought under the Fourteenth Amendment. Such a

6  claim "is cognizable only if the alleged abuse of power 'shocks the conscience' and

7  'violates the decencies of civilized conduct.'" *Stoot v. City of Everett,* 582 F.3d 910

8  (9th Cir. 2009) (cert. denied) (quoting *Lewis*, 523 U.S. at 846).  In expounding on

9  this standard, "*Chavez* refers to 'police torture or other abuse' as actionable under

10  the Fourteenth Amendment, and Justice Kennedy's opinion [in *Chavez*] states that

11  'a constitutional right is traduced the moment torture or its close equivalents are

12  brought to bear.' Such language is consistent with the general rule that 'only the

13  most egregious official conduct can be said to be arbitrary in the constitutional

14  sense' and therefore a violation of substantive due process." *Id*. (citations omitted).

15  The Ninth Circuit in *Stoot* discussed the facts of *Cooper v. Dupnik*, 963 F.2d

16  1220 (9th Cir. 1992) (en banc) in determining that the interrogation at issue was not

17  sufficiently egregious so as to violate substantive due process:

18  > Cooper, for example, involved a calculated plan to ignore
19  > the suspect's Constitutional right to remain silent as well
20  > as any request he might make to speak with an attorney . .
21  > ., to hold the suspect incommunicado, and to pressure and
22  > interrogate him until he confessed, in full recognition that
23  > such actions were unlawful under Miranda and would
24  > render any confession inadmissible at trial. This court
25  > described the officers' techniques as sophisticated
26  > psychological torture designed to extract a confession
27  > after hours of mistreatment, the twentieth-century
28  > inquisitorial version of the Star Chamber.

24  Here, there is no evidence that Detectives continued their investigation

25  despite the fact that they knew that either Plaintiff was innocent.  Even assuming

26  *arguendo* that the Detectives knew or should have known that John Jones was the

27  third shooter, this would not have exonerated Anthony or Cole, as it is undisputed

28  that there were suspects shooting at the ground level on 49th Street and Figueroa.

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4847-5646-5696 v1          - 24 -          CV-11-3241-CBM-AJW
DEFTS' MSJ

1    Second, there is no proof that the Detectives used interviewing and

2    investigative techniques that they knew or should have known would yield false

3    evidence.  For example, there is no evidence that Detectives Winn or Razanskas

4    threatened to take away John and Carol Canty Jones' children. There is also no

5    evidence that Detectives were involved in the Vice investigation of John Jones for

6    pandering or that John Jones was arrested for pandering to compel him to testify.

7    The timeline of events show that John Jones was arrested for pandering *after* he

8    made his witness statements and selected defendants from six-packs, and there is no

9    evidence that John Jones was compelled to come forward with information because

10    he thought he was police were watching his building. (SSUF #98.)  Moreover, John

11    Jones indicated that he was motivated to testify against Cole and Anthony because

12    of the threats made against him by gang members; not because the police coerced

13    him.  (SSUF #89.)  Finally, John Jones denies that the detectives gave him any

14    information confirming his identification. (SSUF #143.)  John Jones indicates that

15    his identifications were made based on what he saw that night. (SSUF #144.)

16    As discussed above, there is no evidence that Detectives Winn or Razanskas

17    gave Victor Trejo any confirmatory information. (SSUF #92-93.)  Further, even

18    assuming *arguendo* that Detectives did provide such information this would not rise

19    to the level of abuse necessary to state a claim.  In *Devereaux*, the court held that

20    even though children had been interrogated for hours about sexual abuse claims,

21    this did not rise to the level of coercive tactics.  Here, Plaintiff alleges that

22    Detective Razanskas told Trejo on his way to court that the suspects had killed his

23    friends.  In addition to the fact that Trejo had already willingly given descriptions of

24    Anthony and Cole before trial, there is nothing showing that Detective Razanskas

25    knew his purported statement would lead to false testimony or that Detective

26    Razanskas' statement "shocks the conscious" as required for a false evidence claim.

27    Further, Trejo denied at his deposition that Detective Razanskas made any such

28    statement. (SSUF #92-93.)

