MARILYN E, BEDNARSKI (No. 105322)
DAVID S. McLANE (No.124952)
CAITLIN S. WEISBERG (No. 262779)
mbednarski@kmbllaw.com
KAYE, McLANE, BEDNARSKI & LITT, LLP
234 East Colorado Boulevard, Suite 230
Pasadena, California 91101
T: (626) 844-7660; F: (626) 844-7670

Attorneys for Plaintiff Obie Anthony, III

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| REGGIE D. COLE,<br><br>          Plaintiff,<br><br>     v.<br><br>CITY OF LOS ANGELES et al.,<br><br>          Defendants.<br>――――――――――――――<br>OBIE S. ANTHONY, III,<br><br>          Plaintiff,<br><br>     v.<br><br>CITY OF LOS ANGELES et al.,<br><br>          Defendants.<br>――――――――――――――<br>OBIE S. ANTHONY, III,<br><br>          Plaintiff,<br><br>     v.<br><br>COUNTY OF LOS ANGELES, et al.,<br><br>          Defendants. | CASE NO. CV 11-03241-CBM (AJWX)<br>[COLE ACTION]<br><br>CASE NO. CV 12-01332-CBM (AJWX)<br>[ANTHONY CITY ACTION]<br><br>CASE NO. CV 13-07224-CBM (AJWX)<br>[ANTHONY COUNTY ACTION]<br><br>[HONORABLE CONSUELO B. MARSHALL]<br><br>PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT  AND/OR SUMMARY ADJUDICATION OF ISSUES OF WHETHER CERTAIN IDENTIFIED INFORMATION ALLEGEDLY WITHHELD WAS EXCULPATORY AND MATERIAL UNDER THE STANDARDS OF *BRADY V. MARYLAND;* MEMORANDUM OF LAW IN SUPPORT THEREOF [FILED CONCURRENTLY WITH SEPARATE STATEMENT OF UNDISPUTED FACTS; DECLARATIONS; EXHIBITS; (PROPOSED) ORDER]<br><br>Hrg. Date/Time:   Jan. 13, 2015, 1:30<br>Trial Date:          Feb. 24, 2015 |

1

2    TO THE HONORABLE COURT AND ALL PARTIES:

3          PLEASE TAKE NOTICE that on the above date and time, in the above

4    referenced Court, Plaintiff Obie Anthony will move for partial summary judgment

5    and/or summary adjudication of issues on two specific Brady violations alleged in

6    the Complaint against Defendant City of Los Angeles and Defendants Marcella

7    Winn and Pete Razanskas. This motion is based on the attached memorandum of

8    points and authorities, and separately but concurrently filed statement of

9    undisputed facts, Exhibits and Declarations of Bednarski and Fant. A proposed

10   order is separately filed.

11                                      KAYE, McLANE, BEDNARSKI & LITT, LLP

12

13   DATED: Dec. 8, 2014          By /s/ Marilyn E. Bednarski_____

14                                      MARILYN E. BEDNARSKI

15                                      Attorneys for Plaintiff Obie S. Anthony, III

16

17

18

19

20

21

22

23

24

25

26

27

28

1

TABLE OF CONTENTS

2

MEMORANDUM OF POINTS AND AUTHORITIES

3

I.      PRELIMINARY STATEMENT ......................................................................1

4

II.     STATEMENT OF FACTS .............................................................................2

5

    A.      Summary of Prosecution Case in Chief...............................................2

6

    B.      Eyewitnesses Trejo, J. Jones & A. Jones.............................................2

7

        1.  Mr. Trejo..................................................................................2

8

        2.  Mr. John Jones.........................................................................4

9

        3.  Mr. Arthur Jones......................................................................7

10

    C.      The Defense Case ...............................................................................8

11

    D.      Post Conviction Discovery of the Evidence of the Bullets on the Roof
        and Arthur Jones Identification of a Filler. ..........................................8

12

13

        1.  Bullets on the Roof ..................................................................8

14

        2.  The Arthur Jones Six Pack Identification Of a Filler
            In the Cole Photospread. .......................................................12

15

        3.  Ballistics Analysis .................................................................12

16

        4.  Information Learned Post-Conviction from Other Witnesses. .......13

17

III.    DEFENDANTS KNEW AND FAILED TO PROVIDE TO THE
    PROPER PROSECUTORIAL AUTHORITIES THE SUPPRESSED

18

    INFORMATION OF THE EVIDENCE ON THE ROOF AND THE

19

    ARTHUR JONES IDENTIFICATION OF A FILLER, AND THEIR

20

    ACTIONS VIOLATED *BRADY V. MARYLAND* BECAUSE
    INDIVIDUALLY AND COLLECTIVELY,  THAT INFORMATION

21

    WAS EXCULPATORY AND MATERIAL. ..................................................14

22

    A.      Evidence That Jones Or Someone In His Building Was Shooting

23

        From The Rooftop Using The Same Weapon That Shot The Bullet

24

        Booked Into Evidence As Item #11Was Exculpatory and Material. ....15

25

        1.  The Evidence from the Roof Was Not Disclosed. ...........................15

26

        2.  The Evidence from the Roof was Exculpatory. ...............................16

27

        3.  The Evidence from the Roof was Material Collectively and
            Individually Because it Undermined the Prosecution's Theory, Cast

28

            Doubt on the Integrity of the Investigation and Impeached John
            Jones. ...................................................................................17

i

B.    Evidence of the Undisclosed Arthur Jones Identification of a
      Filler Was Exculpatory and Material ....................................................19

      1. Arthur Jones Identification of a Filler Was Not Disclosed ..............20
      2. Arthur Jones Identification of a Filler Was Exculpatory .................20
      3. Arthur Jones Identification Of a Filler Was Material Because
         It Was Affirmative Identification Evidence and
         Impeached Arthur Jones ..................................................................22

IV.   CONCLUSION...............................................................................25

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Benn v. Lambert*
283 F.3d 1040 (9th Cir. 2002) ..................................................... 18,24

*United States v. Blanco*
392 F.3d 382 (9th Cir. 2004) ........................................................ 20

*Brady v. Maryland*
373 U.S. 83 (1963)................................................................ passim

*Carriger v. Steward*
132 F.3d 463 (9th Cir. 1997) ....................................................... 25

*Giglio v. United States*
405 U.S. 150 (1972).............................................................. 20,24

*D'Ambrosio v. Bagley*
2006 WL. 1169926 (N.D. Ohio 2006).............................................. 18

*Simms v. Cupp*
354 F. Supp. 698 (D. Oreg. 1972) ................................................. 24

*Hernandez v. City of El Paso*
2009 WL. 2096272 (W.D. Tex. 2009) ............................................. 25

*Hovey v. Ayers*
468 F.3d 892 (9th Cir. 2006) ....................................................... 14

*Kyles v. Whitley*
514 U.S. 419 (1995)............................................................... 24,25

*Lindsey v. King*
769 F.2d 1034 (5th Cir. 1985) ..................................................... 25

*Montgomery v. Bagley*
581 F.3d 440 (6th Cir. 2009) ..................................................... 19,25

*Paradis v. Arave*

iii

130 F.3d 385 (9th Cir. 1997) ........................................................... 18

*Robinson v. Cain*
   501 F. Supp. 2d 399 (E.D. La. 2007).......................................... 19,22

*Singh v. Prunty*
   142 F.3d 1157 (1998) ................................................................. 25

*Smith v. Almada,*
   640 F.3d 931 (9th Cir. 2011) ..................................................... 14

*Strickler v. Greene,*
   527 U.S. 263 (1999)............................................................... 14, 24

*Tennison v. City & County of San Francisco,*
   570 F.3d 1078 (9th Cir. 2009) ................................................... 14

*United States v. Bagley*
   473 U.S. 667 (1985)................................................................... 24

*United States v. Brownlee*
   454 F.3d 131 (3d Cir. 2006) ...................................................... 25

*Watkins v. Sowders*
   449 U.S. 341 (U.S. 1981) .......................................................... 25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    PRELIMINARY STATEMENT**

     This motion is made in the context of the civil case filed against the City of Los Angeles and two individual Los Angeles Police Department "LAPD" police detectives.  The lawsuit alleges amongst other things that the City through its Detectives deprived these plaintiffs of their rights to due process of law and deprived them of a fair trial by, among other acts, suppressing and failing to disclose to the prosecutor in the case material exculpatory information.  Messrs. Anthony and Cole were convicted by jury in 1995 and sentenced to life in prison without parole.  After serving 17 and 15 years respectively, their writs of habeas corpus were granted by two independent Superior Court judges.