1    Similarly, Arthur Jones indicates that he was never told by Detectives Winn,

2    Razanskas, or any law enforcement officer that the police had "caught the suspects"

3    in the case.  Nor was he told that one of the persons that he had identified had been

4    shot in the leg, or any other confirming information. (SSUF #72-73.)  Again, even

5    assuming *arguendo* that Detectives said either of these things, which both Arthur

6    Jones and Detectives deny, Plaintiff alleges that these were said after Arthur Jones

7    contacted them and made a six-pack identification. These statements would neither

8    be considered abusive or coercive if made after an identification.

9    The circumstances here do not approach those high standards outlined in

10    *Stoot*, and Plaintiffs have failed to raise a genuine issue of fact that Defendants

11    knew or should have known that the witness statements and identifications in this

12    case were false based on the nature of their investigative tactics.

13    **IX.**    **PLAINTIFF'S CONSPIRACY TO COMMIT BRADY VIOLATIONS**

14    **& CONSPIRACY FOR FALSE EVIDENCE CLAIMS FAIL**

15    Plaintiff Anthony alleges that Defendants conspired to violate his rights

16    under *Brady* and conspired to use false evidence against him.[3] (Anthony's Coml. at

17    ¶¶ 137-140, 161-164.)  These claims must fail, as described below.

18    To establish a conspiracy under § 1983, plaintiff must prove two elements:

19    (1) that defendants had an "agreement or a meeting of the minds" during which

20    they agreed to violate his constitutional rights (*Franklin v. Fox*, 312 F. 3d 423, 441

21    (9th Cir. 2001)(internal citation omitted)); and (2) an actual deprivation of

22    constitutional rights.  Hart v. Parks, 450 F.3d 1059, 1071 (9th Cir. 2006)( internal

23    citation omitted). For purposes of summary judgment, this requires plaintiff to

24    "produce concrete evidence" of any agreement or meeting of the minds to violate

25    the plaintiff's constitutional rights.  *Radcliff v. Rainbow Constr. Co*., 254 F.3d 772,

26    782 (9th Cir. 2001); s*ee also*, *Henkle v. City of Clarksburg*, 81 F.3d 416, 421 (4th

27

28    ───────────────
[3] Plaintiff Cole does not bring such a claim.

Cir. 1996) (because a civil conspiracy is so easy to allege, plaintiffs have a weighty burden to prove it; it is not enough that conspiring officers know of an intended wrongful act, they had to agree to achieve it).

First, Plaintiffs' conspiracy claim is not actionable because there has not been an actual deprivation of the Plaintiffs' constitutional rights. *Woodrum v. Woodward County, Oklahoma,* 866 F.2d 1121, 1126 (9th Cir. 1989).

Second, there is no evidence of any meeting of the minds between the Detectives to conspire to deny Anthony or Cole their rights or use false evidence against them. Simply showing that Detectives Winn and Razanskas are partners is not enough to establish a conspiracy claim and there must be concrete evidence of an agreement. *Radcliff,* 254 F.3d at 772.

Because Plaintiffs have no evidence that there was an agreement to violate any rights, this claim should be dismissed.

## X.   PLAINTIFF CANNOT ESTABLISH SUPERVISORIAL LIABILITY

Anthony brings a claim for supervisorial liability.[4] Specifically, Anthony alleges that Detective Winn received minimal discipline, training and supervision, and that Detective Razanskas was on notice of her lack of experience and failed to take adequate steps to correct it through training or supervision. (Anthony's Coml. at ¶¶ 166-173.) However, not only do these claims lack merit, but there is no requisite causal connection here.

A supervisor is only liable for constitutional violations of his subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them. There is no respondent superior liability under section 1983. *Ybarra v. Reno Thunderbird Mobile Home Village*, 723 F.2d 675, 680-81 (9th Cir. 1984). In order to show a § 1983 violation for supervisorial liability, the plaintiff must show 1) the supervisor possessed the requisite culpable

---

[4] Plaintiff Cole does not bring such a claim.