     After consultation with defendants in compliance with Local Rule 7-3, Plaintiff Obie Anthony brings this motion for partial summary judgment on issues in this case related to *Brady v. Maryland*, 373 U.S. 83 (1963).  This motion seeks to have the court determine that certain, specified pieces of information that we contend were withheld from the Anthony/Cole prosecutors were exculpatory and material under *Brady*.  These are pure legal issues, as there are no disputed facts regarding their existence, their non-disclosure, their exculpatory nature, or their materiality.  This motion does not seek summary judgment as to whether the non-disclosure was done with reckless indifference to the rights of the plaintiff.

     Specifically, Plaintiff seeks a determination that the below listed items were not disclosed and were exculpatory and material information that had to be provided to the defense before trial.

1)    The suppression of the Arthur Jones six pack identification from Card B (OSA 07094-95) ["A. Jones Card B ID"]; and,

2)    The suppression of the rooftop visit by Detectives Winn and Razanskas on March 28, 1994 during which the detectives saw the roof littered with bullets

1

and casings, and Razanskas collected six bullets from the roof, pocketed them and later gave them to reporter Miles Corwin ["Rooftop Bullets"].

## II.    STATEMENT OF FACTS

### A.    Summary Prosecution Case in Chief

At 11:30 p.m. on March 27, 1994, three African American men tried to rob Victor Trejo and Luis Jimenez and killed Felipe Gonzalez. The emergency medical responders found Gonzalez dead at the scene, lying face down on the street, with blood underneath him and no bloody trail. [Trial Test. Gould, OSA 1599-1600] The Coroner autopsy report indicates that the shot that killed Gonzalez traveled through his body from back to front at a 40° descending angle. [Depo. Exh. 14, OSA 9924] It was the prosecution's theory that Obie Anthony and Reggie Cole were two of the three assailants who tried to rob Trejo and Jimenez and killed Gonzalez. According to the prosecution's theory, Anthony was the one who opened the passenger door and shot Trejo and Jimenez; Cole was the one who attacked and killed Gonzalez. The evidence of culpability presented in the prosecution's case-in-chief consisted, virtually in its entirety, of the eyewitness testimony of three individuals, Trejo, John Jones and Arthur Jones. There was no physical evidence linking Anthony or Cole to the homicide. Castello Depo. 86-93.

### B.    Eyewitnesses Trejo, J. Jones & A. Jones

Each of the three eyewitnesses, Victor Trejo, John Jones and Arthur Jones, was significantly discredited, both at trial and in later post-conviction hearings.

### 1.    Mr. Trejo

Victor Trejo was 17 years old at the time of the assault. Decl. Trejo, Depo. Exh. 168, ¶3. Through the evening hours, Trejo, Jimenez and the decedent Gonzalez had been drinking and eating. They stopped outside Jones' brothel so Gonzalez could see if Melinda a prostitute he knew, was there. *Id.* Trejo and Jimenez waited in the car with the engine running, parked at the curb next to

Jones's two story building.  *Id.* Jimenez was sleeping in the passenger seat when the robbers came up.  He could not identify anyone and was not a witness at trial.

Trejo, the driver, through the rear view mirror saw the assailants surround his friend Gonzalez. [Decl. Trejo, Depo. Exh. 168, ¶4]  One of them pushed Gonzalez up against the back of the car and hit him in the head with a gun.  *Id.* Another opened the passenger door and yelled at them to give him all their money. [Decl. Trejo, Depo. Exh. 168, ¶5] This assailant grabbed Jimenez by the hair and unsuccessfully tried to pull him out.  [*Id*] The assailant pulled a gun from his waistband and started firing at Trejo and Jimenez, shooting both multiple times. [*Id*] Trejo gunned the engine, drove off and saw in his rear view mirror as he was driving, Gonzalez running away from the robbers towards Trejo's car, was then shot in the back, and fell to the ground.  [*Id.*at ¶6; Trejo Depo. 86:4-25]

Trejo was first interviewed three months after the attack, and was shown the photospread containing Anthony in position 1 in Card A.  He identified Anthony as "looks like the suspect who opened the car door and shot me and Luis." [Depo. Exh. 37, OSA 9980, 10735 ]  He was also shown the photospread Card B containing Cole, and could not identify anyone in it. [Trejo Trial Test. OSA 1511-12]  At a live lineup he first viewed a group of people with Anthony, and could not make an identification of Anthony.  [Depo. Exh 45; Trejo Trial Test. OSA 1515, 1533]  When he looked at the group of people with Cole, he identified number 4, not Cole, who was in position Number 5. [Depo. Exh 45; Trejo Trial Test. OSA 1514]  He testified at the preliminary hearing that he was sure that the person he picked in Cole's lineup, the person in position number 4, was Cole.  *Id.*  At the preliminary hearing, with both Anthony and Cole dressed in orange jail jumpsuits, Trejo identified them both as the suspects.  [Preliminary Hearing Transcript, OSA 1262]

At trial Trejo identified Anthony as the man that grabbed Jimenez through the door, and Cole as the man who was hitting and grabbing Gonzalez. [Trejo Trial Test. OSA 1479-1482] He testified that at the preliminary hearing he had doubted his selection of Anthony's picture because he could not remember the person very clearly, it happened very quickly, he was concerned about being killed, and it was dark. [Trejo Trial Test., OSA 1531-1532] To this day, the only person he is sure of being there that night is the person in position 4 of the Cole lineup, who is not Cole. [Decl. Trejo, Depo. Exh. 168, ¶12, ¶15]

## 2.    Mr. John Jones

John Jones lived in and managed the house of prostitution in front of which Gonzalez was murdered. He testified in the trial that he was in the hallway of his building when the first shots were fired, and after his wife told him there was a robbery going on outside, he went to look out the bathroom window. [Trial Test. Jones, OSA 1640] He saw the car driving away. [OSA 1641-43] Anthony and Cole shot at him as they fled down the street. [OSA 1643] He testified that a third shooter was on the street shooting at the fleeing suspects and that one went down, and may have been shot.

Mr. Jones was interviewed three times by detectives Winn and Razanskas, first for a short time – five to six minutes – within a few hours of the murder, next later in the day on March 28 for about five minutes, and lastly on March 31 for 30-45 minutes. [OSA 1860, 1865, 1871, 1885; Winn trial Test., p. 455:9-25; 460:19-28; 466:13-20; 480: 19-26 ] In the detectives' documentation, Jones' recounting of the events of the night was presented as though he was a percipient witness to those details. In the middle of Jones' cross-examination during trial he disclosed that much of the information in his earlier statements to the detectives was actually the amalgamation of what he had been told by other supposedly percipient witnesses. [Jones Trial Test., OSA 1676, 1684,1685] Those included his

daughters- Angela, then 7, and TJ, then 9 – his "wife", Carol Canty, and others "in the neighborhood." [Jones Trial Test., OSA 1685] Detective Winn acknowledged Jones told her that his account was based on what he had learned from others but she failed to disclose that fact, either in her interview reports or otherwise. [Winn Trial Test. OSA 1888, 1904, 1920, 1921]

During the mid-morning of March 28, 1994, the Detectives returned to the crime scene and met with Jones. The Detectives Chronological record of events reflected that they had met with Jones who had given them a videotape. Depo. Exh. 1, OSA 2. The Preliminary Investigation Report did not reference any trip to the roof. Depo. Exh. 13, OSA 016. That rooftop visit and the observations and collection of bullets only became known years after the convictions. [Below §§D1]