1    state of mind, and 2) a causal connection between the supervisor's action or inaction

2    and the infliction of the alleged constitutional harm. *See. e.g., Redman v. County of*

3    *San Diego*, 942 F.2d 1435, 1446-47 (9th Cir.1991) (en banc), cert. denied, 502 U.S.

4    1074 (1992); *Sanders v. Kennedy*, 794 F.2d 478, 483 (9th Cir.1986).

5         Here, Plaintiff's characterizations regarding Detective Winn's lack of

6    experience are untrue.  Detective Winn had already been a detective before joining

7    the homicide division and developed detective skills through many different units.

8    (SSUF #149.)  Nor does Plaintiff have any evidence that Detective Winn needed

9    and/or failed to receive discipline before this case, or that such need for discipline

10   was caused to any claims in this case.

11        Further, the evidence demonstrates Detective Winn's thorough training.  For

12   example, Detective Winn was trained to turn over exculpatory evidence, and not to

13   make any suggestive remarks during identification. (SSUF #153, 162.)  Detectives

14   Winn and Razanskas discussed what to do at a crime scene, note-taking, talking to

15   witnesses, and writing reports.  Detective Razanskas provides trainees with

16   exemplars and let them review murder books of other investigations so that trainees

17   know what is expected. (SSUF #151.)  With respect to identifications, officers are

18   trained to place photos into six-packs with other photographs that are similar to the

19   suspect's hair style, facial hair and any facial anomalies such as scars or tattoos. In

20   1994-1995, photos were obtained from sources such as DMV, booking photos, and

21   indoor Polaroid photos. (SSUF #157.)  Detective Razanskas demonstrated this by

22   showing Detective Winn that photos need to be randomized in a line-up. For

23   example, not all suspects should be placed in window #1. (SSUF #152.)

24        Importantly, Plaintiffs cannot demonstrate that an alleged lack of training or

25   supervision actually <u>caused</u> a constitutional violation, which is required to state a

26   claim. *See Redman* 942 F.2d at 1435.  For example, Plaintiffs may argue that

27   Detective Razanskas should have known about the letter that Detective Winn wrote

28   requesting leniency for John Jones' pandering case.  However, they cannot show

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4847-5646-5696 v1          - 28 -          CV-11-3241-CBM-AJW
DEFTS' MSJ

1  that Detective Razanskas' lack of knowledge led to a constitutional violation.  The

2  evidence shows that Detective Winn wrote a letter per guidelines, and there was

3  nothing improper about this.  Further, this letter was placed in the Murder Book.

4  (SSUF #87.)  The attorneys received this letter, and were also able to use it to look

5  into John Jones' sentencing and send their investigators to the hearing.  (SSUF

6  #102.)  Further, they were able to cross examine John Jones about his pandering

7  case.  Therefore, even though Detective Razanskas did not know that Detective

8  Winn wrote this letter, no constitutional deprivation actually occurred.

9      Finally, while Plaintiffs contend that it was improper for Detective Winn to

10  be lead detective in this case, there was no policy or law prohibiting this.  The

11  evidence shows that Detectives Winn and Razanskas worked together as partners

12  and there are no specific incidents listed or known where Detective Razanskas

13  failed to properly supervise Detective Winn.

14  ## XI.    PLAINTIFFS CANNOT ESTABLISH MONELL LIABILITY

15      Plaintiffs allege that the City of Los Angeles is liable for the alleged

16  deprivation of their rights under *Monell*.  (Anthony's Coml. at ¶¶ 175-179; Cole

17  Compl. ¶¶ 60-64.)  This theory lacks merit.

18      There is no respondeat superior liability under section 1983.  *Monell v. New*

19  *York City Department of Social Services*, 436 U.S. 658, 694-95 (1978); *Tsao v.*

20  *Desert Palace, Inc*., 698 F.3d 1128, 1139 (9th Cir. 2012) (holding that private

21  corporations cannot be held for respondeat superior liability under section 1983).