On May 26, 1994, two months after the Gonzalez homicide, Jones was arrested on pandering and pimping charges relating to his running the house of prostitution. The LAPD VICE division had been investigating him for months and had amassed substantial evidence of his operation including surveillance, statements from prostitutes who lived and worked in the building, statements from a "John," and vast documentary evidence seized from a search of the Jones' building on May 26, 1994. The search also uncovered a .357 caliber Magnum handgun on the second floor in a bedroom next to a bed, which floor Jones controlled, worked and lived with his family. [Depo. Exh. 70, OSA 6385-402]

If the detectives had reviewed Jones' arrest report, they would have learned about the 357 caliber Magnum handgun recovered from Jones's residence. In any event, Winn was on notice that Jones owned a gun because he testified at the preliminary hearing that he had a weapon. [Preliminary Hearing Transcript, John Jones Test., OSA 1338] In addition, both detectives were on notice of the existence of weapons in the building from viewing the building's surveillance video which appears to show a weapon passed from one security guard to another

employee inside the Jones building immediately after the shooting occurred. [Depo. Exhibit 101a, Video Still Shot]  At trial John Jones testified he had a gun that night, but denied shooting it. [Trial Test. Jones, OSA 1702].

John Jones had a prior criminal record, including felony convictions for manslaughter and pandering. The new charges, filed in late May, 1994, carried a mandatory prison sentence of six years which doubled if the strike prior was proven to 12 years.  [Chun Depo. 70-73]  The LAPD wrote letters seeking leniency on Jones' behalf, the first letter written 9/8/94, four days before Jones testified in the preliminary hearing in this case [Depo. Exh 74]; the second letter written 10/12/94 [Depo. Exh 75] shortly after which Jones' plead guilty pursuant to a DA settlement agreement. [Depo. Exh 77]  The DA struck his prior serious felony allegation, and allowed Jones to plead charges which did not require a prison sentence. [Chun Depo 169-173; Depo. Exh 80].  Jones was sentenced to probation with no jail time.  [Chun Depo. 205-206; Depo. Exh. 79]  On cross-examination, Jones denied receiving special treatment on his pandering case ." [Jones Trial Test., OSA 1666].  He testified that after his arrest he asked Detective Winn for help and she told him she could not help that there was nothing she could do. [Jones Trial Test., OSA 1690]  Detective Winn testified that she told him she could not offer any help.  [Winn Trial Test., OSA 1880]  In his rebuttal argument, DA Castello argued that defense counsel Thomason's argument was not true that Jones was testifying and providing information because he wanted the LAPD's help in his own case.  [Trial Closing Argument, OSA 2544]. He argued to the jury that Jones was simply a percipient witness.  [*Id.* at OSA 2541-43][1]

---

[1] While it is not the subject of this motion, the Complaint against the County alleges that the County of Los Angeles is liable for the suppression of this *quid pro quo* deal, because the customs, policies, and practices of the County Defendants were a moving force behind the suppression of exculpatory impeachment

### 3.    Arthur Jones

Arthur Jones worked as a Safety Police Officer at Martin Luther King "MLK" hospital. He responded to the injury alert that Detective Winn put out to area hospitals to look out for a person seeking treatment for a gunshot wound to the leg. [Depo. Exh. 16]  Arthur Jones advised Winn on March 31, 1994 that he had seen suspects who matched the description on the broadcast come to MLK seeking treatment. Depo. Exh 1, Chronological Record, OSA 0002a.

Three months later on June 24, 1994, Detective Winn went to Martin Luther King Hospital to interview Arthur Jones and show him the photospreads she created.  [Depo. Exh 49, OSA 9965]  Her follow-up investigation report stated that she showed Arthur Jones Card A (Anthony, position 1), Card B (Cole, position 2) which and Card C (Miller[2]), that he viewed the photographs and identified number one as the one who looked like he came for treatment for his left leg.  [Depo. Exh. 49, OSA  9965]  Arthur Jones circled and initialed the picture of Obie Anthony and filled out an identification report and wrote in his report that:

> "Number one the one who come [sic] close to look like subject, who came MLK Hospital for medical treatment to left leg He did not receive treatment [sic] because he was ask how did he obtain his injury. He left location."

[Depo. Exh. 35, OSA 9982-83]  That identification report and initialed copy of the photospread Card A was included in Detective Winn's Murder Book and provided to defense counsel in discovery.  No other Arthur Jones identification report was produced pretrial to the defense.  [Thomason Depo. 208, 210; Tom Depo. 120]

The murder book in two other places referenced Arthur Jones being shown photographs, but made no reference to A. Jones making any other identification. [Chron Notes Depo. Exh. 1, OSA 0003; Depo. Exh. 49, p. OSA 9965]. At trial

---

information relating to John Jones' deal, in violation of Brady.  Complaint, CR 1, Case No. CV 13-07224-CBM (AJWx) [Anthony County Action].

[2]    Mr. Miller was the third co-defendant charged in the alleged carjacking counts involving victim Santana, which were dismissed midtrial.

Arthur Jones identified Anthony as the man who came in seeking help for his friend's injured leg and Cole as the man who came into MLK with Anthony. [Trial Test. A. Jones, OSA 1814]  He explained that he did not identify Cole before in the photos because he had a hat on his head.  *Id.* at OSA 1815.  A. Jones testified at trial that he picked them both out at the live lineups and he identified them in court as the two people he had seen come into MLK. [OSA 1815-1818]

   C.   **The Defense Case**

Both Messrs. Cole and Anthony presented alibi defenses to the murder.  Mr. Anthony testified that he did not kill Mr. Gonzalez or rob the others.  [Trial Test. Anthony, OSA 2178-79] He explained that he was not there, but was home sick. *Id.* He testified that he had been at Damon Josephs' 21st birthday party the night before and had gotten very drunk.  [OSA 2172-3, 2193] The next day he was home sick in bed.  [*Id.*] Several witnesses, including Mr. Anthony, testified about him being sick and home the next day and night on March 27.  [Trial Test. Anthony OSA 2172, Williams OSA 2244-48, Alexander OSA 2259]  One defense witness, Undra Williams, said he recalled helping Mr. Anthony move some furniture during that Sunday from an apartment.  [Trial Test. Williams, OSA 2249-50] Anthony denied knowing Cole  and denied that he went by the name Day Day.  [Trial Test. Anthony, OSA 2176, 2187]  He was impeached by evidence that he had a tattoo "Day Day 2" on his arm [OSA 2192-93] and by witnesses the prosecution called in rebuttal who said Cole and Anthony knew each other and Anthony went by Day Day.  [OSA 2300-2301]

Mr. Cole was also very sick, and his family members recalled him being home, watching TV and taking medicine on March 27.  [Trial Test. T. Cole OSA 2139, Cush 2044, S. Cole 2064-66]

   D.   **Post-Conviction Discovery of the Evidence of the Bullets on the Roof and Arthur Jones Identification of a Filler**
   1.   **Bullets on the Roof**

8

The LAPD detectives' investigation was marked by two very unusual facts. Winn had been with the LAPD several years and had been a detective in other divisions, but this was her first homicide investigation as a homicide detective trainee. [Winn Depo 120-122,137-138] She was partnered with Detective Razanskas. Winn was the primary detective and wrote most of the reports which Razanskas, as her supervisor, he signed off on. [Razanskas Depo. 129-130]

Another unusual fact was that Miles Corwin, an investigative journalist for the Los Angeles Times followed the detectives on their investigation of this and four other homicide cases from March – September 1994. Depo. Winn 120-122. They knew he was writing a book which was published in 1997. [Excerpt Book *The Killing Season* Depo. Exh. 95; Depo. Winn 140]

Corwin is now a tenured professor U.C. Irvine where he teaches immersion journalism, the work he was doing when he was following the detectives. [Corwin Depo. 25-27] He described in the source notes for the book that it "was a work of nonfiction; no names have been changed; no incidents have been altered." [Depo. Exh 95, OSA 3015, Corwin Depo. 81-82]

For the first time, when the book was published, the information came to light that Detectives Winn and Razanskas visited the roof of John Jones' building on March 28, 1994, and found and collected six bullets there.[3] [Excerpted pages from the Corwin Book *The Killing Season*, Excerpt Depo. Exh. 95, OSA 2698-99] Corwin describes the trip to the rooftop:

---

[3] In the depositions of Winn and Razanskas in this case, Winn testified that the rooftop was littered all over with bullets and casings. [Depo Winn 338-343] Razanskas testified that they saw scattered debris including expended bullets. [Depo Razanskas 42-45] Detective Razanskas picked up six of these expended bullets, did not book them into evidence, and gave them to Miles Corwin. Corwin kept them at his home until 2014 when Plaintiffs' counsel discovered by subpoena issued prior to his deposition that he had the six bullets from the roof. [Corwin Depo., 136:1-141:15; Razanskas Depo., 42:6-45:17] Decl. Bednarski ¶8.