22  Rather, the municipality or entity itself must cause the constitutional tort.  *City of*

23  *Canton*, *Ohio vs. Harris*, 489 U.S. 378, 387-89 (1989).  "It is only when the

24  execution of the government's policy or custom . . .  inflicts the injury" that a

25  government entity may be held liable under section 1983.  *Id*. at 385, quoting

26  *Monell, supra*, at 694.

27      In *Monell*, the Supreme Court held that municipalities are subject to liability

28  under section 1983, not "based on theories akin to respondeat superior," but on a

1   "fault-based analysis." *Oklahoma City v. Tuttle*, 471 U.S. 808, 818 (1985).  A city

2   is answerable under Monell when an official policy or custom causes the

3   complainant to suffer a deprivation of a constitutional right.  To hold a municipality

4   accountable, the plaintiff must establish that the official policy or custom itself is

5   "the moving force of the constitutional violation." *Monell, supra*, 436 U.S. at 694.

6           In order to recover against an entity under section 1983, plaintiff must either

7   prove: (1) an explicit wrongful government policy pronouncement, or (2) a pattern

8   of wrongful acts by government officials which are "so permanent and well-settled

9   as to constitute an unspoken custom or usage with the force of law."  *Monell, supra*,

10  436 U.S. at 691.  Here, there is no evidence that Plaintiffs can meet either standard.

11          It is undisputed that it is LAPD policy to hand over everything in the Murder

12  Book to the District Attorney and defense attorneys except sealed documents, such

13  as sealed warrants. (SSUF #155.)  It was also LAPD policy that once the Murder

14  Book was turned over, any subsequent investigation documents should also be

15  turned over to the District Attorney and defense. (SSUF #156.)

16          Further, Detectives are trained to conduct proper identifications and read

17  admonitions before showing witness six-packs. (SSUF #157-159.)  It is against

18  policy to tell the person that they made a correct or incorrect identification. (SSUF

19  #161.) It is also against LAPD policy to tap or make any suggestive hand gestures

20  or comments in order to try to influence an identification. (SSUF #162.)

21          It is against LAPD policy to conceal exculpatory and/or material evidence,

22  fabricate evidence or policy reports, influence witnesses, or violate the rights of

23  citizens. (SSUF ## 163-166.)

24          Finally, municipal liability based on a failure to train cannot be derived from

25  a single incident and here there is no pattern of problems that Plaintiffs contend

26  occurred in their case. *Oklahoma City*, 471 U.S. at 823.  Although Plaintiffs will

27  likely refer to the jail house informant scandal of the late 1980s as evidence the

28  problem was beyond a single incident, this case is distinctly different.

1    Notwithstanding the fact that there was a policy regarding handling informants in

2    1994/1995, this is irrelevant to this case as John Jones was not an informant.  Based

3    on what the Detectives knew, he was an eye-witness to this case; not someone who

4    was enlisted to help the LAPD gather information in exchange for leniency. (SSUF

5    #167.)  John Jones made statements and identified Anthony and Cole even before

6    the pandering case was brought against him.  Moreover, both the District Attorney

7    and defense attorneys had the information about John Jones' pimping and

8    pandering case.  They had the leniency letters, and they had received a court order

9    to obtain John Jones file, so the information was not concealed.

10          In sum, Plaintiffs have no evidence that there were any policies or lack of

11   policies which allegedly were the "moving force of the constitutional violation[s]"

12   alleged, and Plaintiffs' *Monell* claims should therefore be dismissed.

13   **XII.   <u>DEFENDANTS ARE ENTITLED TO QUALIFIFED IMMUNITY</u>**

14          Defendants have neither violated Anthony nor Cole's constitutional rights,

15   nor could they have recognized that their actions violated Anthony or Cole's

16   constitutional rights based on the law.  Defendants are thus entitled to qualified

17   immunity because they reasonably believed their actions were lawful and were not

18   on notice that their actions were unlawful.

19          **A.      The Standard for Finding Qualified Immunity.**

20          Qualified immunity shields an official from civil-damages liability unless his

21   conduct violated clearly established law, of which a reasonable official would have

22   known.  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Thus, officials are

23   afforded "ample room for mistaken judgments by protecting all but the plainly

24   incompetent or those who knowingly violate the law."  *Hunter v. Bryant*, 502 U.S.