1    "He [Jones] takes them onto the roof for a better view of the murder scene. .
2    . . Razanskas finds six rusty slugs on this roof within a few minutes and
     pockets them.
3    Jones walks to the edge of the roof, looks down at the spot
4    where Gonzales was shot and says, 'It was cold, man. Those
     some cold dudes.'"
5    Corwin then describes how Jones takes the detectives downstairs where he
6
     shows them a video tape that they watch in his VCR showing the victim Gonzalez
7
     coming to the door, being told his friend is not home, leaving and then voices and
8
     shots are heard.  [Excerpt Depo. Exh. 95, OSA 2698-99]  Corwin recounts how the
9
     detectives watch the video again, and that Detective Razanskas was bothered about
10
     the gunshots and could not account for the third weapon.  [*Id.* at OSA 2699][4]
11
     Corwin then recounts the following conversation:
12
13   "'Did you see a third shithead with a gun?' Razanskas asks.
     Jones shakes his head.
14   'Was there another suspect out on the street who could have
     been strapped?' Winn asks.
15   Jones shakes his head. 'I told you everything I know.'
16   . . . Razanskas stares out the window, lost in thought. 'I think
     our wit is holding out.'
17   'Yeah,' she [Winn] says. 'He's only going halfway with us.'
18   'He was up on that roof the whole time. He knows more
     than he's letting on. That's OK. We'll get another shot at him.'"
19
20   [Excerpt Depo. Exh. 95,  OSA 2698-99]

21       Corwin describes in his article that a few days later, the detectives have John
22   Jones come to the station for an interview.  [Excerpt  Depo. Exh. 94, OSA 3025]
23
24   _____
     [4]        In March 1994 three months before the trial Miles Corwin published an
25   article in the LA Times Sunday section which was excerpted from the book to be
     published.  Depo. Exh. 94, p. OSA 3020-31.  That article included information that
26   Jones had shown them his video which showed Gonzalez coming to the door,
     asking for someone and being told his friend was not home, and leaving, followed
27   by voices and shots. The article revealed that Razanskas was bothered by the
     gunshots and could not account for the third weapon.  [OSA 3025] The article did
28   not include the information quoted and indented above and on p.11.

                                                    10

1    Winn has testified that Corwin was present during the interview.  [Winn Test.

2    Anthony Habeas 9/1/11 672; Winn Test. Cole MTS 12/18/07 6536-43]  Corwin

3    writes how John Jones tells them that they should look into whether one of the

4    suspects got shot,  Razanskas suggests they call the third shooter an unknown

5    citizen, and Jones says the unknown citizen might have capped off about six

6    rounds, firing the shots as the suspects ran away  down the street, where he saw the

7    suspect get shot and begin limping and get the help of his friend to escape.  [Depo.

8    Exh. 94, OSA 3026]  Corwin then describes in his book the following information

9    not included in the article: that after Razanskas told Jones he had no problem with

10   this guy firing a few shots, Jones asked "What if he's an ex-felon with a gun?"

11   [Excerpt Depo. Exh. 95, OSA 2703]

12        In addition Corwin describes in his book (not in the article) that after Jones

13   tells them the unknown citizen shot and hit one of the suspects in the leg:

15        "Razanskas and Winn quickly try to figure out who the unknown
         citizen was. Maybe the unknown citizen knew the victim
16       and decided to mete out some street justice after he saw
         what happened. Maybe the unknown citizen was a neighbor
17       who wanted to scare the suspects off. Or maybe the unknown
         citizen was Jones, and maybe he fired at the suspects after they
18       had fired at him.
         Winn and Razanskas do not want to push too hard to determine
19       who the unknown citizen was. They have a good witness,
20       a rare commodity these days at South Bureau Homicide. They
         do not want to do anything to scare him off."
22   [Excerpt Depo. Exh. 95, OSA 2703]

23        A witness statement of that interview was initialed and signed by Jones.

24   [Depo. Exh. 15, OSA 9952-53]  Nowhere in that statement [Depo. Exh 15], in the

25   Chronological Record entry [Depo. Exh 1] or anywhere else in the murder book

26   was the trip to the roof, the observations on the roof, or the collected bullets

27   documented.   The rooftop evidence and observations were not disclosed to the

28   defense counsel prior to trial. [Depo Thomason 215-17;  Depo. Tom 125-28]

11

### 2.    The Arthur Jones Six Pack Identification Of a Filler In the Cole Photospread

After trial, and during post-conviction proceedings for Cole[5], it came to light for the first time that when Arthur Jones looked at the Cole photospread on June 24, 1994, that he had identified someone else, not Cole.  The actual copy of the photospread that he initialed and circled the person in Position 1 (not Cole) and the report he wrote describing his selection of that person were not disclosed before trial.  A. Jones wrote in that report:

> "Number one looks like subject who was carring [sic] the other subject in to the MKL hospital and the [sic] both left together in a white Toyota."

Depo. Exh 36, OSA 7094-5;  A. Jones/Card B].

Cole was in the number 2 position. *Id.* Arthur Jones identification of another person was not in the Chronological Record, the Follow-up Report or any witness Statement or Report.  Winn further concealed the suppressed identification, when she falsely testified when asked if Arthur Jones identified anyone other than Mr. Anthony, Detective Winn testified "No, he did not." [Trial Test. Winn, OSA 1902]

### 3. Ballistics Analysis

After Corwin revealed in 2014 that he had the bullets pocketed on the rooftop, Plaintiffs' counsel obtained the bullet found in the street (Item #11) from the trial court evidence clerk and the Corwin bullets.  Decl. Bednarski at ¶9. The characteristics of the bullets found on the roof were examined and analyzed by Forensic Firearms Examiner Patricia Fant, an expert retained by the Plaintiff in this case once the significance of the previously undisclosed bullet evidence was disclosed.  She determined that one of the six bullets (a .38Spec/357Mag caliber)

---

[5] Counsel Christopher Plourd for Mr. Cole in his Motion to Strike Proceedings in Imperial County, in the course of investigating the underlying facts of the Gonzalez murder case, discovered the A. Jones PS Identification Report and initialed PS Card B documents, apparently when he was provided a copy of the Gonzalez murder book different from the copy that was provided defense counsel in the Gonzalez trial. Decl. Bednarski at¶ 6.

had been discharged from the same weapon that had discharged the .38 special bullet that had been found on the street in the vicinity of the homicide victim on March 28, 1994. [Fant Decl. ¶¶6C & 6D].