25   224, 229 (1991) (internal quotes and citation omitted).  Qualified immunity applies

26   to mistaken judgments, regardless of whether the officials make a mistake of law,

27   fact, or some combination.  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

28          Constitutional requirements are not always clear-cut at the time that action is

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4847-5646-5696 v1          - 31 -          CV-11-3241-CBM-AJW
DEFTS' MSJ

1   required by officials.  *Saucier v. Katz*, 533 U.S. 194, 205-06 (2001).  But qualified

2   immunity ensures that officials are on notice that their conduct is unlawful before

3   they are subjected to suit.  *Id.*  It, therefore, prevents officials from being distracted

4   from their governmental duties or inhibited from taking necessary discretionary

5   action.  *Harlow*, 457 U.S. 800 at 816.  It also prevents "deterrence of able people

6   from public service."  *Id.*  In prisons, it allows officials to use their expertise to

7   maintain order without fear of liability for doing what seemed "reasonable" at the

8   time.  *Jeffers v. Gomez*, 240 F.3d 845, 860 (9th Cir. 2001).

9        In *Saucier v. Katz*, the Supreme Court explained that an official is entitled to

10   qualified immunity unless:  (1) the plaintiff alleged facts showing a constitutional

11   violation and (2) it was clearly established, at the time, that the conduct was

12   unconstitutional.  *Saucier v. Katz*, 533 U.S. at 201.  "If no constitutional right

13   would have been violated were the allegations established, there is no necessity for

14   further inquiries concerning qualified immunity."  *Id.*  Under the second prong, the

15   inquiry is as to whether the right was clearly established, meaning that the contours

16   of the right were sufficiently clear that a reasonable official would understand that

17   what he is doing violates that right.  *Id.*  The dispositive inquiry is "whether it

18   would be clear to a reasonable officer that his conduct was unlawful in the situation

19   he confronted."  *Id.*  "If the officer's mistake as to what the law requires is

20   reasonable, ... the officer is entitled to the immunity defense."  *Id.*  at 205.  Courts

21   have discretion to decide which prong of the qualified immunity analysis to address

22   first in light of the circumstances in each case.  *Pearson*, 555 U.S. at 236.

23        **B.    Plaintiffs Cannot Show Defendants Violated a Constitutional**

24               **Right or Knew That Their Conduct was Unlawful**

25            **1.    Expended Bullet Slugs**

26        Detectives Winn and Razanskas are entitled to qualified immunity with

27   respect to Plaintiffs' allegations regarding turning over the expended bullet slugs

28   that were found on the rooftop of John Jones building because there was no clearly

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4847-5646-5696 v1          - 32 -          CV-11-3241-CBM-AJW
DEFTS' MSJ

1  established law indicating that law enforcement had to turn over evidence that they

2  thought was neither material nor exculpatory.

3      Detectives Winn and Razanskas thought the expended bullets that they found

4  on the roof looked older because they were weathered and oxidized.  Detectives

5  Winn and Razanskas did not believe that the slugs appeared like projectiles or

6  bullets that had been recently fired. (SSUF #29.) Detective Razanskas has a great

7  deal of experience with firearms both through his position in LAPD, his experience

8  in the military, and through personal hunting and experience at the range firing

9  different types of weapons.  He is able to tell the difference between an expended

10  casing and an expended bullet.  (SSUF #33.)  Similarly, Miles Corwin believed that

11  the expended bullet slugs were not connected with the shooting from the previous

12  day because they were all rusty and covered with dirt and debris. (SSUF #30.)