The Smith & Wesson 357 Magnum caliber stainless steel revolver seized from Jones building on May 26, 1994, is capable of discharging a .38 special bullet. [Fant Decl. ¶6E]  Razanskas conceded that he knew a .357 could discharge a .38 bullet.  [Razanskas Depo., 468:15-469:19]  The .357 Magnum weapon discovered in the second floor bedroom  was destroyed by the Los Angeles Police Department in 1996.  [Depo. Exh. 70, OSA 7247; OSA 011605; Fant Decl. ¶6E]  Although the technology existed, no effort was made by the detectives to compare the .38 special bullet found on the street with Jones' .357 caliber Magnum handgun to determine whether that weapon shot that bullet.  [Fant Decl. ¶6G]

### 4. Other Information Learned Post-Conviction

Isaac Gaston has been deposed in this case and testified that he lived in John Jones' house of prostitution on and off for six years in the 1990s, including at times in 1994 and 1995.  He himself was a pimp who employed three prostitutes, [Gaston Depo., 11:6-17:10]. He was familiar with the activities inside the building as well as the prostitution activities of John Jones.   [Gaston Depo., 16:1-18:11] He testified in his deposition that John Jones regularly carried a handgun, including a .357 caliber revolver which was his weapon of choice [Gaston Depo., 40:19-44:18]. Jones employed a "security crew" to protect the building and the prostitutes who worked there; at least two of the crew were positioned on the roof of the building every night [Gaston Depo., 40:7- 42:6, 80:24-83:10, 109:5-110:7].[6] Jones and members of the "security crew" shot at people on the street whom they

---

[6]Jones' daughter, Angela, 7 years old in 1994, testified in post-conviction proceedings that she heard her father's footsteps on the roof during the incident. [OSA 3553, Angela Jones testimony,  OSA1212: 3-7; 1225:2-20] The defense lawyers did not know this information. Tom Depo. 118; Thomason Depo. 238.

perceived as threats to the prostitution business. [Gaston Depo., 42-47; 109-110] On several occasions, Gaston observed Jones point his weapon from inside the building at persons on the street who Jones believed were making trouble around the building. *Id.* A prostitute named Kim, who worked for Gaston in 1994/95, told him, regarding the night of the homicide: "you know Johnny did that [expletive] Daddy."  [Gaston Depo, 106: 20-24: "You know Johnny did that shit."]

**III.    DEFENDANTS KNEW AND FAILED TO PROVIDE TO THE PROPER PROSECUTORIAL AUTHORITIES THE SUPPRESSED INFORMATION OF THE EVIDENCE ON THE ROOF AND THE ARTHUR JONES IDENTIFICATION OF A FILLER, AND THEIR ACTIONS VIOLATED *BRADY V. MARYLAND* BECAUSE INDIVIDUALLY AND COLLECTIVELY,  THAT INFORMATION WAS EXCULPATORY AND MATERIAL**

*Brady v. Maryland*, 373 U.S. 83 (1963), establishes that the "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good or bad faith of the prosecution." *Brady,* 373 U.S. at 87. There are three essential components to a *Brady* claim. (1) the evidence at issue must be favorable to the accused; (2) the evidence must have been suppressed by the State; (3) prejudice must have ensued. *Strickler v. Greene*, 527 U.S. 263 (1999); *Smith v. Almada*, 640 F.3d 931, 939 (9th Cir. 2011). To determine whether prejudice existed, courts look to the materiality of the allegedly suppressed evidence. *Hovey v. Ayers*, 468 F.3d 892, 916 (9th Cir. 2006).   To establish civil liability, "a §1983 plaintiff must show that police officers acted with deliberate indifference to or reckless disregard for an accused's rights or for the truth in withholding evidence from prosecutors." *Tennison v. City & County of San Francisco*, 570 F.3d 1078, 1087 (9th Cir. 2009).

This motion concerns two types of evidence, which plaintiff contends was known to defendants yet withheld from prosecutors and defense counsel: the

14

suppression of the Arthur Jones six pack identification from Card B (OSA 07094-95) ["A. Jones Card B ID"]; and, the rooftop visit by Detectives Winn and Razanskas on March 28, 1994 during which Razanskas collected six bullets from the roof, pocketed them and later given to reporter Miles Corwin ["Rooftop Bullets"].

### A.    Evidence That Jones Or Someone In His Building Was Shooting From The Rooftop Using The Same Weapon That Shot The Bullet Booked Into Evidence As Item #11 Was Exculpatory & Material

### 1.    The Evidence From The Roof Was Not Disclosed

The murder book contained a Chronological Record "Chron" of the investigation.  Depo. Exh. 1. DA Castello testified at his deposition that the Murder Book should contain a witness statement or Chron note for every contact or interview by the police.  Depo. Castello RT 68-69.  He testified that any relevant material should be in the murder book and that would include Brady evidence. *Id*. at RT 74.  It is the detectives' responsibility to put together the murder book and to put everything involved with the case (information, reports, observations, and all Brady information) in there.  *Id*. at RT 68-69.

This roof top visit evidence was described for the first time in reporter Miles Corwin's non-fiction book 'The Killing Season" published in 1997, two years after the trial.  The reporter shadowed the detectives when they went back to the crime scene and Jones building on March 28, 1994.  The murder book disclosed in this case contained no document or note revealing that Jones had taken the detectives on the roof on March 28, or the Detectives observations on the rooftop. The lawyers who defended Anthony and Cole have testified in their deposition that they never knew the information about the trip to the roof, the observations or bullets collected from the roof. Consistent with that testimony, the trial record reveals no reference at trial to such a trip to the roof , any observations of the roof being littered with bullets or casings, or any expended bullets being pocketed.

This evidence of shooting on the roof is potent evidence that the Gonzalez shooting from the roof and therefore was inconsistent with an assailant shooting Gonzalez from the ground.  Without the information discovered post-conviction of Winn and Razanskas accompanying Jones to the roof, seeing the rooftop littered with bullets and casings, and Razanskas pocketing the six bullets, the defense was not on reasonable notice of the importance of a ballistics analysis that could have compared Bullet #11 to the rooftop bullets, or Bullet #11 to Jones'  357 handgun.

### 2. The Evidence from the Roof was Exculpatory

The suppressed rooftop bullet that is a match to #11 was strong evidence that the third shooter was shooting from the roof and that person was either John Jones or someone in his employ.  The Coroner autopsy report indicated that the shot that killed Gonzalez travelled through his body at a descending angle. [Depo Exhibit 14, OSA 9924]  This information coupled with the undisclosed bullet information, supports the theory that the bullet that killed Mr. Gonzalez was shot from the roof. Defense counsel argued in closing that the shot came from higher, and that Jones had a reason to lie and shift the blame to avoid trouble.  [Transcripts Trial Closing Arguments, OSA 2509-10]  The roof of the building as well as the bathroom window where John Jones claimed he was, were above the corner where Gonzalez was shot and died. [Depo. Exh. 22, OSA 8248] Jones admitted having a gun that night, and could from his higher location in the building, have shot the bullet that killed Gonzalez. The bullets from the roof were exculpatory and would have been tangible physical evidence supporting defense counsel's argument.  They would have supported a defense theory that John Jones was managing a violent criminal operation (impeaching his credibility and exposing possible bias) and/or that John Jones or someone in the building was involved in the Gonzalez shooting.

In addition the evidence would have directly undercut the prosecution's theory of the case that Cole fired the shot that killed Gonzalez and directly impeached Jones that an "unknown citizen" was the third shooter.  He had a

16

motive to lie to deflect the investigation away from himself or someone on his staff as the shooter.  He also had a motive to make himself an essential eyewitness to curry the LAPD favor in his own pandering case.

Had the above information been made known to the defense before trial, a reasonable investigation would have uncovered substantial circumstantial evidence that the fatal shot was fired from the roof of the house of prostitution by John Jones or one of his "security" crew.  This investigation may well have led to an interview with Angela Jones, the daughter who testified in a post-conviction proceeding for Cole that she heard her father's footsteps on the roof during the crime.

### 3. The Evidence From the Roof was Material Collectively and Individually Because it Undermined the Prosecution's Theory, Cast doubt on the Integrity of the Investigation and Impeached John Jones

Any evidence tending to prove the involvement by Jones or his employees in the shooting would have been highly material because it would have established a motive for John Jones, the prosecution's key witness, to cooperate with the LAPD and shift the blame to anyone else.  It also would have given the jury a powerful third party liability theory and, if they believed it was Jones, impeached his testimony that he was at the second floor window and saw the perpetrators from that vantage.