13      As explained above, based on their initial investigation of the Gonzales

14  homicide, Detectives Winn and Razanskas did not believe there was a suspect on

15  the roof shooting. (SSUF #31.)   If Detective Winn or Razanskas thought there was

16  any evidentiary value to the expended bullet slugs, they would have documented

17  this as evidence, and it would have been turned over in the investigation. (SSUF

18  #35.)  However, because Detective Razanskas did not believe that the expended and

19  oxidized bullet slugs had any evidentiary value, he gave them to Miles Corwin as a

20  souvenir. (SSUF #36.)  As Detective Razanskas explained, there is simply no

21  reason that he would give a Los Angeles Times reporter something if he thought it

22  was material evidence in a case.  Doing so would be unwise in terms of solving the

23  case and also threaten his job. (Decl. Raznaskas ¶ 36.)  It was still early on in the

24  investigation and there was no reason why the detectives would not take advantage

25  of every possible lead.

26      Based on the evidence known at the time, a reasonable officer could have

27  believed that the expended bullet casings were neither material nor exculpatory, and

28  thus did not believe that it was necessary to enter these items into evidence.

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4847-5646-5696 v1                    - 33 -                    CV-11-3241-CBM-AJW
DEFTS' MSJ

## 2.   John Jones' Testimony

Detective Winn would also be entitled to qualified immunity because a reasonable officer in her position would not think that she was required to "correct" John Jones' testimony as to whether he received special treatment when 1) it was debatable whether Jones was actually lying about receiving a deal, and 2) both the District Attorney and the criminal defense attorneys had all of the same information that Detective Winn knew, and perhaps more information.

Whether John Jones actually received special treatment in his pandering case in exchange for his testimony was debated at length both during bench conferences and in front of the jury. The argument could be made, and indeed was made by District Attorney Castello, that he did not receive a benefit because John Jones gave his description and made his identifications. (SSUF #98.) Conversely, Thomason argued that Jones' credibility was an issue. Thomason said that he believes that he made it clear to jury what the minimum/maximum sentence John Jones was facing based on his pandering charge, and he made it clear to the jury that LAD had requested leniency. (SSUF #107.)

It is not the police's duty to be a lawyer in a criminal case or know the contours of how the sentence was reached in John Jones' pandering case. Instead, it was the police's duty to provide information regarding Jones' case, which is what they did. As the Court held in *Jean v. Collins*, 221 F.3d 656 (4th Cir. 2000)(en banc), police officers are not lawyers:

> "[T]he prosecutor must ask such lawyer's questions as whether an item of evidence has 'exculpatory' or 'impeachment' value and whether such evidence is 'material'. It would be inappropriate to charge police with answering these same questions, for their job of gathering evidence is quite different from the prosecutions task of evaluating it. This is especially true because the prosecutor can view the evidence from the perspective of the case as a whole while police officers, who are often involved in only one portion of the case, may lack necessary context. To hold that the contours of the due process duty applicable to the police must be identical to those of the prosecutor's Brady duty would thus

improperly mandate a one-size-fits-all regime."

Detective Winn's job with the LAPD was to investigate this case, not to be a lawyer cross-examining John Jones at trial. Because Detective Winn did not know any more about John Jones' pandering sentence than any of the defense attorneys or District Attorneys, an officer in Detective Winn's situation would believe that it was not necessary to "correct" John Jones' testimony.

### 3.    Arthur Jones Identification

Plaintiffs allege that Detectives withheld Arthur Jones' second identification (Card B), where he selected a filler. However, there is no evidence that they knowingly withheld the identification. It is undisputed that Arthur's Jones' second identification is in the current copy of the Murder Book. (SSUF #69.) If Detectives Winn or Razanskas wanted to conceal that witnesses selected a filler, it makes no sense that they would put Arthur Jones' misidentification back into the Murder Book. Nor would make sense that the Detectives would remove Arthur Jones' card with a misidentification, and would not remove Carol Canty Jones' misidentification from the Murder Book. (SSUF #65.) Copies of the Murder Book were made for the District Attorney and defense attorneys for the Gonzales homicide case, and it was always Detective Winn's intention that the lawyers received the entire Murder Book and all exculpatory evidence. (SSUF #146.)

Further, Detectives Winn and Razanskas are entitled to qualified immunity because they would not be on notice during 1994-1995 that they could be held liable for an unintentional mistake. The Ninth Circuit did not reject the bad faith standard for *Brady* claims against law enforcement until the 2009 case, *Tennison v. City and County of San Francisco*, 570 F.4d 1078 (9th Cir. 2009.)