The evidence observed on and collected from the roof undermined the prosecution's theory, cast doubt on the integrity of the investigation and impeached John Jones.   In his July 28, 2014 deposition, Deputy District Attorney George Castello testified that, if there had been evidence in 1994-1995 that John Jones had fired the fatal bullet, "everything in this case would have been different."  [Castello Depo.182:1-25]  DA Castello explained at his deposition that if Jones was a shooter and was shooting from the roof, then he may have shot one of the victims which would change the nature of the case.  If Jones shot and killed Gonzalez it changes the analysis of whether liability on a felony murder or other theory could

be extended to the perpetrators of the robbery.  [Castello Depo. 107-108]  He further explained that if Jones was on the roof, rather than the window, it would change his vantage point impeaching his identification.  [Castello Depo. 105-107]

It is clearly the law in California that "direct or circumstantial evidence linking [a] third person to the actual perpetration of the crime" is admissible in a homicide prosecution like this one. *People v. Hall*, 41 Cal.3d 826, 835, 226 Cal. Rptr. 112 (1986). "To be admissible, the third-party evidence need not show 'substantial proof of a probability' that the third person committed the act; it only needs to be capable of raising a reasonable doubt of defendant's guilt." *Id.* at 832. *See also United States v. Spencer*, 1 F3d 742,749 (9th Cir. 1992).  Here DA Castello tried the case on a felony murder theory arguing that each of the robbers was responsible for the acts of the other robbers occurring in the course of the robbery. Trial Closing Arguments, OSA 2484-85. The prosecution theory was that Cole shot the bullet that killed Gonzalez.  OSA 2489-94.  This evidence that a third person, not one of the robbers, and not Cole shot the fatal bullet contradicted the prosecution's theory.

Numerous cases support that evidence is material which undermines the prosecution's theory of the case and supports an alternative theory. *See, e.g., D'Ambrosio v. Bagley*, 2006 WL 1169926 (N.D. Ohio 2006) (suppressed witness statements and other evidence were material in part because they could have undercut the state's theory of the case and assisted the defendant in establishing an alternative theory); *Benn v. Lambert*, 283 F.3d at 1055 (undisclosed expert witness conclusion that a fire was accidental was material evidence that could have served to rebut state's primary theory for motive, and the aggravating circumstances of common scheme or plan); *Paradis v. Arave*, 130 F.3d 385 (9th Cir. 1997) (failure to disclose detectives' notes containing medical examiner's conclusion that would have rebutted prosecution's theory of the case was material impeachment evidence where the medical examiner later offered testimony contradictory to the

conclusions conveyed to the detective); *Robinson v. Cain*, 501 F.Supp.2d 399, 410 (E.D. La. 2007) (failure to disclose police report referencing anonymous witness statements violated *Brady*, as they suggested a motive not easily imputable to the defendant).

Moreover, suppression of evidence related to Jones' involvement in shooting deprived defense counsel of the opportunity to pursue their own investigation to explore and possibly confirm the alternative theory. *Montgomery v. Bagley*, 581 F.3d 440, 448 (6th Cir. 2009) ("failure to disclose exculpatory witness statements not only deprives the defense of certain evidence, but also has the effect of representing to the defense that the evidence does not exist causing defense counsel to abandon lines of independent investigation, defenses, or trial strategies that it otherwise might have pursued").

Furthermore, the evidence impeached the prosecution's central witness John Jones. If Jones was the shooter, then he lied when he said he testified he did not shoot a gun that night.  If he had a 357 and shot it and killed Gonzalez then he lied about many things including that he was in the window as opposed to the roof, that he did not shoot but an unknown citizen did, that if he shot maybe he shot not to defend his own life, but to defend his business and turf.  [Castello Depo. 107-108, agreeing that if Jones was the shooter, possessed a weapon as a felon and may have shot Gonzalez would change the case].[7]

**B.    Evidence of the Undisclosed Arthur Jones Identification of a Filler Was Exculpatory and Material**

---

[7] There is ample other circumstantial evidence discovered since the trial that corroborates this strong physical evidence that Jones was the third shooter including Trejo deposition testimony that Detective Razanskas told him that the bullet that killed Gonzalez came from the building from above. [Trejo Decl. 7/4/2014 at ¶ 13; Trejo Depo., 120: 16-23 ]

**1.**     **Arthur Jones Identification of a Filler was Not Disclosed**.

It is undisputed that the Detectives did not include in the murder book or otherwise disclose to the prosecutor the Arthur Jones Report of Identification or his initialed and circled photocopy of the Card B photospread in which he identified someone else, not Cole. [Depo. Exh. 36, Depo. Tom 120-121 (previously testified did not get these documents in discovery before the trial, still has that opinion and would have used it during trial if had gotten it); Depo Thomason 207-208 (was not provided Depo Exh. 36 before trial)] The two pages that constituted the identification were not used or referenced during any proceeding; they are not contained in the archived DA file or either of the defense attorneys' archived files. Decl. Bednarski at §5. DA Castello testified in his deposition that he did not recall seeing Depo. Exh 36 before. [Castello Depo. 135-6] The fact of the filler identification was omitted from Detective Winn's chronology and follow-up identification report, and it was not mentioned in any other LAPD report. Both Detective Winn and Arthur Jones testified falsely at trial further concealing the identification of the filler: Arthur Jones testified that he was shown the Anthony photospread and circled no. 1 and those were the only ones [photos] he saw. [Trial Test. A. Jones OSA 1832] Detective Winn testified that Arthur Jones had not made any other identifications from the six-packs that he was shown (aside from Card A). [Excerpt Trial Test. Winn Vol. 3, OSA 1902]

**2.**     **Arthur Jones Identification of a Filler Was Exculpatory**

Evidence that Arthur Jones identified someone else, not Cole in his photospread Card B constitutes significant impeachment evidence, which is exculpatory within the meaning of *Brady*. *United States v. Blanco*, 392 F.3d 382, 393 (9th Cir. 2004); *Giglio v. United States*, 405 U.S. 150, 154 (1972), (evidence affecting credibility falls within the general rule requiring disclosure). Arthur Jones testified he made no other identifications (besides his identification of Anthony in

card A). Winn also testified that Arthur Jones made no other identifications.  Both would have been impeached by this evidence that he <u>did</u> in fact make another identification and it was <u>not</u> of Cole.

Furthermore his Card B identification of another person is affirmative evidence admissible to exculpate Anthony and Cole as it is non-hearsay evidence of identification of another, not a defendant/suspect.  The prosecution theory was that Anthony and Cole ran away from the crime scene and that as they ran, one was shot in the leg.  The detectives based that theory on John Jones' statement that he saw them running down 49th, that one went down, and that they should look into whether they had a leg wound. The detectives asked area hospitals if anyone had seen the suspects which they described coming for treatment for a gunshot wound to the leg.  Arthur Jones responded on March 31 that he had seen the suspects fitting the description come into the hospital for treatment.  On June 24, 1994, Winn showed Arthur Jones the photospreads and that is when he said Anthony in Card A came closest to looking like the guy he saw with the bandaged leg assisted by another man.

At the preliminary hearing, which took place after the detective found out Cole had a scared leg from a gunshot wound, Arthur Jones identified Cole as the one he saw with the bandaged leg, and Anthony the one helping him.  The suppressed photospread Card B and ½ page report by Arthur Jones describing his pick of another person in Card B, not Cole, is powerful affirmative evidence that he saw someone else, not Cole and Anthony and is evidence that strongly impeaches his under oath identification of Cole as the wounded man at the preliminary hearing.  If he was wrong about that, he could be wrong about something else. At trial, Cole's counsel presented affirmative evidence that Cole's bullet wound was from being shot when he was 13 years old, that his leg was not injured and that Officer Garcia saw him running away from him on April 1, 1994.