### 4.    John Jones' Daughters

Detectives Winn and Razanskas are entitled to qualified immunity because they did not improperly conceal that John Jones' daughters were witnesses. Carol

1   Canty Jones indicates that she was with her daughters and they never saw anything.

2   (SSUF #60.)  Further, there is no evidence that Carol Canty Jones, John Jones, or

3   the daughters themselves told the detectives that they were eyewitnesses who

4   relayed information.  (SSUF #17.)

5          Plaintiffs may point to the fact that more than a decade later, John Jones'

6   daughters testified at Anthony's evidentiary hearings that they were percipient

7   witnesses and saw a Hispanic man shoot and kill Gonzales. In addition to the fact

8   that there is no corroboration to this far-fetched story, as every other witness

9   indicates that the suspects were black males, there is no evidence that this was

10  known at the time of the 1994-1995 investigation.  Based on what Detectives knew

11  at the time, they did not conceal anything about John Jones' daughters.   Thus, the

12  Detectives reasonably believed their actions were lawful.

13              **5.      MLK Safety Officers and Medical Staff**

14         With respect to LA Safety Police Officers Brock and Wilson and the nurse at

15  MLK hospital, Detectives Winn and Razanskas are entitled to qualified

16  immunity.  Even assuming that Officers Brock and Wilson were shown six-packs

17  and could not identify anyone, Detectives Winn and Razanskas would not think this

18  was exculpatory because neither Officer said that they remembered enough to make

19  an identification. (SSUF #70.)  Further, there is no evidence that Winn showed the

20  six-pack to any nurse.  Thus, the fact that they did not make an identification would

21  be of no consequence. The jury was not told that additional witnesses made

22  identifications, nor was it implied.  In fact, when questioned about it, Detective

23  Winn testified at trial that no other officers could make identifications. Thus, the

24  Detectives would not have been on notice that their actions were unlawful.

25              **6.      Gang Monikers**

26         As articulated more fully above, there is no evidence that either Detective

27  Winn or Detective Razanskas found the list of names for every person who went by

28  the name "Baby Day" or "Baby Day Day," and then failed to disclose this

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4847-5646-5696 v1                      - 36 -                      CV-11-3241-CBM-AJW
                                                                       DEFTS' MSJ

1  information to the defense.  Even if Plaintiffs argue that the detectives should have

2  looked up every Baby Day or Baby Day Day, or investigated 53 Avalon Crips,

3  negligent investigation is not enough to establish a *Brady* violation.  *See Daniels,*

4  474 U.S. 327.  Therefore, the Detectives would not be on notice that they violated

5  Plaintiffs rights with respect to investigating the anonymous tip.  Defendants Winn

6  and Razanskas were entitled to qualified immunity for their actions.

7  **XIII.  CONCLUSION**

8        For the foregoing reasons, Defendants are entitled to summary judgment.  As

9  an initial matter, Cole's claims are barred by collateral estoppel.  Plaintiffs also

10  have insufficient evidence to demonstrate that Defendants violated *Brady* by

11  concealing exculpatory or material evidence, improperly influenced identifications,

12  falsified evidence, or conspired to do any of these things.  Further, Defendants are

13  not liable for supervisory liability or *Monell*.  Finally, Defendants are entitled to

14  qualified immunity in this case because they reasonably believed that their actions

15  were lawful.

16

17  Dated:  December 8, 2014          BURKE, WILLIAMS & SORENSEN, LLP

18

19                                   By:   /s/ Susan E. Coleman
                                          Susan E. Coleman
20                                        Kristina Doan Gruenberg

21                                   Attorneys for Defendants
                                     CITY OF LOS ANGELES, P.
22                                   RAZANSKAS AND M. WINN

23

24

25

26

27

28

Burke, Williams &
Sorensen, LLP
Attorneys At Law
Los Angeles

LA #4847-5646-5696 v1                    - 37 -              CV-11-3241-CBM-AJW
                                                            DEFTS' MSJ