DA Castello then argued in closing that it must have been Anthony that was injured, and that Arthur Jones must be mistaken with respect to which of the two of the men was injured.  Trial Closing Arguments, OSA 2494-95.The prosecution's sudden switch in closing argument to adjust to Cole's evidence of no fresh leg wound would have had little persuasive effect if the jury had known that Arthur Jones had not identified Cole, but someone else entirely.

Detective Winn's failure to disclose this other identification in discovery and her false testimony casts serious doubts on the integrity of the entire police investigation.  *See Robinson v. Cain*, 501 F.Supp.2d 399 (evidence that investigating officers falsely attributed an identification to a witness who did not in fact make the identification tends to impeach the credibility of the officers and the general credibility of their investigation).

### 3.    Arthur Jones Identification of a Filler Was Material Because it was Affirmative Identification Evidence and Impeached Arthur Jones

The case against Anthony and Cole was built entirely on eyewitness testimony, and any evidence undermining the three eyewitnesses was essential to the defense.  Each of the three eyewitnesses had problems of reliability, accuracy or bias.  Thus the case would have been further weakened by evidence that Arthur Jones was unable to identify Cole, and actually identified someone else in the Cole photospread.  This made the withheld information critical exculpatory evidence.

For example, the prosecution argued that Arthur Jones had ample opportunity and lighting to observe the suspects, suggesting that he was unlikely to be mistaken.  The filler identification would have demonstrated, inter alia, that he had already been mistaken (assuming that the filler was not actually one of the perpetrators) and that he was willing to make identifications when he could not.

John Jones acknowledged during cross-examination that he did not view the entire incident, and he had not witnessed much of what he conveyed to the police. Thus, his opportunity to view was quite limited, with suspects running away in the

dark and shooting at him.  His reliability as an eyewitness was compromised by the circumstances.  In addition he had significant motives to lie both because of the evidence suggesting he was running a brothel, and had been long been under investigation, that he was charged with  pimping and pandering in a mandatory prison case when he identified Anthony and Cole at the preliminary hearing as the suspects, that he was an ex-felon in possession of a weapon on March 27,  that he may have been the third shooter, and that he had two prior felony convictions.

Mr. Trejo's eyewitness testimony was inherently suspect considering the fact that the events he recounted happened so quickly, it was dark, and it was traumatic.  He was unable to positively identify either defendant during photo spreads or live line ups.  He did not get a very good look at the man at the door. He got a much better look at the man who assaulted Gonzalez.  He identified Anthony in the Card A photospread as looking like the man who grabbed Jimenez and did not identify anyone from card B.  He did not identify either Anthony or Cole at the live lineups. In fact, he identified someone other than Mr. Cole at that procedure, person number 4 in live-lineup 2, which according to his deposition testimony and declaration is the only one of which he is sure was involved in the crime - - an innocent filler. [Trejo Decl. Depo Exh. 168 at ¶ 15; Trejo Depo. 107-113] Although he identified Anthony at trial, he did so subsequent to having seen him several times before including in photos, the lineup, and the preliminary hearing.

Arthur Jones' testimony was equally as suspect, even before considering the non-disclosed identification of someone else.  After originally identifying Mr. Anthony as the hospital visitor with the leg wound, his recollection dramatically changed so that he ultimately identified Mr. Cole as the wounded visitor, thereby making his identification of Mr. Cole coincide with the detectives position at that time that Cole had a bullet wound from the shooting.  John Jones supplied the link making it seem that Arthur Jones' identification evidence independently corroborated his identification of Anthony and Cole enabling the prosecutor to

argue that it was an unlikely coincidence that Arthur Jones, Victor Trejo and John Jones all identified the defendants.  Trial Closing Arguments, OSA 2498-2500. For these reasons, Arthur Jones' credibility and reliability or lack thereof of his identification of Anthony and Cole was of paramount importance to the case and, therefore, any evidence reflecting negatively on his credibility was material.

The undisclosed evidence was material in another respect. Arthur Jones' incomplete description of the photo six pack procedure was tantamount to false testimony that had to be disclosed insofar as it left jurors with the impression that although Arthur Jones had good lighting and opportunity to observe, he may have not identified the second man "Cole" in the six pack --even though he really was the man --because he'd been called away to another hospital emergency.  *E.g., Simms v. Cupp*, 354 F. Supp 698, 700 (D. Oreg. 1972) ("[t]here is no distinction between false testimony and the presentation of a witness' partial testimony which, when considered in isolation, creates a distorted picture of the facts…").

Evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *United States v. Bagley*, 473 U.S. 667, 682 (1985). A "reasonable probability" of a different result exists where evidentiary suppression "undermines confidence in the outcome of the trial." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (quoting *Bagley*). The issue is whether, in the absence of the disclosure, the defendant "received a fair trial, understood as a trial resulting in a verdict worthy of confidence". *Id*. The court may find a "reasonable probability" even where the remaining evidence would have been sufficient to convict the defendant. *Strickler v. Greene,* 527 U.S. 263, 280 (1999).

Impeachment evidence is decidedly material where it could undermine the credibility of a key witness on an essential issue in the case. *Banks v. Dretke*, 540 U.S. 668, 699-703 (2004); *Giglio* at 154-155 (1972); *Kyles v. Whitney*, 514 U.S. at 444; *Benn v. Lambert*, 283 F.3d at 1054 (holding impeachment evidence material

where witness's reliability may well be determinative of guilt or innocence); *Singh v. Prunty*, 142 F.3d at 1161 (impeachment evidence of deal between state and witness was material because witness's credibility was vital where witness provided the sole evidence to establish the prosecution's murder for hire theory); *Carriger v. Steward*, 132 F.3d 463, 479 (9th Cir. 1997).

Any evidence impeaching Arthur Jones identification might well have altered the outcome of the trial and was therefore material. *Kyles v. Whitney*, 514 U.S. at 419 (noting that the effective impeachment of one eyewitness can call for a new trial even though the attack can extend to others); *Hernandez v. City of El Paso*, 2009 WL 2096272, *supra*, at p. 18 (undisclosed witness statement undermining eyewitness account was material because the case turned almost exclusively on eyewitness identification and lacked physical evidence linking defendant to the victim's murder); *Montgomery v. Bagley*, 2009 WL 3075609 (6th Cir. 2009).  Eyewitness identification testimony greatly influences juries. *See, e.g., Watkins v. Sowders*, 449 U.S. 341, 350, 101 S.Ct. 654, 660 (U.S. 1981) (Brennan, J., dissenting) (citing Elizabeth Loftus, Eyewitness Identification, for the proposition that eyewitness identification is "overwhelmingly influential"); *United States v. Brownlee*, 454 F. 3d 131 (3d Cir. 2006) (citing dissent); *Lindsey v. King*, 769 F.2d 1034, 1042 (5th Cir. 1985) ("the destruction by cross-examination of the credibility of one of two crucial witnesses-even if the other remains untouched-may have consequences beyond the discrediting of his own testimony").

## IV.    CONCLUSION

For the reasons stated above, the motion should be granted.

DATED: December 8, 2014          Respectfully Submitted,

KAYE, McLANE, BEDNARSKI & LITT, LLP
By  /s/ Marilyn E. Bednarski
MARILYN E. BEDNARSKI
Attorneys for Plaintiff Obie S. Anthony, III

DECLARATION OF MARILYN E. BEDNARSKI

1.    I am one of Plaintiff Obie Anthony's counsel of record in the matter of *Obie S. Anthony III v. City of Los Angeles et. al.*, Case No. CV 12-01332 –CBM (AJWx).

2.    This declaration is prepared and filed in support of Plaintiff's Statement Of Undisputed Facts filed separately but concurrently with Plaintiff's Motion for Summary Judgment against the City Defendants entitled "Plaintiff's Motion For Partial Summary Judgment On The Issues Of Whether Certain Identified Information Allegedly Withheld Was Exculpatory And Material Under The Standards of *Brady v. Maryland*."

3.    Several of the Exhibits filed with the Statement of Undisputed Facts and referenced in the Summary Judgment Motion against the City are referred to by Deposition Exhibit number, that is the number used in Depositions and referred to in the witnesses' testimony at those depositions.

4.    The Exhibits that I have filed are exact copies of the exhibits used in the depositions with these exceptions:

A. On occasion I have highlighted the portion referenced by placing a redlined box around the specific portion.  I did this to assist the reader in efficiently locating the referenced part of the exhibit.  The redlined box markings are not in the original documents.  A good example of this is attached Deposition Exhibit 1, p. 1, where I have put a redlined box around the entry dated 3-28-94 1130 in the Detectives Chronological Record of the investigation of this case.

B. Because Deposition Exhibit 95 (Miles Corwin's book, *The Killing Season,* is 356 pages long, and the references to this Motion consist of few pages, I have designed my excerpted pages for purposes of this

1

motion as Deposition Exhibit 95, partial excerpt pp. OSA 2663, 2697-2703, 3015,.

5.      I have reviewed the entire transcript of the 1995 preliminary hearing and trial in the homicide case against Messrs. Anthony and Cole and based on that review conclude that the two pages that constituted the Arthur Jones identification of filler, not Mr. Cole (Depo. Exh 36) were not used or referenced during any part of those proceedings.  I have reviewed the copy of the archived DA file in the *People v. Anthony and Cole* [Gonzalez] murder case BA 097736 and both of the defense attorneys' archived files and conclude that the two pages that constituted the Arthur Jones identification of filler, not Mr. Cole (Depo. Exh 36) were not contained in those files. I attended the depositions of both trial counsel Mr. Thomason and Mr. Tom and both testified that they were not provided those two pages in discovery, did not have those documents prior to trial, and first saw them during post-conviction proceedings many years later.

6.      It is my understanding from reviewing the vast files and records of this case that Counsel Christopher Plourd for Mr. Cole in his Motion to Strike Proceedings in Imperial County, in the course of investigating the underlying facts of the Gonzalez murder case, discovered the A. Jones PS Identification Report and initialed PS Card B documents, apparently when he was provided a copy of the Gonzalez murder book different from the copy that was provided defense counsel in the Gonzalez trial.  Detective Winn testified in her deposition when she said her murder book was fedexed to the DA in the Imperial County Proceedings [which started in 2007].  Winn Depo. 206-209.

7.      I have reviewed the entire transcript of the 1995 preliminary hearing and trial in the homicide case against Messrs. Anthony and Cole and based on that review conclude that there was no reference in those proceedings to the information and evidence as described in the Corwin book that was not included in

the article (about the detectives going on the roof with John Jones on March 28, 1994, seeing the roof littered with debris including bullets and casings, and Razanskas pocketing the six bullets, or the information about Jones asking the detectives what if the [unknown shooter] were a felon in possession, or Razanskas or Winn believing Jones was not telling them everything, or to the detectives having a theory that John Jones may have been the unknown shooter). I attended the depositions of both trial counsel Mr. Thomason and Mr. Tom and both testified that they were not provided that information before the trial in any discovery.

8.    I am familiar with the reports documenting the ballistics evidence booked in the underlying Gonzalez murder investigation and there is no reference therein to the six bullets Corwin produced to the private investigation Alfredo Rasch retained by this firm. Plaintiffs' counsel discovered by subpoena issued to Mr. Corwin prior to his deposition that he had six bullets and he subsequently explained in his deposition that they were the bullets detective Razanskas picked up on the roof on March 28, 1994. [Corwin Depo., 136:1-141:15; Razanskas Depo., 42:6-45:17]

9.    After Corwin revealed in 2014 that he had the bullets pocketed on the rooftop, Plaintiffs' counsel obtained the bullet found in the street (Item #11) from the trial court evidence clerk and the Corwin bullets.

I declare under penalty of perjury that the facts stated herein are of my own personal knowledge and observation. Executed in Pasadena, California.


Dated: December 8, 2014        By__/S/ Marilyn E. Bednarski_____
                                            Marilyn E. Bednarski

1  MARILYN E, BEDNARSKI (No. 105322)
   DAVID S. McLANE (No.124952)
2  CAITLIN S. WEISBERG (No. 262779)
   mbednarski@kmbllaw.com
3  KAYE, McLANE, BEDNARSKI & LITT, LLP
   234 East Colorado Boulevard, Suite 230
4  Pasadena, California 91101
   T: (626) 844-7660; F: (626) 844-7670
5

6
   Attorneys for Plaintiff Obie Anthony, III
7

8              UNITED STATES DISTRICT COURT
               CENTRAL DISTRICT OF CALIFORNIA
9

10                                    | CASE NO CV 04-9692 AHM (E)

11 REGGIE D. COLE,                    | [PROPOSED] ORDER ON
                                      | PLAINTIFF'S MOTION FOR
12        Plaintiff,                  | PARTIAL SUMMARY JUDGMENT
                                      | AND/OR SUMMARY
13    v.                              | ADJUDICATION OF ISSUES OF
                                      | WHETHER CERTAIN IDENTIFIED
14 CITY OF LOS ANGELES et al.,        | INFORMATION ALLEGEDLY
                                      | WITHHELD WAS EXCULPATORY
15        Defendants.                 | AND MATERIAL UNDER THE
                                      | STANDARDS OF *BRADY V.*
16                                    | *MARYLAND*.
   OBIE S. ANTHONY, III,
17                                    | Hearing Date:   Jan. 13, 2015
          Plaintiff,                  | Hearing Time:   1:30 p.m.
18                                    | Courtroom:      2
      v.                              | Trial Date:     Feb. 24, 2015
19 CITY OF LOS ANGELES et al.,
20        Defendants.
21
22 OBIE S. ANTHONY, III,
23        Plaintiff,
24    v.
25 COUNTY OF LOS ANGELES,
   et al.,
26        Defendants.
27
28

                        1

1    Plaintiff's Motion for Partial Summary Judgment and/or Summary

2  Adjudication against the City of Los Angeles came before the Court on January 13,

3  2015. The parties were represented by their respective counsel of record. Having

4  read and considered the papers and evidence submitted by the parties and

5  arguments of counsel, the Court finds that, pursuant to Federal Rule of Civil

6  Procedure 56, Plaintiff is entitled to partial summary judgment against Defendant

7  City of Los Angeles for the following reasons:

8  1)    At the time of the investigation and prosecution of Plaintiffs Anthony and

9        Cole, the City of Los Angeles through its detectives Marcella Winn and Pete

10       Razanskas suppressed the Arthur Jones six pack identification from Card B

11       (OSA 07094-95) ["A. Jones Card B ID"]; and, that information was

12       exculpatory and prejudiced the fairness of the trial.

13  2)    At the time of the investigation and prosecution of Plaintiffs Anthony and

14       Cole, the City of Los Angeles through its detectives Marcella Winn and Pete

15       Razanskas suppressed the facts that on March 28, 1994, they went on the

16       rooftop with John Jones, that they observed bullets and casings littered about

17       the roof, and that detective Razanskas collected six bullets from the roof,

18       pocketed them and later gave them to reporter Miles Corwin. This

19       information, observations and evidence was exculpatory and individually

20       and collectively prejudiced the fairness of the trial.

21       For the above-stated reasons, IT IS ORDERED that Plaintiff's motion for

22  partial summary judgment is granted and the requirements of  1) non-disclosure; 2)

23  exculpatory nature; and 3) materiality as against the are City of Los Angeles in this

24  action is deemed established pursuant to Federal Rule of Civil Procedure 56(d)(2).

25  Trial on these two *Brady* issues will be limited to whether the non-disclosure of the

26  //

27  //

28  //

2

1   information alleged in 1) and 2) above was done with deliberate indifference and

2   for the purpose of determining the extent of damages suffered by Plaintiffs.

3

4

5

6   DATED: _____          By_____

7                                        Hon. Consuelo B Marshall
                                         United States District Court,
8                                        Central District of California

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3