PAUL B. BEACH, State Bar No. 166265
pbeach@lbaclaw.com
MICHAEL D. ALLEN, State Bar No. 198126
mallen@lbaclaw.com
LAWRENCE BEACH ALLEN & CHOI, PC
100 West Broadway, Suite 1200
Glendale, California 91210-1219
Telephone No. (818) 545-1925
Facsimile No. (818) 545-1937

Attorneys for Defendants
COUNTY OF LOS ANGELES and
LOS ANGELES COUNTY DISTRICT ATTORNEY'S OFFICE

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| REGGIE COLE, <br><br> Plaintiff, <br><br> vs. <br><br> CITY OF LOS ANGELES, et al., <br><br> Defendants. | ) Case No. CV 11-03241-CBM (AJWx) <br> ) (*Cole Action*) <br> ) <br> ) Case No. CV 12-01332-CBM (AJWx) <br> ) (*Anthony City Action*) <br> ) <br> ) Case No. CV 13-07224-CBM (AJWx) <br> ) (*Anthony County Action*) <br> ) |
| OBIE S. ANTHONY, III, <br><br> Plaintiffs, <br><br> vs. <br><br> CITY OF LOS ANGELES, et al., <br><br> Defendants. | ) Honorable Consuelo B. Marshall <br> ) <br> ) <br> ) **NOTICE OF MOTION AND** <br> ) **MOTION BY DEFENDANTS** <br> ) **COUNTY OF LOS ANGELES AND** <br> ) **LOS ANGELES COUNTY** <br> ) **DISTRICT ATTORNEY'S OFFICE** |
| OBIE S. ANTHONY, III, <br><br> Plaintiff, <br><br> vs. <br><br> COUNTY OF LOS ANGELES, et al. <br><br> Defendants. | ) **FOR SUMMARY JUDGMENT OR,** <br> ) **ALTERNATIVELY, SUMMARY** <br> ) **ADJUDICATION OF INDIVIDUAL** <br> ) **ISSUES; MEMORANUM OF** <br> ) **POINTS AND AUTHORITIES** <br> ) <br> ) [Separate Statement of Uncontroverted <br> ) Facts; Declarations and Exhibits; and <br> ) [Proposed] Judgment filed concurrently <br> ) herewith] <br> ) <br> ) Date:        January 13, 2015 <br> ) Time:        10:00 a.m. <br> ) Courtroom:  2 <br> ) |

1

TO THE HONORABLE COURT, ALL INTERESTED PARTIES, AND TO THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on January 13, 2015 at 10:00 a.m. in Courtroom 2, or soon thereafter as counsel may be heard, by the above-captioned Court located 312 N. Spring Street, Los Angeles, California, Defendants COUNTY OF LOS ANGELES ("County") and LOS ANGELES COUNTY DISTRICT ATTORNEY'S OFFICE ("DA's Office") will, and hereby do, move for summary judgment on the grounds that there is no genuine issue of material fact as to any of Plaintiff's claims, and these Defendants are entitled to judgment as a matter of law.

PLEASE TAKE FURTHER NOTICE that if, for any reason summary judgment cannot be had, these Defendants will, and hereby do further move the Court for summary adjudication as to each of the following issues:

1. Plaintiff's *Brady/Napue*-based claims are barred by the absence of the required showing of prejudice and suppression of material and exculpatory evidence;

2. Even assuming, *arguendo*, there is a genuine issue of material fact as to any of Plaintiff's *Brady/Napue*-based claims against the County or DA's Office, because the alleged wrongful conduct was carried out on behalf of the State of California, Plaintiff's claims against these Defendants are further barred based on Eleventh Amendment immunity; and

3. Even assuming, *arguendo*, that there is a genuine issue of material fact as to Plaintiff's *Brady/Napue*-based claims against the County and DA's Office and that the alleged wrongful conduct was not carried out on behalf of the State of California, there is no genuine issue of material fact that a policy, practice or custom of "deliberate indifference" by either of these Defendants caused Plaintiff's alleged constitutional violation.

1       This Motion is based upon this Notice, the attached Memorandum of Points

2  and Authorities, the concurrently filed Declarations of Michael D. Allen, John

3  Jones, George Castello, Jason Lustig, Kenneth C. Wullschleger and Kellyjean

4  Chun and accompanying Exhibits, the Separate Statement of Uncontroverted Facts

5  and Conclusions of Law, and the Court's file in this matter, and upon such other

6  and further matters as may be properly come before the Court.

7       This Motion is made following an unsuccessful good faith attempt by the

8  County and DA's Office to informally resolve these issues pursuant to Central

9  District of California Local Rule 7-3. (*See*, Declaration of Michael D. Allen ¶ 3

10  and Exhibit "A" filed concurrently herewith.)

11

12

13  Dated:  December 8, 2014     LAWRENCE BEACH ALLEN & CHOI, PC

14

15

16       By /s/ *Michael D. Allen*

17       Michael D. Allen
     Attorneys for Defendants

18       COUNTY OF LOS ANGELES and
     LOS ANGELES COUNTY DISTRICT
     ATTORNEY'S OFFICE

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

MEMORANDUM OF POINTS AND AUTHORITIES .......................................... 1

I.    INTRODUCTION ........................................................................................ 1

II.   STATEMENT OF FACTS ......................................................................... 2

    A.    The March 27, 1994 Murder of Felipe Gonzalez and John Jones' Identification of Plaintiff Obie Anthony as One of the Shooters .................................................................................................. 2

    B.    Facts Regarding Jones' Arrest For Pimping and Pandering and Plea Deal (and Plaintiff's Defense Team's Knowledge of Same) .................................................................................................... 3

    C.    Facts Regarding John Jones' Testimony During Plaintiff's Murder Trial ......................................................................................... 4

    D.    Additional Facts Relevant To Plaintiff's *Monell* Claim Against the County and DA's Office ............................................................... 6

III.  STANDARD OF REVIEW ....................................................................... 7

IV.   THE REQUISITE REQUIREMENTS FOR SECTION 1983 RELIEF UNDER *BRADY/NAPUE* CANNOT BE SATISFIED IN THE INSTANT CASE ................................................................................. 8

    A.    There Was No "Suppression" of Material Evidence ......................... 9

    B.    Because Jones Responded That He Did Not Receive "Special Treatment" Based On His Subjective Belief In Response To A Subjective Question And He Was Thoroughly Impeached Following That Response, No Actual Prejudice Occurred ............... 12

V.    BECAUSE THE ACTUAL CONDUCT WAS CARRIED OUT ON BEHALF OF THE STATE OF CALIFORNIA, PLAINTIFF'S *MONELL* CLAIMS ARE NOT ACTIONABLE BASED ON THE NINTH CIRCUIT'S *WEINER* DECISION .................................................. 14

    A.    The Crux Of A Section 1983 Claim Against A Public Entity Is An Official Policy, Practice Or Custom Of "Deliberate Indifference" Carried Out On Behalf Of A Local Policymaker ...... 15

    B.    *Weiner* Has Already Held That District Attorneys Are State Officers When Investigating and Proceedings With Criminal Prosecutions ....................................................................................... 16

    C.    Based On The Undisputed Facts In The Instant Case, Plaintiff's Attempt To Rely On The Limited Exception To *Weiner* In *Goldstein v. City Of Long Beach* Is Misplaced ............... 17

i

VI.   A FURTHER BASIS FOR SUMMARY ADJUDICATION IS THE FACT THAT THERE IS NO GENUINE ISSUE OF MATERIAL FACT THAT A POLICY, PRACTICE OR CUSTOM OF "DELIBERATE INDIFFERENCE" BY THE COUNTY OR DA'S OFFICE CAUSED A *BRADY* VIOLATION ................................................. 19

    A.   Other Than Plaintiff's Attempt To Rely On The Facts Of The Instant Case, There Is Absolutely No Evidence Of A "Persistent And Widespread" Custom By The DA's Office In Failing To Convey Information About Plea Deals To Persons To Defense Counsel In Separate Criminal Actions Where Such Persons Are Witnesses In A Separate Criminal Case ............. 20

    B.   Nor Is There Evidence That *Deliberate Indifference* By the DA's Office Caused The Alleged Constitutional Violation ............. 22

VII.  CONCLUSION ........................................................................... 25

ii

1

# **TABLE OF AUTHORITIES**

2

Cases

3

*Adickes v. S.H. Kress & Co.*,

4

    398 U.S. 144 (1970) ........................................................................20

5

*Board of Comm'rs of Bryan Cty. v. Brown*,

6

    520 U.S. 397 (1997) ...................................................................22, 23

7

*Brady v. Maryland*,

8

    373 U.S. 83 (1963) ............................................................................8

9

*Canton v. Harris*,

10

    489 U.S. 378 (1989) ...................................................................22, 23

11

*Carter v. District of Columbia*,

12

    795 F.2d 116 (D.C. Cir. 1986) ........................................................21

13

*Celotex Corp. v. Catrett*,

14

    477 U.S. 317 (1986) ..........................................................................7

15

*City of Oklahoma City v. Tuttle*,

16

    471 U.S. 808 (1985) ........................................................................20

17

*Claar v. Burlington N.R.R.*,

18

    29 F.3d 499 (9th Cir. 1994) ..............................................................7

19

*Connick v. Thompson*,

20

    131 S. Ct. 1350 (2011) ..........................................................22, 23, 24

21

*Goldstein v. City of Long Beach*,

22

    715 F.3d 750 (9th Cir. 2013)..................................................17, 18, 19

23

*Guatay Christian Fellowship v. San Diego*,

24

    670 F.3d 957 (9th Cir. 2011) ............................................................8

25

*Hamilton v. Rogers*,

26

    791 F.2d 439 (5th Cir. 1986)............................................................21

27

*Hovey v. Ayers*,

28

    458 F.3d 892 (9th Cir. 2006).............................................................13

*Jackson v. Barnes*,

    749 F.3d 755 (9th Cir. 2014)..................................................................17

*Kyles v. Whitley*,

    514 U.S. 419 (1995) ..............................................................................9

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

    475 U.S. 574 (1986) ..............................................................................8

*McMillian v. Monroe County, Ala.*,

    529 U.S. 781 (1997) ........................................................................15, 16

*Monell v. New York City Dept. of Soc. Services*,

    436 U.S. 658 (1978) ........................................................................14, 15

*Napue v. Illinois*,

    360 U.S. 264 (1959) ..............................................................................8

*Nazir v. County of Los Angeles, et al.*

    2011 WL 819081 (C.D. CA 2011) ......................................................17

*Neri v. County of Stanlislaus, et al.*,

    2010 WL 3582575 (E.D. CA 2010) ....................................................17

*Penbaur v. Cinncinati*,

    475 U.S. 469 (1986) ............................................................................15

*Pitts v. Kern County*,

    17 Cal.4th 340 (1998).....................................................................16, 17

*Ramos v. City of Chicago*,

    707 F.Supp. 345 (N.D. Ill. 1989) .......................................................21

*Rodriguez v. Avita*,

    871 F.2d 552 (5th Cir. 1989)...............................................................21

*Scott v. Harris*,

    550 U.S. 372 (2007) ..............................................................................8

*Sloman v. Tadlock*,

    21 F.3d 1462 (9th Cir. 1994)...............................................................21

*Smith v. Almada*,

   640 F.3d 931 (9th Cir. 2011)..................................................................9

*Smith v. Cain*,

   ___ U.S. ___, 132 S.Ct. 627 (2012) .....................................................9

*Sommer v. U.S.*,

   2011 WL 4592788 (S.D. CA 2011) ...............................................9, 12

*Strickler v. Greene*,

   527 U.S. 263 (1999) ..............................................................................9

*U.S. v. Bagley*,

   473 U.S. 667 (1985) ..............................................................................9

*U.S. v. Dupuy*,

   760 F.2d 1492 (9th Cir. 1985)...............................................................9

*U.S. v. Griggs*,

   713 F.2d 672 (11th Cir. 1983)...............................................................9

*United States v. Various Slot Machines on Guam*,

   658 F.2d 697 (9th Cir. 1981)................................................................8

*Weiner v. San Diego County*,

   210 F.3d 1025 (9th Cir. 2000)..............................................14, 16, 17

*Wilkinson v. Torres*,

   610 F.3d 546 (9th Cir. 2010)................................................................8

*Will v. Michigan Dept. of State Police*,

   491 U.S. 58 (1989) ..............................................................................14

Statutes

42 U.S.C. § 1983................................................................................passim

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.      INTRODUCTION.**

In July, 1995, Plaintiff Obie Anthony ("Plaintiff") and Reggie Cole ("Cole") were convicted of the March 27, 1994 murder of Felipe Gonzalez ("Gonzalez"). Various individuals at the scene, including John Jones ("Jones"), provided information to the Los Angeles Police Department ("LAPD"), the agency who conducted the investigation and presented the case to the District Attorney's Office ("DA's Office") for prosecution, which led to the July, 1995 conviction.

In September, 2011, Plaintiff's conviction was vacated following the filing of a *habeas* petition based on claims that certain evidence was not turned over by the LAPD and/or the DA's Office and that certain testimony was not corrected at trial. While there are a wide variety of issues that Plaintiff raised at the *habeas* proceedings, the only cause of action against the County of Los Angeles ("County")/DA's Office in the instant action is actually narrow and limited to the claim that information regarding the a plea deal regarding one of the witnesses was not turned over and that the DA's Office failed to correct purportedly false testimony by this witness at the underlying criminal trial.

As discussed in greater detail below, the County and DA's Office are entitled to summary judgment because, based on the undisputed evidence, all of the information that Plaintiff's defense team needed to effectively cross-examine the witness was, in fact, provided to Plaintiff's defense team prior to the July, 1995 trial. Any documents Plaintiff claims were not turned over were internal DA's Office work product that contained the same information about the plea deal that was turned over as part of *Brady* disclosures. Plaintiff's claim that the prosecutor who tried the underlying case was not aware of that information is wrong. Based on the fact that the prosecutor did not agree to twist the evidence the way Plaintiff's defense team did, Plaintiff tries to claim that prosecutor was not aware of the details of the plea deal. To the contrary, the prosecutor read the file

regarding the plea deal and simply did not agree with Plaintiff's defense team's attempt to mischaracterize the nature of the deal.

Moreover, with respect to the allegations that the DA's Office failed to correct false testimony, the evidence is that the witness testified, in his subjective opinion, that he did not receive "special treatment" because, even though he had come forward as a percipient witness and cooperated in the murder investigation months before his pimping arrest, he was still "arrested" and "hauled into court." After this testimony, this witness was thoroughly and exhaustively impeached by Plaintiff's defense about the details of his pimping charge, the LAPD's request for leniency and the ultimate sentence he received based on the plea.

Even assuming, *arguendo*, that this evidence would be sufficient to create a genuine issue of material fact as to a *Brady/Napue* violation, Plaintiff still cannot prove that such violation, if any, was caused by a policy, practice, or custom of "deliberate indifference" by either the County or DA's Office.

## II.   STATEMENT OF FACTS.[1]

### A.   The March 27, 1994 Murder of Felipe Gonzalez and John Jones' Identification of Plaintiff Obie Anthony as One of the Shooters.

On the night of March 27, 1994, Felipe Gonzalez ("Gonzalez") was shot and murdered outside of a building located on the corner of 49th Street and Figueroa Street in Los Angeles. (Uncontroverted Fact Nos. ("UFN") 1-8.)  The Los Angeles Police Department ("LAPD") Detectives Marcella Winn and Peter Razanskas were the assigned investigators. (UFN 9.)  While conducting their investigation at the scene, John Jones ("Jones"), a man who lived in the building on the corner of 49th and Figueroa, contacted Detective Winn and told her that he observed two of the shooters and was able to identify them. (UFN 10-24.)  A little

---

[1] A more detailed version of the uncontroverted facts, which demonstrate the absence of a genuine issue of material fact for trial, is set forth in the Separate Statement of Uncontroverted Facts filed concurrently herewith.

over a month later, on May 3, 1994, Jones identified photographs of Plaintiff Obie Anthony ("Plaintiff") and Reggie Cole ("Cole") as the two shooters in photographic six-packs. (UFN 25-26.)  After LAPD Detective Winn presented the case to the DA's Office, Plaintiff and Cole were ultimately arrested and charged for the murder of Gonzalez. (UFN 29.)  Jones was never asked to cooperate in the investigation and prosecution of Plaintiff.  (UFN 27-28.)

    **B.**    **Facts Regarding Jones' Arrest For Pimping and Pandering and Plea Deal (and Plaintiff's Defense Team's Knowledge of Same).**

On May 26, 1994, almost two months after Jones came forward as a witness to the murder of Gonzalez (and more than three weeks after he identified Plaintiff in a photographic six-pack), Jones was arrested and charged for a violation of Penal Code § 266(h), pimping and pandering. (UFN 30-31.)  During the course of the Jones prosecution, the LAPD contacted the DA's Office to request leniency for Jones because he purportedly had assisted the LASD in several homicide investigations, including the Gonzalez murder investigation. (UFN 41-44.)  The LAPD was told they needed to put their request for leniency in writing, which they did in two letters dated September 8 and October 12, 2014, respectively. (UFN 42-48.)  Both letters were turned over to the defense as part of the prosecution's *Brady* obligations. (UFN 49-52.)  On November 8, 1994, Judge Michael Tynan presided over the arraignment and plea hearing in the Jones' prosecution during which Jones entered a guilty plea.  (UFN 54-56.) According to transcript of the proceeding, the basis for the plea was "for a variety of reasons." (UFN 57.)  According to Judge Tynan's notes, Jones is referred to as a "snitch" in an unidentified homicide case, and it is indicated that leniency was given to Jones because of his "good, if belated, citizenship." (UFN 59.)  Like the LAPD letters requesting leniency, Judge Tynan's notes were also turned over to the defense as part of the prosecution's *Brady* obligations. (UFN 58.)

According to DDA Ken Wullschleger, the prosecutor who made the decision whether to provide leniency to Jones in response to the LAPD's request for leniency, the fact that the LAPD requested leniency based on Jones' assistance in multiple homicide investigations suggested to him that the leniency being requested was not for Jones' assistance in any single investigation.[2]  (UFN 53, 62.)   On January 24, 1995, Jones was sentenced to time served, placed on probation for three years and ordered to perform 200 hours of community service. (UFN 64-66.)  Plaintiff's defense attorney obtained transcripts of both the November 8, 1994 plea and the January 24, 1995 sentencing and was fully aware of the minimum mandatory sentence Jones faced as well as the sentence he ultimately received.[3] (UFN 67.)

## C.    Facts Regarding John Jones' Testimony During Plaintiff's Murder Trial.

The underlying murder trial commenced on July 13, 1994. (UFN 91.) DAPD Thomason represented Plaintiff throughout the trial while DDA George Castello prosecuted the trial on behalf of the State. (UFN 92-93.)  Several months prior to the trial, DDA Castello obtained and read the Jones' file. (UFN 88.) After Jones identified Plaintiff and Cole as the shooters, on cross-examination, Jones was asked whether he had received "special treatment" in his pimping and pandering case and he denied it based on his subjective belief that he did not receive special treatment since he had been arrested and "hauled into court" several months after he had come forward as a percipient witness in the murder investigation; his opinion was that, if he had, indeed, received special treatment, he would not have been arrested in the first place.  (UFN 100-104.)

---

[2] Likewise, that was the defense team's understanding as well. (UFN 63.)

[3] In fact, on May 22, 1995, about two months before the murder trial, Plaintiff's defense attorney during the criminal proceedings, Deputy Alternate Public Defender ("DPAD") Patrick Thomason filed a motion to dismiss the murder prosecution based on Jones' plea. (UFN 87-90.)

After stating that, in his subjective opinion, that he did not receive "special treatment", DAPD Thomason thoroughly impeached Jones with evidence that (1) on the date of the murder, he was renting rooms to prostitutes at his building , (2) he was collecting money from the prostitutes as "visitor's fees", (3) his collection of "visitor's fees" from the prostitutes who were renting rooms in his building was the basis for the pimping charge against him, (4) he pled guilty in the pimping case, (5) based on the charges and other allegations he was "facing a mandatory minimum under the law of six years in state prison", (6) sometime previously, he had worked with the LAPD on a whole other case, (7) the LAPD submitted two letters on September 8, 1994 and October 12, 1994, respectively, requesting leniency for him based on his assistance in the various matters, which were both submitted into evidence, (8) he purportedly received a "deal" in his pimping case, (9) at the time of his sentencing on the pimping charge, it was changed from pimping to a lesser charge of sale of persons for immoral purposes, and (10) while the pimping charge would have carried a mandatory minimum of six years in state prison, the charge he was ultimately convicted of only resulted in a sentence of time served plus probation and Cal Trans work. (UFN 105-115.) Had Jones denied any of that information on cross-examination, DDA Castello fully understood that he would have had an obligation to correct that.  (UFN 117-123.)  In closing argument, despite the fact that Jones was a percipient witness in the murder case, the defense team continued to smear Jones by trying to claim that he was acting as an "informant" in the murder case and claiming that the only reason he was testifying was to avoid prison in his pimping case. (UFN 124-125.)

On August 1, 1995, the jury found Plaintiff guilty of the murder of Gonzalez. (UFN 126.)  Following their verdict, jurors informed the defense team that "their main determining factor" in deciding to convict was their belief that Plaintiff had lied on the stand, which they considered "pretty damning." (UFN 127-128.)

### D.    Additional Facts Relevant To Plaintiff's *Monell* Claim Against the County and DA's Office.

Throughout the entire career of a prosecutor at the DA's Office, starting from the moment they are hired, prosecutors are encouraged to err on side of caution when fulfilling obligations under Brady and to disclose any information that could potentially exculpate a criminal defendant or impeach the credibility of a prosecution witness. (UFN 133-136.)  Prosecutors are required to fulfil significant training requirements before they are allowed to handle homicide cases like the underlying criminal case.  (UFN 137-158.) Moreover, the DA's Office has a motto that "Every Day is a Training Day" and makes available to its DDAs a wide variety of materials such as which provide updates on changes in the law such as prosecutors' discovery obligations (including, but not limited to, obligations under Brady) as well as handling leniency requests. (UFN 159-161.)

In addition, prosecutors at the DA's Office are trained how to access various databases to obtain relevant information to their cases and to facilitate and expedite compliance with discovery obligations, including, but not limited to, obligations under *Brady*. (UFN 162-163.)  In fact, the DA's Office even created an entire sub-division called the Brady Compliance Unit which established a separate database called the Brady Alert System to facilitate prosecutors' ability to comply with their disclosure obligations under Brady.  (UFN 164-165.)

With respect to facilitating disclosure of information regarding pleas and leniency agreements such as the Jones deal, all prosecutors in the DA's Office are required to run the criminal histories of all of the witnesses that they are going to call in a case. (UFN 167-169.)  With respect to percipient witnesses in criminal cases who may obtain leniency or some other favorable disposition in separate prosecutions against them, this type of information is available to prosecutors in the individual case files as well as the Prosecutor's Information Management System ("PIMS") database. (UFN 166.)  All prosecutors in the DA's Office are

6

trained to keep their criminal case files updated using the Case Chron for internal use of the DA's Office. (UFN 35-36.)  In addition, when a case is resolved, the assigned DDA will prepare a Disposition Report, also for internal use by the DA's Office, to document recommendations concerning, and to obtain approval for, the disposition of a case (or to report an event or court action affecting a case). (UFN 68-69.)  The primary purpose of the Case Chron and Disposition Report is to assist supervising prosecutors in understanding and approving various key developments during a prosecution as to facilitate prosecutors' *Brady* obligations. (UFN 36, 70.)  The entire case file, including the Case Chron and Disposition Report, is scanned into the PIMS database. (UFN 72.)

Other than the facts of the instant case, Plaintiff has no evidence of any other cases that have been overturned on habeas because of the situation in the instant case, i.e., alleged failure to correct a witness's purported false testimony about receiving a plea deal.  In fact, in the over 25 years that DDA Chun and DDA Castello have been in the DA's Office, the instant case is the only case they have been involved in that has been overturned based on an alleged *Brady* violation. (UFN 51, 95.) In fact, out of the thousands of cases they handled against the DA's Office in over 30 years, the public defenders on the case below could not think of a single other case that was ever overturned on habeas or direct appeal because of a purported *Brady* violation or failure to correct false testimony. (UFN 179-184.)

### III.   STANDARD OF REVIEW.

In ruling on a summary judgment motion, while a court is to view the record in the light most favorable to the non-moving party, the non-moving party has the "burden of [pointing] to 'specific facts showing that there is a genuine issue for trial. …'  [I]t is not the district court's job to sift through the record to find admissible evidence in support of a non-moving party's case." *Claar v. Burlington N.R.R.*, 29 F.3d 499, 504 (9th Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477

1  U.S. 317, 324 (1986)); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

2  574, 587 (1986) ("Where the record taken as a whole could not lead a rational trier

3  of fact to find for the non-moving party, there is no 'genuine issue for trial');

4  *Guatay Christian Fellowship v. San Diego*, 670 F.3d 957, 972 (9th Cir. 2011).

5        "When opposing parties tell two different stories, one of which is blatantly

6  contradicted by the record, so that no reasonable jury could believe it, a court

7  should not adopt that version of the facts for purposes of ruling on a motion for

8  summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380 (2007) (no "genuine issue

9  for trial" under the *Matsushita* standard where opposing parties submitted two

10 different accounts of the facts, but the record (a videotape) so utterly discredited

11 the respondent's version that no reasonable jury could have believe respondent);

12 *Wilkinson v. Torres*, 610 F.3d 546, 549 (9th Cir. 2010).

13       A court may disregard "visible fiction" in cases where the responding

14 party's "version of events is so utterly discredited by the record that no reasonable

15 jury could have believed him."  *Id.* at 380-81 (emphasis added); *United States v.*

16 *Various Slot Machines on Guam*, 658 F.2d 697, 701 (9th Cir. 1981) ("Even on a

17 motion for summary judgment, a court is not compelled to give weight to an

18 allegation that is incontrovertibly demonstrated to be false.").

19 **IV.    THE REQUISITE REQUIREMENTS FOR SECTION 1983 RELIEF**

20 **       UNDER *BRADY/NAPUE* CANNOT BE SATISFIED IN THE**

21 **       INSTANT CASE**.

22       In Plaintiff's single cause of action against the County/DA's Office, Plaintiff

23 contends that, by not turning over two internal work product documents from the

24 Jones' case, they violated *Brady v. Maryland*, 373 U.S. 83 (1963).  In addition,

25 Plaintiff attempts to allege that DDA Castello violated *Napue v. Illinois,* 360 U.S.

26 264 (1959), by not correcting the purported false testimony by Jones after he was

27 thoroughly impeached by Plaintiff's defense team regarding his denial of receiving

28 "special treatment."  Under *Brady*, a criminal defendant is denied his due process

right to a fair trial, and the government violates its constitutional duty to disclose material evidence where (1) the evidence in question is favorable to the accused in that it is exculpatory or impeachment evidence, (2) the government willfully or inadvertently suppresses this evidence and (3) prejudice ensues from the suppression (*i.e.,* the evidence is "material").  *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *Kyles v. Whitley*, 514 U.S. 419, 433 (1995).

The evidence which was allegedly "suppressed" must have been "material." The Ninth Circuit explained that, in *Strickler v. Greene*, the Supreme Court stated that "strictly speaking, there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a **reasonable probability that the suppressed evidence would have produced a different verdict**."  *Smith v. Almada*, 640 F.3d 931, 939 (9th Cir. 2011); *see also, U.S. v. Bagley*, 473 U.S. 667, 682 (1985) ("The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different"); *Kyles v. Whitley, supra*, 514 U.S. at 433 (the failure to disclose is prejudicial if "there [was] a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.");  *Smith v. Cain*, ___ U.S. ___, 132 S.Ct. 627 (2012) (a reasonable probability exists if the likelihood of a different result is great enough to undermine confidence in the outcome of the trial).

### A.    There Was No "Suppression" of Material Evidence.

There is no meaningful "suppression" within the meaning of *Brady* if the alleged evidence was actually provided to the defense or "if the **means** of obtaining the exculpatory evidence has been provided to the defense."  *U.S. v. Dupuy*, 760 F.2d 1492, 1502 (9th Cir. 1985) (emphasis added); *U.S. v. Griggs*, 713 F.2d 672, 674 (11th Cir. 1983) ("Where defendants…had within their knowledge the information by which they could have ascertained the supposed *Brady* material, there is no suppression by the government"); *Sommer v. U.S.*, 2011 WL 4592788 at

1   *7 (S.D. CA 2011) (“*Brady* violation does not occur if the defendant knew or

2   should have know[n] the **essential facts** permitting him to take advantage of any

3   exculpatory information.”) (Emphasis added.)

4          In the instant case, by the time the underlying July, 1995 trial took place,

5   Plaintiff’s defense was provided with and was aware of the criminal complaint in

6   Jones’ pimping and pandering case, the two LAPD letters requesting leniency for

7   Jones, the transcripts from both the plea and sentencing proceedings in Jones’ case,

8   Judge Tynan’s notes explaining why leniency was being given as well as the

9   ultimate sentence that Jones received.  While the defense repeatedly tried to

10  suggest that Jones was an “informant” ***in Plaintiff’s case*** and that the sole reason

11  for him getting plea deal was because of his cooperation in the underlying murder

12  investigation and prosecution, this is simply not true nor is it supported in the two

13  internal work product documents that were not turned over to Plaintiff’s defense

14  team.  While *Brady* requires that exculpatory and material evidence be turned over,

15  *Brady* does not require a prosecutor to accept a defense team’s attempt to

16  inaccurately twist the evidence at trial.

17         First, based on the information provided to the DA’s Office from the LAPD,

18  it was their understanding that Jones approached the LAPD voluntarily and of his

19  own free will and came forward as a percipient witness in the underlying murder.

20  There was absolutely no information in the DA’s Office materials that Jones was

21  acting in the capacity as an “informant” in the ***investigation of Plaintiff*** for

22  murder.  In fact, Jones had provided information and identified Plaintiff as one of

23  the shooters well before Jones was ever arrested.  This simply was not a situation

24  where the LAPD was using Jones an informant for getting a recorded confession

25  by Plaintiff or some other informant-type assistance.

26         Moreover, if Jones’ deal was solely in exchange for his testimony in

27  Plaintiff’s case, it would have been the practice of the DA’s Office to hold his

28  sentencing over until ***after*** Plaintiff’s criminal trial, i.e., until Jones held his end of

1    the bargain.  The fact that Jones was sentenced six months before Plaintiff's

2    criminal trial is a further indication that his plea was not solely in exchange for his

3    cooperation in Plaintiff's case.  It was the understanding of both the prosecution

4    and the defense that Jones had assisted the LAPD in multiple matters and, in fact,

5    both the transcript from the plea proceeding and Judge Tynan's notes indicated the

6    plea was in exchange for a "variety of reasons" and not solely because of Jones'

7    cooperation as a witness in Plaintiff's underlying criminal case.

8         Despite the foregoing, Plaintiff in the instant case (and during the criminal

9    proceedings below) has tried to mischaracterize the basis of the plea and argued to

10   the jury that, notwithstanding the fact that Jones had come forward as a percipient

11   witness months before he was arrested in his separate pimping case, the only

12   reason he cooperated in the murder prosecution was to obtain leniency in his

13   pimping case.

14        Nor do the two work product documents from Jones file not provided to

15   Plaintiff's defense team support this argument.  In fact, the materials Plaintiff's

16   defense team was provided contained the same information that in these two

17   documents.  For example, in the July 21 entry in the case chronology from the

18   Jones file, where the LAPD first contacted the DA's Office regarding possible

19   leniency, it is indicated that Jones is a *witness* (not informant) in a homicide case

20   and that "[h]e has assisted in other [homicide investigations]." (UFN 43.) This

21   entry indicates that the LAPD was advised to put the requests for leniency in

22   writing, which the LAPD did in the two letters which were provided to Plaintiff's

23   defense attorney below.  In several subsequent entries, while there are references to

24   Jones as an "informant" or a "snitch", none of them indicate that Jones was acting

25   in the capacity as a "snitch" or "informant" *in the underlying murder prosecution*.

26   (*See,* Exhibit "K".)  Likewise, in DDA Wullschleger's Disposition Report, he

27   specifically refers to the "factors be considered" in the LAPD letters requesting

28   leniency. (*See,* Exhibit "R".)  Nowhere in this document does it indicate that the

1    only reason leniency was given was because of Jones' cooperation in the

2    underlying investigation of Plaintiff for murder. (Id.)

3       **B.    Because Jones Responded That He Did Not Receive "Special**

4            **Treatment" Based On His Subjective Belief In Response To A**

5            **Subjective Question And He Was Thoroughly Impeached**

6            **Following That Response, No Actual Prejudice Occurred**.

7       With respect to the alleged failure to correct Jones' testimony regarding his

8    purported receipt of "special treatment", the uncontroverted evidence is that in

9    response to the question "Did you receive special treatment?" Mr. Jones' initial

10   response was "What do you mean special treatment?"  This was a clear indication

11   that Mr. Jones did not understand the question.  Rather than clarifying the

12   question, the defense simply repeated the question.  Mr. Jones, who felt that he

13   should never have been arrested in the first place because he had come forward as

14   a witness months before the arrest stated that he "was arrested" and "hauled into

15   court" indicating that, in his subjective opinion, he did not receive "special

16   treatment".  (UFN 100-104.)

17      Following this exchange, however, the defense thoroughly impeached with

18   evidence that (1) on the date of the murder, he was renting rooms to prostitutes at

19   his building , (2) he was collecting money from the prostitutes as "visitor's fees",

20   (3) his collection of "visitor's fees" from the prostitutes who were renting rooms

21   in his building was the basis for the pimping charge against him, (4) he pled

22   guilty in the pimping case , (5) based on the charges and other allegations he was

23   "facing a mandatory minimum under the law of six years in state prison", (6)

24   sometime previously, he had worked with the LAPD on a whole other case, (7)

25   the LAPD submitted two letters on September 8, 1994 and October 12, 1994,

26   respectively, requesting leniency for him based on his assistance in the various

27   matters, which were both submitted into evidence, (8) he purportedly received a

28   "deal" in his pimping case, (9) at the time of his sentencing on the pimping

charge, it was changed from pimping to a lesser charge of sale of persons for immoral purposes and (10) while the pimping charge would have carried a mandatory minimum of six years in state prison, the charge he was ultimately convicted of only resulted in a sentence of time served plus probation and Cal Trans work. (UFN 105-115.)

After the cross-examination of Jones, DDA Castello thought that it was clearly understood to everyone in the courtroom, including the jurors, that (1) in March, 1994, Jones had been engaging in illegal activity involving the collection of money for prostitution activity, (2) sometime after he became a percipient witness in the murder case, he was arrested and charged with pimping and pandering, (3) he was facing prison time as a result of these charges, (4) based on his prior assistance to the LAPD as well as his assistance in the pending murder case, the LAPD had requested leniency in his pimping and pandering case and (5) that he had received a reduced sentence on his pimping and pandering charge following the request for leniency by the LAPD. (UFN 119-123.)  Had Jones denied any of that information on cross-examination, DDA Castello is fully aware that he would have had an obligation to correct that. (UFN 117.)

Moreover, during closing argument, the defense continued their attempt to smear Jones and repeated their theory that Jones was an "informant guy" who was acting only in his self-interest by testifying against Plaintiff.  (UFN 124-125.)  It was Plaintiff's untruthfulness on the stand, however, that had the biggest impact on the jury.  Under circumstances just like this, the Ninth Circuit rejected *Brady/Napue* claims stating that "[g]iven that the defense impeached the informants' credibility to this extent and the jury still convicted Hovey, **it is not reasonably probable that the additional evidence of actual leniency** with regard to one of the two informants **would have altered the outcome of the trial**." *Hovey v. Ayers*, 458 F.3d 892, 920 (9th Cir. 2006) (emphasis added).  If anything, Plaintiff's *Brady* argument is even weaker in the instant case than *Hovey* because,

unlike in *Hovey*, there is no indication that Jones was acting in the capacity as an informant in the investigation of Plaintiff.

As such, because there was no "actual prejudice" from any alleged failure to turn over exculpatory evidence, Plaintiff's *Brady/Napue* claims against the County and DA's Office fail on this additional basis.

## V. BECAUSE THE ACTUAL CONDUCT WAS CARRIED OUT ON BEHALF OF THE STATE OF CALIFORNIA, PLAINTIFF'S *MONELL* CLAIMS ARE NOT ACTIONABLE BASED ON THE NINTH CIRCUIT'S *WEINER* DECISION.

There is no respondeat superior liability under Section 1983 with respect to Plaintiff's claims against the County/DA's Office. In order for Plaintiff to prove his claims under Section 1983 premised on alleged misconduct by the DA's Office, it must be determined that the alleged constitutional violations were carried out as part of a policy, practice or custom of "deliberate indifference" on behalf of these parties. *See, Monell v. New York City Dept. of Soc. Services*, 436 U.S. 658, 694 (1978). If the conduct at issue was carried out on behalf of the State of California, as a matter of law, Plaintiff cannot prove his *Monell* claims against the County/DA's Office. *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 fn. 10 (1989) (neither states nor state officials acting in their official capacities are "person[s]" within the meaning of Section 1983 when sued for damages); *see also, Weiner v. San Diego Count*y, 210 F.3d 1025, 1030 (9th Cir. 2000).

As set forth in greater detail below, the Ninth Circuit in *Weiner* has already held that claims against a county and district attorney's office under *Monell* are properly dismissed because district attorneys act on behalf of the State when investigating and proceeding with criminal prosecutions.

**A.**    <u>**The Crux Of A Section 1983 Claim Against A Public Entity Is An**</u>
<u>**Official Policy, Practice Or Custom Of "Deliberate Indifference"**</u>
<u>**Carried Out On Behalf Of A Local Policymaker.**</u>

42 U.S.C. § 1983 provides, in pertinent part that "[e]very **person** who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. …"  (Emphasis added.)

In *Monell,* the Supreme Court addressed the question of whether local governmental units could be treated as a "person" for Section 1983 purposes and held that such treatment is appropriate only under certain circumstances. Specifically, the Supreme Court held that governmental bodies may be sued directly under Section 1983 if the action that is alleged to be unconstitutional was carried out as part of an official policy, practice or custom of "deliberate indifference" on behalf of that particular governmental body.  *Id. at* 690-9; *see also, McMillian v. Monroe County, Ala.*, 529 U.S. 781, 785 (1997) (the plaintiff must establish that the official (1) had final policymaking authority "concerning the action alleged to have caused the particular constitutional or statutory violation at issue" and (2) was the policymaker for the local governing body for the purposes of the particular act); *Penbaur v. Cinncinati*, 475 U.S. 469, 481 (1986) ("Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered.").  Thus, if the alleged deprivation **was not carried out on behalf of the local governmental body being sued**, no claim under Section 1983 against the governmental body can be stated.  Such is the case here based on the *Weiner* analysis.

15

**B.**      ***Weiner* Has Already Held That District Attorneys Are *State*
**Officers When Investigating and Proceedings With Criminal**
**Prosecutions.**

Whether the DA's Office acts on behalf of the County or the State when engaging in certain conduct, is a question dependent on state law.  *McMillian v. Monroe County, Ala., supra*, 529 U.S. at 786.  The California Supreme Court is the ultimate interpreter of California state law.  *Weiner v. San Diego County, supra,* 210 F.3d at 1028-29.  In *Weine*r, the Ninth Circuit referred to California law and acknowledged that "[a]ll relevant California cases, including *Pitts [v. Kern County,*17 Cal.4th 340 (1998)], have held that District Attorneys are state officers for the purpose of **investigating and proceeding with criminal prosecutions**." *Id.* at 1030 (emphasis added.)  *Weiner* relied heavily on the analysis in *Pitts*, a case in which the California Supreme Court directly addressed the question as to whether a district attorney's office acts on behalf of a county or the state for the purposes of Section 1983 liability.

In *Pitts*, the plaintiffs were individuals whose convictions for numerous sex offenses had been reversed because of alleged prosecutorial misconduct.  The plaintiffs sued, naming both a county and a district attorney's office as defendants. *Id.* at 346.  One of the grounds for the trial court's dismissal of the county was that the county "had no ability to hire, fire or discipline [the District Attorney], who was an elected public official." *Id.*  The Court of Appeal reversed this ruling stating that it could not "hold as a matter of law that [the district attorney] was not a County policymaker for Section 1983 purposes." *Id.* at 347.  The Court of Appeal also held that several triable issues of material fact remained: whether the district attorney was a policymaker for the county for purposes of Section 1983; whether the alleged prosecutorial misconduct resulted from a county policy or custom; and whether the plaintiff suffered any constitutional injury as a result. *Id.*  After a thorough examination of relevant statutes and case law, *Pitts* reversed the appellate

1  court's decision and held that a district attorney in the State of California

2  "represents the state and is not a policymaker for the county." *Id.* at 362; *Weiner,*

3  *supra*, 210 F.3d at 1030.

4        Nor does it make any difference that Plaintiff has sued both the County and

5  the DA's Office.  The analysis is still the same because of the crux of the

6  *Weiner/Pitts* analysis is the fact that the State Attorney General's Office, not the

7  County Board of Supervisors, has ultimate control and supervision over certain

8  policymaking functions of the various district attorney's offices throughout the

9  State.  Indeed, in a fairly recent case before the Honorable Stephen Wilson, this

10  Court applied the *Pitts/Weiner* analysis to bar a Section 1983 claim against **both**

11  the County (to the extent the allegations were based on conduct by the DA's

12  Office) and the DA's Office.  *See, Nazir v. County of Los Angeles, et al.*, 2011

13  WL 819081 at *6-8 (C.D. CA 2011).  This was not the first time (nor the last

14  time) that the *Pitts/Weiner* analysis had been applied to bar claims under Section

15  1983 brought simultaneously against a county as well as a district attorney's

16  office.  *See, Neri v. County of Stanislaus, et al.,* 2010 WL 3582575 at *4, 9 (E.D.

17  CA 2010); *see also, Jackson v. Barnes*, 749 F.3d 755, 767 (9th Cir. 2014) ("With

18  respect to the Ventura County District Attorney's Office, Jackson alleges, in

19  effect, that the District Attorney's Office is liable for Murphy's unlawful

20  prosecutorial conduct. The District Attorney's Office, however, acts as a state

21  office with regard to actions taken in its prosecutorial capacity, and is not subject

22  to suit under § 1983. *Weiner,* 210 F.3d at 1030.")

23    **C.    Based On The Undisputed Facts In The Instant Case, Plaintiff's**

24          **Attempt To Rely On The Limited Exception To *Weiner* In**

25          ***Goldstein v. City Of Long Beach* Is Misplaced.**

26        Plaintiff's attempt to rely on a narrow exception to the *Weiner* rule found in

27  *Goldstein v. City of Long Beach*, 715 F.3d 750 (9th Cir. 2013) is misplaced in the

28  instant case.  Specifically, *Goldstein* involved a situation where impeachment

information about a jailhouse informant[4] was not turned over to the defense because the prosecutor trying the case was completely unaware of the impeachment information.   Relevant to this, *Goldstein* cited to the fact that a special grand jury investigation had looked into issues involving the DA's Office use of jailhouse informants and specifically recommended the implementation of a centralized index or database with jailhouse informant information to avoid this problem from reoccurring.  *Id.* at 758.  This was found to be an administrative issue outside the investigative and prosecutorial functions of a prosecutor and therefore outside the scope of *Weiner*. *Goldstein, supra* at 762.

In an attempt to avoid *Weiner,* Plaintiff is attempting to claim that the prosecutor trying the murder case below was clueless about Jones' deal and that some sort of separate database or index would have changed things.  This is simply not supported by the evidence.  Unlike *Goldstein,* it is undisputed that all of the information regarding Jones plea was easily accessible to all of the prosecutors in the DA's Office through Jones' case file as well as PIMS and that the prosecutor who tried the underlying murder case read the Jones file and was aware of the plea deal.[5] (UFN 71-73, 88.)  It is further undisputed that the non-privileged materials

_____

[4] In a transparent attempt to try to equate the instant case with *Goldstein,* Plaintiff has repeatedly attempted to refer to Jones as an "informant" even though there is no evidence that Jones was acting in the capacity as an informant in the underlying murder investigation. Indeed, as discussed in the instant Motion at 11:14-12:2, *infra,* consistent with the materials disclosed to the defense below, the DA's Office internal work product referred to Jones as a witness (not informant) in the subject investigation.  The information conveyed to the DA's Office was that Jones lived in the building outside where the shooting occurred and that he was cooperating as a percipient witness in the investigation for several months before he was even arrested on the pimping charge.  As such, and unlike Fink in the *Goldstein* case, Jones was a percipient witness.  In fact, *Goldstein* specifically noted that there was absolutely no witness evidence that connected the plaintiff to the murder victim. *Goldstein*, *supra* at 752.

[5] Indeed, Plaintiff specifically alleges in Complaint that Jones' purported "false testimony was sponsored by the prosecution, inasmuch as **the prosecution was aware that the testimony was false**, but nonetheless allowed it to go uncorrected, undermined the defense's efforts to prove it was false, and argued to the jury that it was true." (UFN 131.)

regarding Jones' plea were turned over to the defense and that the defense also had the transcripts of Jones' plea and sentencing hearings. (UFN 52, 58, 67.)  While in *Goldstein* "it was the lack of an index that allowed [the jailhouse informant] to lie about the benefits he received for testifying against Goldstein [that] prevented prosecutors in Goldstein's case from knowing [the jailhouse informant']s history, and **prevented Goldstein's counsel from impeaching [the jailhouse informant]**" (*Id.* at 762 (emphasis added)), in the instant case there is no dispute that Jones was thoroughly impeached by the defense at trial after he denied receiving "special treatment." (UFN 105-125.)

The instant case is not about the lack of an index or database, but rather the alleged failure to correct false testimony at trial.  This is a critical difference from *Goldstein* because *Goldstein* specifically stated that "**it is clear that the district attorney acts on behalf of the state when conducting prosecutions**, but that the local administrative policies challenged by Goldstein are distinct from the prosecutorial act." *Goldstein, supra,* 715 F.3d at 759 (emphasis added.)  Clearly, the direct, cross and re-direct examination of a witness such as Jones is part of "conducting" a prosecution and, therefore, the allege failure to correct the false testimony was carried out on behalf of the State of California, not the County or DA's Office.  For this additional reason, summary judgment in favor of the County and DA's Office is mandated as a matter of law.

## VI.    A FURTHER BASIS FOR SUMMARY ADJUDICATION IS THE FACT THAT THERE IS NO GENUINE ISSUE OF MATERIAL FACT THAT A POLICY, PRACTICE OR CUSTOM OF "DELIBERATE INDIFFERENCE" BY THE COUNTY OR DA'S OFFICE CAUSED A BRADY VIOLATION.

There is absolutely no evidence that the DA's Office has either a policy or practice of not providing potentially exculpatory information about witnesses who receive plea deals in other cases.  Nor is there any evidence of a policy or practice

by the DA's Office of failing to correct false testimony.  In fact, the undisputed evidence is that prosecutors at the DA's Office receive significant training regarding both their discovery and ethical obligations throughout their career and there are substantial materials provided to prosecutors discussing how to comply with both their *Brady* and ethical obligations. (UFN 133-170.)  Since Plaintiff cannot prove that a policy or practice of "deliberate indifference" by the DA's Office caused any alleged constitutional violation, Plaintiff must prove not only a "custom" of failing to convey information regarding plea deals given to persons who happen to be a witness in another case or failing to correct false testimony, but also that such custom was the result of "deliberate indifference" by the DA's Office.  As set forth below, based on the undisputed evidence, there is no genuine issue of material fact as to either of these elements.

> ### A.    Other Than Plaintiff's Attempt To Rely On The Facts Of The Instant Case, There Is Absolutely No Evidence Of A "Persistent And Widespread" Custom By The DA's Office In Failing To Convey Information About Plea Deals To Persons To Defense Counsel In Separate Criminal Actions Where Such Persons Are Witnesses In A Separate Criminal Case.

To prove that the DA's Office had a custom which caused his constitutional rights to be violated, Plaintiff must show that the practices are "persistent and widespread . . . permanent and well-settled [and] deeply imbedded." *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 167-68 (1970).  Courts have proven to be particularly sensitive to claims that a government entity maintains an unspoken, wrongful "custom" of violating civil rights.  In *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823-824 (1985), the United States Supreme Court found that a Section 1983 plaintiff cannot recover under a "custom" theory by simply producing evidence of isolated incidents of alleged misconduct directed toward him.  Based on *Tuttle*, the lower courts have

repeatedly required a Section 1983 plaintiff to support their "custom" allegations with evidence of multiple, similar past incidents -- thereby demonstrating official knowledge and tacit approval of a wrongful course of conduct by municipal employees.  *Rodriguez v. Avita*, 871 F.2d 552, 555 (5th Cir. 1989).  In the absence of an overwhelming showing of numerous prior similar incidents -- involving numerous other citizens and officers -- a section 1983 plaintiff proceeding on a tacit, wrongful "custom" theory fails to make a prima facie case against a governmental entity.

Indeed, as many as 12 prior incidents have been held insufficient to constitute evidence of a "pattern" for purposes of Section 1983.  *See*, *Hamilton v. Rogers*, 791 F.2d 439, 443 (5th Cir. 1986) (approximately 12 racial employment incidents in two and-a-half years at fire department insufficient to constitute pattern for purposes of civil rights laws); *Carter v. District of Columbia*, 795 F.2d 116, 123-24 (D.C. Cir. 1986) (plaintiff produced evidence of approximately 11 prior incidents in an effort to establish municipal custom; court enters directed verdict for city: "This catalog of disquieting events is not sufficient to demonstrate a pervasive pattern of police officer use of force, persisting in a district because of (supervisory) tacit approval . . . "); *Ramos v. City of Chicago*, 707 F.Supp. 345, 347 (N.D. Ill. 1989) (six prior incidents fail to make up prima facie case under Section 1983 against municipality); *Sloman v. Tadlock*, 21 F.3d 1462 (9th Cir. 1994) (court overturns jury finding of <u>Monell</u> liability for lack of evidence indicating that misconduct was widespread on police force; "habitual" harassment of plaintiff by one officer in sufficient as a matter of law).

Against this background, to the extent that Plaintiff attempts to prove a tacit, wrongful "custom" by the County and/or DA's Office, his Section 1983 claims are hopelessly defective.  Plaintiff has no evidence of a requisite pattern of wrongful acts -- involving numerous officers -- sufficient to raise an inference that such customs exist and indeed no such policies or customs exist. Indeed,

Plaintiff seeks to base his claim solely on the existence of the subject incident. However, as set forth above, it is well settled that one incident is insufficient to establish *Monell* liability.

## B.    Nor Is There Evidence That *Deliberate Indifference* By the DA's Office Caused The Alleged Constitutional Violation.

"[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Board of Comm'rs of Bryan Cty. v. Brown,* 520 U.S. 397, 410 (1997). Here, because Plaintiff has no evidence of a policy, practice or custom of not conveying information to plea deals offered to persons who are witnesses in a separate criminal proceeding and/or a policy, practice or custom of failing to correct false testimony, Plaintiff is apparently relying on the "single-incident" liability hypothesized by the Supreme Court in *Canton v. Harris*, 489 U.S. 378, 389 (1989).

Pertinent to this is the recent published decision by the United States Supreme Court in *Connick v. Thompson*, 131 S. Ct. 1350, 1360 (2011).  Like the instant case, *Connick* involved the reversal of a conviction after an appellate court determined that there was a *Brady* violation because of a failure to disclose a crime lab report.  In the subsequent civil lawsuit, the plaintiff tried to a county and prosecutor's office under Section 1983 on a theory that there was a failure to train prosecutors on how to avoid such *Brady* violations.  Also like the instant case, there was no evidence of a policy or practice of not disclosing crime lab reports or a "persistent and widespread" custom of failing to disclose such materials.  Instead, the plaintiff tried to rely on the *Canton* "single-incident" policy of inaction argument.

Rejecting the plaintiff's argument, *Connick* stated:

It does not follow that, because *Brady* has gray areas and some *Brady* decisions are difficult, prosecutors will so obviously make wrong

22

decisions that failing to train them amounts to "a decision by the city itself to violate the Constitution." *Canton,* 489 U.S., at 395, 109 S.Ct. 1197 (O'Connor, J., concurring in part and dissenting in part). To prove deliberate indifference, Thompson needed to show that Connick was on notice that, absent additional specified training, it was "highly predictable" that the prosecutors in his office would be confounded by those gray areas and make incorrect *Brady* decisions as a result. In fact, Thompson had to show that it was *so* predictable that failing to train the prosecutors amounted to *conscious disregard* for defendants' *Brady* rights. See *Bryan Cty.,* 520 U.S., at 409, 117 S.Ct. 1382; *Canton, supra,* at 389, 109 S.Ct. 1197. He did not do so. *Connick, supra,* 131 S. Ct. at 1365.

There simply is no evidence that the lack of a separate database or index was a result of "deliberate indifference," much less the cause of Plaintiff's alleged constitutional violation.  Notably, all of the prosecutors in the DA's Office are required to run the criminal histories of all of the witnesses that they are going to call in a case. (UFN 167-168.)  So, for example, if a prosecutor runs a criminal history of a witness (such as Jones) and learns that there is a pending prosecution against that witness, the prosecutor merely needs to obtain the file of the case against the witness to obtain information about the witness's status in that criminal case.  (UFN 169.)  The information from the criminal files are easily accessible to prosecutors throughout the DA's Office. (UFN 71-73.)  The fact that the non-privileged documents about the plea were indeed turned over to the defense (UFN 52, 58) and that the prosecutor trying the case read the Jones' file (UFN 88) makes it clear that the foregoing steps took place in the instant case.[6]

---

[6] While Plaintiff will likely argue that the **reasons** for the plea were not disclosed, this is simply not supported by the evidence.  As indicated in the two LAPD letters, it was indicated that Jones had assisted the LAPD not just in Plaintiff's prosecution, but in other homicide investigations. In fact, at the time of the underlying prosecution, the defense, like the DA's Office, understood

1        Moreover, it is undisputed that the DA's Office utilizes various databases

2  when using peace officer witnesses, government employees and/or jailhouse

3  informants to ensure compliance with *Brady*. (UFN 162-165.)  Unlike these types

4  of witnesses, however, percipient witnesses are less likely to be a recurring

5  witness in multiple prosecutions. (UFN 171.) Therefore, there is not the same

6  need for an additional database or index for such witnesses.[7]  As set forth above,

7  to ensure compliance with *Brady* obligations with these types of witnesses, the

8  DA's Office has procedures in place. (UFN 167-170.)

9        Based on *Connick*, Plaintiff's *Monell* claim is simply not viable.  Given the

10  undisputed evidence that it is the practice of prosecutors at the DA's Office to run

11  the criminal histories of all witnesses they are going to call in a case, combined

12  with maintenance of detailed information regarding plea deals in the individual

13

---

14  those letters to indicate that Jones had assisted the LAPD in multiple cases. (UFN 62-63.)
Nonetheless, while Plaintiff's defense counsel repeatedly tried to argue that the only reason for
15  the providing Jones leniency was his cooperation in the underlying murder investigation, that
was not supported by the LAPD letters requesting leniency, the transcript of the plea proceeding,
16  Judge Tynan's notes, the Case Chron or the Disposition Report. (UFN 43, 46-47, 57, 59-60, 62-
63, 74-78.)  *See also,* instant Motion at 11:14-12:2, *infra.*  All of these documents indicated that
17  leniency was given to Jones because the LAPD had informed the DA's Office that Jones had
assisted the LAPD in multiple matters. (Id.) While the DA's Office had a duty to disclose the
18  information regarding the leniency request and the plea deal, the DA's Office was not required to
twist those facts the way Plaintiff's defense team wanted to spin those facts, i.e., that Jones only
19  cooperated to get a good deal on his pimping and pandering case.

20  [7] Moreover, maintaining a separate centralized index or database for all percipient witnesses
would simply not be feasible because of the sheer number of percipient witnesses that the DA's
21  Office deals with on an annual basis. For example, from 1996 through 2013, there have been a
total of 3,161,711 combined felony and misdemeanor cases filed by the DA's Office for an
22  average of 175,650 cases per year. (UFN 173.) Taking into account the fact that there are
usually multiple witnesses in each prosecution, maintaining a separate centralized index or
23  database for hundreds of thousands of individuals each year would be an extremely onerous
process.  Even if the database were limited to only those individuals who settled their criminal
24  cases through a plea deal or otherwise, it would still require a significant diversion of resources
at the DA's Office because, during that same time period (1996 through 2013), the annual
25  average of criminal defendants who resolved their cases through a plea was 143,244.  (UFN
175.)  Approximately 80% of cases which plea out are as a result of a negotiated plea with the
26  DA's Office (as opposed to the situation where a defendant enters a guilty or no contest plea on
his own). (UFN 176.)  Thus, to create a database limited to individuals who enter into plea
27  deals would still require a significant diversion of resources because this would entail creating
entries for roughly 114,595 individuals annually.  (UFN 177.) Moreover, the amount of the
28  information that could be included in such a database or index would be significantly more
limited than what is already in the individual case files and PIMS. (UFN 178.)

1    case files and PIMS, has resulted in an effective safeguard to ensure that

2    prosecutors comply with their obligation to communicate information regarding

3    plea deals to the defense in criminal cases, the lack of a separate "witness" or

4    "plea deal" database does not rise to the level of "deliberate indifference."

5    Moreover, because both DDA Castello and Plaintiff's defense team were fully

6    aware of the details of Jones' plea, including the reason why leniency was

7    granted, summary adjudication in favor of the County and DA's Office is

8    warranted on this additional basis.

9    **VII.   CONCLUSION.**

10          For each and all of the foregoing reasons, Defendants COUNTY OF LOS

11   ANGELES and LOS ANGELES COUNTY DISTRICT ATTORNEY'S OFFICE

12   respectfully request that this Court enter summary judgment in their favor and that

13   the claims alleged against these Defendants be dismissed with prejudice.

14

15   Dated:  December 8, 2014          LAWRENCE BEACH ALLEN & CHOI, PC

16

17                                    By /s/ *Michael D. Allen*
                                         Michael D. Allen
18                                       Attorneys for Defendants
                                         COUNTY OF LOS ANGELES and
19                                       LOS ANGELES COUNTY DISTRICT
                                         ATTORNEY'S OFFICE

20

21

22

23

24

25

26

27

28

1  PAUL B. BEACH, State Bar No. 166265
   pbeach@lbaclaw.com
2  MICHAEL D. ALLEN, State Bar No. 198126
   mallen@lbaclaw.com
3  DENNIS M. GONZALES, State Bar No. 59414
   dgonzales@lbaclaw.com
4  LAWRENCE BEACH ALLEN & CHOI, PC
   100 West Broadway, Suite 1200
5  Glendale, California  91210-1219
   Telephone No. (818) 545-1925
6  Facsimile No. (818) 545-1937

7  Attorneys for Defendants
   COUNTY OF LOS ANGELES AND
8  LOS ANGELES COUNTY DISTRICT ATTORNEY'S OFFICE

9
              **UNITED STATES DISTRICT COURT**
10
              **CENTRAL DISTRICT OF CALIFORNIA**
11

12
   REGGIE COLE,                          ) Case No. CV 11-03241-CBM (AJWx)
13                                        ) (*Cole Action*)
                    Plaintiff,            )
14         vs.                            ) Case No. CV 12-01332-CBM (AJWx)
                                          ) (*Anthony City Action*)
15 CITY OF LOS ANGELES, et al.,           )
                                          ) Case No. CV 13-07224-CBM (AJWx)
16                  Defendants.           ) (*Anthony County Action*)
17 ───────────────────────────            ) Honorable Consuelo B. Marshall
   OBIE S. ANTHONY, III,                  )
18                                        ) **SEPARATE STATEMENT OF**
                    Plaintiffs,           ) **UNCONTROVERTED MATERIAL**
19         vs.                            ) **FACTS AND CONCLUSIONS OF**
                                          ) **LAW BY DEFENDANTS COUNTY**
20 CITY OF LOS ANGELES, et al.,           ) **OF LOS ANGELES AND LOS**
                                          ) **ANGELES COUNTY DISTRICT**
21                  Defendants.           ) **ATTORNEY'S OFFICE**
22 ───────────────────────────            )
   OBIE S. ANTHONY, III,                  ) [Motion for Summary Judgment;
23                                        ) Declarations and Exhibits; and
                    Plaintiff,            ) [Proposed] Judgment filed concurrently
24                                        ) herewith]
           vs.                            )
25                                        )
   COUNTY OF LOS ANGELES, et al.          ) Date:        January 13, 2015
26                                        ) Time:        10:00 a.m.
                    Defendants.           ) Courtroom:  2
27 ───────────────────────────            )

28

                              1

1    Defendants COUNTY OF LOS ANGELES ("County") and LOS ANGELES

2  COUNTY DISTRICT ATTORNEY'S OFFICE ("DA's Office") submit the

3  following Separate Statement of Uncontroverted Material Facts and Conclusions of

4  Law in support of their Motion for Summary Judgment, or in the alternative,

5  Summary Adjudication.

6

7  Dated: December 8, 2014        LAWRENCE BEACH ALLEN & CHOI, PC

8

9

10                              By  /s/ *Michael D. Allen*
                                    Michael D. Allen
11                                  Attorneys for Defendants
                                    COUNTY OF LOS ANGELES and
12                                  LOS ANGELES COUNTY DISTRICT
                                    ATTORNEY'S OFFICE

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# I.  UNCONTROVERTED MATERIAL FACTS RELEVANT TO NO GENUINE ISSUE OF MATERIAL FACT AS TO A *BRADY* VIOLATION BY THE COUNTY OR DA'S OFFICE.

| UNCONTROVERTED MATERIAL FACTS: | SUPPORTING EVIDENCE: |
| --- | --- |
| **Facts Regarding the March 27, 1994 Shooting of Felipe Angeles Gonzalez.** | |
| 1.   On March 27, 1994, at approximately 11:30 p.m., Victor Trejo ("Trejo") drove his 1987 Mazda with Luis Jimenez ("Jimenez") and Felipe Angeles Gonzalez ("Gonzalez") to a building on the corner of 49th Street and Figueroa Street in Los Angeles. | 1.   Complaint, Exhibit "B" at ¶ 20. |
| 2.   Gonzalez got out of the car and unsuccessfully tried to enter the building. | 2.   Complaint, Exhibit "B" at ¶ 20. |
| 3.   As Gonzalez was walking back towards the car, three or four African American males approached Trejo's car. | 3.   Complaint, Exhibit "B" at ¶ 20. |
| 4.   One suspect pushed Gonzales up against the back of the car, while another opened the passenger side door, yelled at Trejo and Jimenez to give him their money, and tried to pull Jimenez out of the car. | 4.   Complaint, Exhibit "B" at ¶ 20. |

3

| UNCONTROVERTED MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| 5.    Shots were fired and both Trejo and Jimenez were shot several times. | 5.    Complaint, Exhibit "B" at ¶ 20. |
| 6.    After being shot, Trejo drove off with Jimenez in the car. | 6.    Complaint, Exhibit "B" at ¶ 20. |
| 7.    As he was driving away, Trejo saw the suspects pushing Gonzalez and then he heard more gun shots. | 7.    Complaint, Exhibit "B" at ¶ 20. |
| 8.    Police found Gonzalez dead at the scene, lying face down on Figueroa Street with a single gunshot wound through his torso. | 8.    Complaint, Exhibit "B" at ¶ 21. |
| 9.    Detectives Marcella Winn and Peter Razanskas of the Los Angeles Police Department ("LAPD") South Bureau Homicide were the investigators assigned to the case. | 9.    Complaint, Exhibit "B" at ¶ 22. |
| **Facts Regarding John Jones' Statements to the LAPD Identifying Plaintiff As A Shooter In The Gonzalez Homicide Investigation.** | |
| 10.  Sometime after midnight on the night Gonzalez was shot and killed, John Jones ("Jones"), a man who lived in the building on the corner of 49th Street and Figueroa Street, observed several LAPD Detectives arrive on the scene and collect evidence. | 10.  Declaration of John Jones ("Jones Decl.") at ¶ 4. |

| UNCONTROVERTED MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| 11.  At approximately 4:00 a.m. on March 28, 1994, Jones called out to LAPD Detective Winn to get her attention. | 11.  Jones Decl., ¶ 4. |
| 12.  Jones then went downstairs and informed LAPD Detective Winn of what he observed, including a description of the two individuals he observed shooting at him. | 12.  Jones Decl., ¶ 4. |
| 13.  After speaking to Jones during the early morning hours of March 28, 1994, LAPD Detective Winn filled out a statement form regarding her conversation with him. | 13.  Reporter's Transcript of criminal trial in *People v. Anthony III, et al.*, Case No. BA097736 ("*Anthony* Criminal Trial Transcript"), Exhibit "AA" at 455:9-24; John Jones March 28, 1994 Statement, Exhibit "C." |
| 14.  According to the March 28, 1994 statement, Jones is reported as stating that he observed four African American males approach Trejo's car, that one of the suspects stated, "Give me your money, give me all the money, get out of the car", and that a second suspect stated, "Kill him, kill him." | 14.  Exhibit "C." |

| UNCONTROVERTED MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| 15.  According to the March 28, 1994 statement, the first suspect grabbed Gonzalez and shot him. | 15.  Exhibit "C." |
| 16.  According to the March 28, 1994 statement, stated that he then yelled at the suspects and the first and second suspects began firing at him. | 16.  Exhibit "C." |
| 17.  According to the March 28, 1994 statement, Jones is further reported as giving a physical description of the two suspects and stating that he could positively identify the shooters. | 17.  Exhibit "C." |
| 18.  Three days later, on March 31, 1994, Jones went to the LAPD South Bureau Homicide office to give a further statement to LAPD Detectives Winn and Razanskas regarding the March 27, 1994 shooting. | 18.  Jones Decl., at ¶ 5; *Anthony* Criminal Trial Transcript, Exhibit "AA" at 252:21-27, 350:23-351:4, 456:1-13; Statement Form Dated March 31, 1994 ("Jones March 31, 1994 Statement"), Exhibit "D". |
| 19.  Jones signed the March 31, 1994 statement. | 19.  Jones Decl., ¶ 5; *Anthony* Criminal Trial Transcript, Exhibit "AA" at 252:21-27; Jones March 31, 1994 Statement, Exhibit "D". |

| UNCONTROVERTED MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| 20.  According to the March 31, 1994 statement signed by Jones, Jones stated that on March 27, 1994, at approximately 11:30 p.m., he was informed by his girlfriend that someone was being robbed at the street corner outside of his building. | 20.  Jones March 31, 1994 Statement, Exhibit "D". |
| 21.  According to the March 31, 1994 statement signed by Jones, Jones stated that he heard gun shots, then looked down towards the street from out of his bathroom window. | 21.  Jones March 31, 1994 Statement, Exhibit "D". |
| 22.  According to the March 31, 1994 statement signed by Jones, Jones stated that he then realized he was being shot at, and saw muzzle flashes from two guns. | 22.  Jones March 31, 1994 Statement, Exhibit "D". |
| 23.  According to the March 31, 1994 statement signed by Jones, Jones gave a physical description of the two shooters. | 23. Jones March 31, 1994 Statement, Exhibit "D". |
| 24.  According to the March 31, 1994 statement signed by Jones, Jones indicated again that he would be able to positively identify the two shooters. | 24. Jones March 31, 1994 Statement, Exhibit "D". |

| UNCONTROVERTED MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| 25. On May 3, 1994, Jones identified photographs of Plaintiff Obie Anthony ("Plaintiff") and Reggie Cole ("Cole") as the two shooters in photographic six-packs. | 25. *Anthony* Criminal Trial Transcript, 253:6-255:11; Jones Decl., ¶ 6; Exhibits "E"-"H." |
| 26. With regard to the six-pack containing the photograph of Plaintiff, Jones identified the picture of Plaintiff and wrote, "Suspect number 1 on card A, a male black, approximately five-nine in a gray coat with a chrome handled gun shooting at me and the Mexican guys." | 26. *Anthony* Criminal Trial Transcript, Exhibit "AA" at 254:8-10; Jones Decl., ¶ 6; Exhibits "E" and "F." |
| 27. Jones was never asked to cooperate in the investigation and prosecution of Plaintiff and Cole. | 27. Jones Decl., ¶ 7. |
| 28. Jones agreed to cooperate in the investigation and prosecution of Plaintiff and Cole of his own free will because he believed they were the individuals who shot at him. | 28. Jones Decl., ¶ 7. |

| UNCONTROVERTED MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| 29.  After LAPD Detective Winn presented the case to the District Attorney's Office ("DA's Office"), Plaintiff and Cole were ultimately arrested and charged for the murder of Gonzalez. | 29.  Complaint, Exhibit "B" at ¶¶ 42, 52. |
| **Facts Regarding John Jones' Arrest For Pimping and Pandering, His Plea Deal and Materials Conveyed to the Defense Regarding the Plea Deal.** | |
| 30.  On May 26, 1994, almost two months after Jones came forward as a witness to the March 27, 1994 murder of Gonzalez (and more than three weeks after he had identified Plaintiff) from the photographic six-pack as a suspect in the Gonzalez shooting, Jones was arrested for the crimes of pimping and pandering. | 30.  Plaintiff's Motion to Dismiss filed on May 22, 1995 in *People v. Anthony, et al.,* Case No. BA097736 ("*Anthony* Motion to Dismiss"), p. 3, Exhibit "I"; Jones Decl. ¶ 7. |
| 31.  On May 31, 1994, a felony complaint was filed against Jones alleging two counts of Penal Code § 266(h), pimping and Penal Code § 266(i), pandering and the Deputy District Attorney ("DDA") assigned to handle the case was DDA Kellyjean Chun. | 31.  Declaration of Kellyjean Chun ("Chun Decl."), ¶ 9; Jones Decl., ¶ 7. |

9

| UNCONTROVERTED MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| 32.  At the time the Jones complaint was filed, DDA Chun had been with the DA's Office for over approximately eight years. | 32.  Chun Decl., ¶¶ 1, 18. |
| 33.  DDA Chun had handled cases that involved leniency and immunity requests from either criminal defendants or witnesses. | 33.  Chun Decl., ¶ 19. |
| 34.  The criminal complaint, which is a matter of public record, further alleged that Jones had a prior strike conviction. | 34.  Chun Decl., ¶ 9. |
| 35.  All prosecutors in the DA's Office are trained to keep their files updated using a form called Chronology of the Case ("Case Chron"). | 35.  Declaration of Jason Lustig ("Lustig Decl.") at ¶ 15; Exhibit "J"; Chun Decl., ¶ 9. |
| 36.  While the Case Chron is viewed by the DA's Office as internal work product, the primary reason for the D.A.'s Office practice of keeping a Case Chron in each DA case file was to make such information readily accessible and available internally within the DA's Office to other prosecutors for reference. | 36.  Lustig Decl., ¶ 15; Chun Decl., ¶ 21. |

10

| UNCONTROVERTED MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| 37.  The information in the Case Chron from the Jones file would have been accessible to any prosecutors handling separate cases in which Jones was a witness. | 37.  Chun Decl., ¶ 21. |
| 38.  DDA Chun noted in the Case Chron of Jones' internal DA file that the minimum state prison sentence for the pimping and pandering charge brought against Jones was six years. | 38.  Chun Decl., ¶¶ 9-10; Exhibit "K." |
| 39.  Jones contacted LAPD Detective Winn to ask if she could help with stopping his business from being raided. | 39.  *Anthony* Criminal Trial Transcript, Exhibit "AA" at 286:1-11; Jones Decl., ¶ 7. |
| 40.  Jones later testified that LAPD Detective Winn told him that she could not help him. | 40.  Jones Decl., ¶ 7; *Anthony* Criminal Trial Transcript, Exhibit "AA" at 286:10-14. |
| 41.  DDA Chun's notes in the Case Chron for Jones' internal DA file reflect that, on July 21, 1994, LAPD Detective Winn contacted to request leniency in Jones pimping and pandering case. | 41.  Chun Decl., ¶ 11; Exhibit "K." |

11

| UNCONTROVERTED MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| 42.  DDA Chun informed LAPD Detective Winn that, pursuant to the DA Office's policies and procedures regarding leniency requests from law enforcement agencies, the LAPD would have to submit the leniency request in writing in the form of a letter from her Captain to the DA's Office. | 42.  Chun Decl., ¶ 11; Lustig Decl., ¶ 20; Special Directives and portions of the Legal Policies Manual pertaining to requests for leniency and settlement of felony cases, Exhibit "N"; Exhibit "K." |
| 43.  Following the July 21, 1994 conversation between DDA Chun and Detective Winn, an entry was made in the Jones' Case Chron indicating that Jones was a witness on a murder case and that he assisted in other murder cases. | 43.  Exhibit "K." |
| 44.  The July 21, 1994 entry in the Jones' Case Chron also indicated that LAPD Detective Winn wanted to recommend leniency for Jones and that DDA Chun had told her that a Captain from her division had to write a letter addressing these issues. | 44.  Exhibit "K." |

| UNCONTROVERTED MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| 45.  Less than a month and a half after LAPD Detective Winn's communication with DDA Chun, on September 8, 1994, a letter was sent to the DA's Office from Deputy Chief Pomeroy, Acting Director of the LAPD Office of Operations, requesting leniency on behalf of Jones in the pimping and pandering matter. | 45.  Chun Decl., ¶ 12; Letter signed by Martin H. Pomeroy of the LAPD dated September 8, 1994 ("September 8, 1994 LAPD Letter"), Exhibit "L." |
| 46.  The September 8, 1994 LAPD Letter stated that Jones had provided information to the LAPD South Bureau Homicide both before and after his arrest on the pimping and pandering charges in May 1994 and that his information had led to the arrest of two persons for murder. | 46.  Chun Decl., ¶ 12; September 8, 1994 LAPD Letter, Exhibit "L." |
| 47.  The September 8, 1994 LAPD Letter further stated that "[a]dditionally, [Jones] has provided the identity of other suspects involved in ongoing homicide investigations." | 47.  Chun Decl., ¶ 12; September 8, 1994 LAPD Letter, Exhibit "L." |

13

| UNCONTROVERTED MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| 48.  Subsequently, another letter dated October 12, 1994 from Captain Larry Goebel of the LAPD 77th Street Community Station was sent to DDA Chun stating that the 77th Street Community Station concurred with the LAPD Office of Chief of Police's request for leniency on behalf of Jones. | 48.  Chun Decl., ¶ 13; Letter signed by Larry R. Goebel of the LAPD dated October 12, 1994 ("October 12, 1994 LAPD Letter"), Exhibit "M." |
| 49.  Pursuant to the DA's Office policy, practice and custom, where an offer was made on a leniency request where the criminal defendant accepting the offer was a witness in another pending criminal matter, such information would have to be disclosed to the criminal defendant in the second matter pursuant to prosecutor's *Brady* obligations. | 49.  Lustig Decl., ¶¶ 2, 14-15, 20; Chun Decl., ¶ 20. |
| 50.  It is and always has been DDA Chun's practice to communicate such information to the prosecutor handling the second matter to ensure that the DA's Office complies with its *Brady* obligations. | 50.  Chun Decl., ¶ 20. |

| UNCONTROVERTED MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| 51.  In DDA Chun's 27 years as a prosecutor at the DA's Office, 13 of which have been in a supervisory capacity, she had never had a single case that she handled overturned on habeas for a violation of *Brady* disclosure obligations including, but not limited to, an alleged failure to turn over information of a plea deal pertaining to a witness in the case. | 51.  Chun Decl., ¶ 24. |
| 52.  Both the September 8 and October 12 LAPD letters requesting leniency were turned over to Plaintiff's defense attorney as part of the DA's Office *Brady* obligations. | 52.  *Anthony* Motion to Dismiss, pp.1-3; Castello Decl., ¶ 13; Thomason Depo., Exhibit "CC" at 57:10-59:5. |
| 53.  The decision whether to provide leniency to Jones in response to the LAPD's request for leniency was made by DDA Chun's supervisor, DDA Ken Wullschleger. | 53.  Chun Decl., ¶ 14; Declaration of Kenneth C. Wullschleger ("Wullschleger Decl."), ¶ 2-9; DA's Office policies and procedures pertaining to request for leniency and settlement of felony cases, Exhibit "N." |

| UNCONTROVERTED MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| 54.  On November 8, 1994, DDA Chun appeared at the arraignment and plea hearing in the Jones prosecution. | 54. Chun Decl., ¶ 15; Reporter's Transcript of the November 8, 1994 plea and arraignment proceedings in *People of the State of California v. John Henry Jones,* Case No. BA096384, Exhibit "O." |
| 55.  Judge Michael Tynan presided over the November 8, 1994 arraignment and plea hearing. | 55. Chun Decl., ¶ 15; Exhibit "O." |
| 56.  At the November 8, 1994 arraignment and plea hearing, Jones pled guilty to a violation of Penal Code §266(h). | 56. Chun Decl., ¶ 15; Exhibit "O." |
| 57.  According the transcript of the plea hearing, Judge Tynan indicated his understanding that the DA's Office was willing to accept a plea "for a variety of reasons." | 57. Exhibit "O" at 2:18-20. |

| UNCONTROVERTED MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| 58.  Judge Tynan's notes regarding the plea were also turned over to Plaintiff's defense counsel as part of the DA's Office *Brady* obligations. | 58.  *Anthony* Motion to Dismiss, Exhibit "I" at p. 3; "Case Notes by Judge" taken by the Honorable Michael J. Tynan in *People of the State of California v. John Henry Jones,* Case No. BA096384 ("Judge Tynan's notes"), Exhibit "P"; Thomason Depo., Exhibit "CC" at 59:9-60:3; Castello Decl., ¶ 13. |
| 59.  According to Judge Tynan's notes, Jones is referred to as a "snitch" in an unidentified homicide case, and it is indicated that leniency was given to Jones because of his "good, if belated citizenship." | 59.  Wullschleger Decl., ¶ 6; Judge Tynan's notes, Exhibit "P," 219:6-15; *Anthony* Motion to Dismiss, Exhibit "I" at p. 3. |
| 60.  There is nothing in Judge Tynan's notes indicating that leniency was given to Jones solely in exchange for his testimony in Plaintiff's pending murder case. | 60.  Judge Tynan's notes, Exhibit "P." |

| UNCONTROVERTED MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| 61.  DDA Wullschleger reviewed the information contained in Jones' case file, including the Case Chron, as well as the LAPD letters and approved a plea deal to Jones for a one-year maximum prison sentence. | 61. Chun Decl., ¶ 14; Wullschleger Decl., ¶¶ 2-7. |
| 62.  According to DDA Wullschleger, the fact that the September 8, 1994 LAPD Letter indicated that Jones had assisted the LAPD in multiple investigations suggests that the leniency being requested was not for Jones' assistance in any single investigation. | 62. September 8, 1994 LAPD Letter, Exhibit "L"; Wullschleger Decl., ¶ 5. |
| 63.  Like DDA Wullschleger, Plaintiff's and Cole's defense attorneys in the underlying prosecution understood that the September 8, 1994 letter indicated that Jones had assisted the LAPD in multiple matters. | 63. *Anthony* Criminal Trial Transcript, Exhibit "AA" at 980:1-16, 1122:3-6; Deposition of Patrick Thomason ("Thomason Depo."), Exhibit "CC" at 260:18-261:24; Deposition of Dick Tom ("Tom Depo."), Exhibit "DD" at 53:22-54:18. |

| UNCONTROVERTED MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| 64.  DDA Wullschleger appeared at Jones' sentencing hearing, which took place on January 24, 1995. | 64.  Wullschleger Decl., ¶ 7; Reporter's Transcript of January 24, 1995 sentencing hearing in *People of the State of California v. John Henry Jones,* Case No. BA096384, Exhibit "Q." |
| 65.  At the January 24, 1995 sentencing in the Jones' prosecution, Jones' prior November 8, 1994 guilty plea to a violation of California Penal Code § 266(h) was changed to a guilty plea to a violation of California Penal Code 266(f). | 65.  Wullschleger Decl., ¶ 6; Exhibit "Q." |
| 66.  At the January 24, 1995 sentencing in the Jones' prosecution, Jones was sentenced to time served, placed on probation for three years and ordered to perform 200 hours of CalTrans community service. | 66.  Wullschleger Decl., ¶ 6; Exhibit "Q." |
| 67.  By May 22, 1995, DAPD Thomason had obtained transcripts of both the November 8, 1994 plea hearing and the January 24, 1995 sentencing hearing in the Jones' pimping and pandering case. | 67.  *Anthony* Motion to Dismiss, p. 3; Judge Tynan's notes, Exhibit "P," 219:6-15. |

19

| | UNCONTROVERTED MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|---|
| 68. | When a case is resolved, a Disposition Report for internal use by the DA's Office (and treated as work product) is prepared to document recommendations concerning, and to obtain approval for, the disposition of a case (or to report an event or court action affecting a case). | 68. Lustig Decl., ¶ 15. |
| 69. | The primary purpose of the Disposition Report is to assist supervising prosecutors in understanding and approving various key developments during a prosecution. | 69. Lustig Decl., ¶ 15. |
| 70. | The additional information in the Disposition Report can also assist trial prosecutors in fulfilling their *Brady* obligations. | 70. Lustig Decl., ¶ 15. |

| UNCONTROVERTED MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| 71.  Not only was Jones' file stored at CJC i.e., the same criminal courthouse building where Plaintiff's criminal trial was being prosecuted – but the file was available to other prosecutors, including DDA Bobby Grace and DDA Castello, for reference as it related to Plaintiff's prosecution. | 71.  Chun Decl., ¶ 23. |
| 72.     In addition, the entire file for each case, including the Case Chron and Disposition Report, is scanned into the Prosecutor's Information Management System ("PIMS") database used by prosecutors throughout the DA's Office. | 72.  Lustig Decl., ¶ 15. |
| 73.     The fact that the Case Chron and Disposition Report from each case are scanned into the PIMS database not only makes the materials easily accessible from each prosecutor's computer, but also ensures that they will be retained and not inadvertently destroyed. | 73.  Lustig Decl., ¶ 15. |

| UNCONTROVERTED MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| 74.  DDA Wullschleger prepared the Disposition Report in the Jones' case, which is dated January 24, 1995, the same date as the sentencing hearing. | 74.  Wullschleger Decl., ¶ 7; Disposition Report in Jones' case, Exhibit "R." |
| 75.  The Disposition Report specifically indicated that the LAPD had written letters requesting certain factors to "be considered in a dispo of this case." | 75.  Exhibit "R." |
| 76.  DDA Wullschleger approved leniency for Jones' based on his understanding that Jones had assisted the LAPD in multiple homicide cases. | 76.  Wullschleger Decl., ¶ 7; Exhibit "R." |
| 77.  Had the decision to grant leniency to Jones been solely based on his testimony in Plaintiff's murder case, the normal practice of the DA's Office would have been to postpone Jones' sentencing until after he had testified in Plaintiff's murder case. | 77.  Chun Decl., ¶ 17; Wullschleger Decl., ¶ 7. |

| UNCONTROVERTED MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| 78.  The fact that Jones was sentenced approximately six months **prior** to Plaintiff's murder trial is a further indication that the leniency given to Jones was not solely because of his testimony in Plaintiff's murder case. | 78. Chun Decl., ¶ 17; Wullschleger Decl., ¶ 7. |
| **Facts Regarding John Jones' Testimony at the Preliminary Hearing and Subsequent Threats Made Against Jones.** | |
| 79.  On September 12, 1994, Jones testified at the preliminary hearing on Plaintiff's and Cole's murder charges. | 79. Declaration of George Castello ("Castello Decl."), ¶ 9; Jones Decl., ¶ 8. |
| 80.  At the September 12, 1994 preliminarily hearing, Jones identified Plaintiff and Cole as two of the individuals he saw shooting on the night of March 27, 1994. | 80. Jones Decl., ¶ 8. |
| 81.  At the September 12, 1994 preliminary hearing, probable cause to prosecute both Plaintiff and Cole for the murder of Gonzalez was found. | 81. Castello Decl., ¶ 9. |

23

| UNCONTROVERTED MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| 82.  A little over a month after the preliminary hearing, Jones began receiving threats by several individuals who he believed to be members of the Five Deuce Hoover Crips gang. | 82.  Jones Decl., ¶ 9; *Anthony* Criminal Trial Transcript, Exhibit "AA" at 259:24-260:7, 265:16-25. |
| 83.  Specifically, someone said to Jones, "You better keep your black ass out of court." | 83.  Jones Decl., ¶ 9; *Anthony* Criminal Trial Transcript, Exhibit "AA" at 259:24-260:7. |
| 84.  Approximately one month after this original threat, Jones continued to receive additional threats. | 84.  Jones Decl., ¶ 9; *Anthony* Criminal Trial Transcript, Exhibit "AA" at 259:24-260:7. |
| 85.  Jones reported the various threats to LAPD Detective Winn and, in response, Detective Winn offered to relocate Jones and his family, but Jones declined. | 85.  Jones Decl., ¶ 9. |
| 86.  Jones did not like being threatened and the threats only made him more certain of testifying at Plaintiff's murder trial. | 86.  Jones Decl., ¶ 9; *Anthony* Criminal Trial Transcript, Exhibit "AA" at 258:18-22, 259:25-260:8. |
| **Facts Regarding the Motion to Dismiss the Underlying Criminal Trial Because of the Plea, John Jones' Testimony During Plaintiff's Murder Trial and the Defense Team's Impeachment of Jones.** | |

24

| UNCONTROVERTED MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| 87.  On May 22, 1995, about two months before the murder trial, DAPD Thomason filed a motion to dismiss the murder prosecution based on the plea with Jones. | 87. *Anthony* Motion to Dismiss, pp. 1-3; September 9, 2011 Reporter's Transcript from habeas proceedings in *People v. Anthony III, et al.*, Case No. BA097736 ("Anthony *Habeas* Transcript"), Exhibit "BB" at 75:8-76:4; Castello Decl., ¶ 14. |
| 88.  Prior to the hearing on the May, 1995 motion to dismiss, DDA George Costello, the attorney who eventually prosecuted the underlying criminal trial, obtained and reviewed the file from the Jones case. | 88. Castello Decl., ¶ 14. |
| 89.  The motion to dismiss stated that Jones had been arrested on May 26, 1994 for pimping and pandering, charges were filed for those crimes, and that "three strikes" priors were alleged. | 89. *Anthony* Motion to Dismiss, p. 3. |

| UNCONTROVERTED MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| 90.  The motion further stated that the judge's notes from Jones' plea hearing revealed that "the District Attorney agreed to probation and time served because 'of his good, if belated, citizenship[]'", that his charge was reduced from Penal Code § 266(h), which carried a mandatory state prison term, to Penal Code § 266(f), for which probation may be granted, and that "Mr. Jones received probation, time served with community service." | 90. *Anthony* Motion to Dismiss, p. 3; Judge Tynan's notes, Exhibit "P"; Anthony *Habeas* Transcript, Exhibit "BB" at 76:9-25. |
| 91.  The criminal trial for *People v. Anthony, et al.*, Case No. BA097736, commenced on July 13, 1994. | 91. Castello Decl., ¶ 19; Exhibit "AA". |
| 92.  DAPD Thomason represented Plaintiff while DPD Tom represented Cole during the trial. | 92. Thomason Depo., Exhibit "CC" at 81:4-10. |
| 93.  DDA Castello prosecuted the trial on behalf of the People of the State of California. | 93. Castello Decl., ¶¶ 9-22. |
| 94.  By the time DDA Castello tried the *Anthony* case, he had been with the DA's Office for approximately six years. | 94. Castello Decl., ¶ 2. |

| UNCONTROVERTED MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| 95.  Other than Plaintiff's case, in DDA Castello's over 25 years with the DA's Office, he has never had a single case that he handled overturned on habeas for a violation of *Brady* disclosure obligations including, but not limited to, any failure to correct a witness's testimony at trial. | 95.  Castello Decl., ¶ 25. |
| 96.  During the criminal trial, the defense team tried to argue that the only reason Mr. Jones was testifying was to reduce the charge on his pimping and pandering case. | 96.  Castello Decl., ¶ 15; *Anthony* Criminal Trial Transcript, Exhibit "AA" at 218:4-7, 219:10-18. |
| 97.  The judge at the underlying murder trial did not preclude or interfere with the defense efforts to impeach Jones with his alleged "snitch" status; rather, he invited the defense to put forth evidence showing that Jones had knowledge of the impending arrest on the pimping and pandering charges prior to his May 3, 1994 identification of Plaintiff and Cole. | 97.  *Anthony* Criminal Trial Transcript, Exhibit "AA" at 223:20-27, 325:2-5, 980:22-981:9. |

| UNCONTROVERTED MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| 98.  The defense also cross-examined Jones on the two LAPD letters, the plea, and Judge Tynan's notes from his pimping and pandering case. | 98. Castello Decl., ¶¶ 15, 18-19; *Anthony* Criminal Trial Transcript, Exhibit "AA" at 262:27-263:1. |
| 99.  Specifically, Jones admitted to having prior felony convictions for pandering and voluntary manslaughter. | 99. *Anthony* Criminal Trial Transcript, Exhibit "AA" at 258:2-12. |
| 100. The defense asked Jones whether he had received "special treatment" in his pimping and pandering case. | 100.  Castello Decl., ¶ 16; *Anthony* Criminal Trial Transcript, Exhibit "AA" at 262:1. |
| 101. In response, Jones asked for clarification by asking, "What do you mean by 'special treatment'?" | 101.  Jones Decl., ¶ 12; Castello Decl., ¶¶ 16-17; *Anthony* Criminal Trial Transcript, Exhibit "AA" at 262:2. |
| 102. Rather than clarifying the question, Plaintiff's defense team simply repeated the question, "Did you receive any special treatment?" | 102.  Jones Decl., ¶ 12; Castello Decl., ¶¶ 16-17; *Anthony* Criminal Trial Transcript, Exhibit "AA" at, 262:3. |
| 103. In response, Jones testified, "I was arrested, hauled into court.  No." | 103.  Jones Decl., ¶ 12; Castello Decl., ¶¶ 16-17; *Anthony* Criminal Trial Transcript, Exhibit "AA" at 262:4. |

| UNCONTROVERTED MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| 104. Jones' testimony that he did not receive "special treatment" was based on his subjective belief that he did not receive special treatment since he had been arrested and "hauled into court" several months after he had come forward as a percipient witness in the murder investigation; his opinion was that, if he had, indeed, received special treatment, he would not have been arrested in the first place. | 104.  Jones Decl., ¶ 12; Castello Decl., ¶ 17; Thomason Depo., Exhibit "CC" at 97:8-98:25. |
| 105. After Jones denied receiving "special treatment" he was impeached with evidence that, on the date of the murder, he was renting rooms to prostitutes at his building. | 105.  Castello Decl., ¶ 19; *Anthony* Criminal Trial Transcript, Exhibit "AA" at 320:23-26; Thomason Depo., Exhibit "CC" at 99:2-12; Tom Depo., Exhibit "DD" at 62:24-63:5. |
| 106. After Jones denied receiving "special treatment" he was impeached with evidence that he was collecting money from the prostitutes as "visitor's fees". | 106.  Castello Decl., ¶ 19; *Anthony* Criminal Trial Transcript, Exhibit "AA" at 321:6-15; Thomason Depo., Exhibit "CC" at 99:13-101:2; Tom Depo., Exhibit "DD" at 63:6-11. |

| UNCONTROVERTED MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| 107. After Jones denied receiving "special treatment" he was impeached with evidence that his collection of "visitor's fees" from the prostitutes who were renting rooms in his building was the basis for the pimping charge against him. | 107.  Castello Decl., ¶ 19; *Anthony* Criminal Trial Transcript, Exhibit "AA" at 321:20-23; Thomason Depo., Exhibit "CC" at 101:3-10; Tom Depo., Exhibit "DD" at 63:12-64:4. |
| 108. On cross-examination, Jones further testified that he had been worked with the LAPD on "a whole other" case. | 108.  Castello Decl., ¶ 19; *Anthony* Criminal Trial Transcript, Exhibit "AA" at 979:4-10; Thomason Depo., Exhibit "CC" at 102:18-21; Tom Depo., Exhibit "DD" at 65:15-66:9. |
| 109. On cross-examination, Jones testified that he asked LAPD Detective Winn for her help on his pimping and pandering charges after he was arrested on May 26, 1994. | 109.  *Anthony* Criminal Trial Transcript, Exhibit "AA" at 264:11-15, 264:22-23. |

| UNCONTROVERTED MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| 110. After Jones testified that he was told by Detective Winn that there was nothing she could so for him, he was impeached with the two LAPD letters dated September 8, 1994 and October 12, 1994, respectively, which requested leniency for him based on his assistance in multiple homicide investigations. | 110. Castello Decl., ¶ 19; *Anthony* Criminal Trial Transcript, Exhibit "AA" at 327:5-10; Thomason Depo., Exhibit "CC" at 103:2-14, 108:14-25; Tom Depo., Exhibit "DD" at 61:7-62:5, 67:3-7. |
| 111. The two LAPD letters were submitted into evidence. | 111. Castello Decl., ¶ 19; *Anthony* Criminal Trial Transcript, Exhibit "AA" at 263:17-18; Anthony *Habeas* Transcript, Exhibit "BB" at 95:14-18; Thomason Depo., Exhibit "CC" at 103:2-14; Tom Depo., Exhibit "DD" at 61:7-62:5, 67:3-7. |
| 112. Jones was further impeached with evidence that, a few months after his testimony at the September 12, 1994 preliminary hearing in Plaintiff and Cole's murder prosecution, he received a "deal" in his pimping and pandering case. | 112. Castello Decl., ¶ 19; *Anthony* Criminal Trial Transcript, Exhibit "AA" at 330:11-13; Thomason Depo., Exhibit "CC" at 103:23-105:3; Tom Depo., Exhibit "DD" at 66:10-67:2. |

31

| UNCONTROVERTED MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| 113. Jones was further impeached with evidence that he pled guilty in the pimping case in November 1994. | 113.   Castello Decl., ¶ 19; *Anthony* Criminal Trial Transcript, Exhibit "AA" at 321:20-23; Thomason Depo., Exhibit "CC" at 101:11-16; Tom Depo., Exhibit "DD" at 64:5-12. |
| 114. Jones was further impeached with evidence that he knew he faced a mandatory minimum of six years in state prison on his pimping and pandering charges. | 114.   Castello Decl., ¶ 19; *Anthony* Criminal Trial Transcript, Exhibit "AA" at 326:19-23; Anthony *Habeas* Transcript, Exhibit "BB" at 90:6-10; Thomason Depo., Exhibit "CC" at 101:17-22, 108:3-12; Tom Depo., Exhibit "DD" at 64:23-65:14, 67:8-24. |
| 115. Jones was further impeached with evidence that, despite the fact he had originally faced a mandatory minimum of six years in state prison, he only received a sentence of time served plus probation and Cal Trans service. | 115.   Castello Decl., ¶ 19; *Anthony* Criminal Trial Transcript, Exhibit "AA" at 322:10-16; Thomason Depo., Exhibit "CC" at 105:19-106:3; Tom Depo., Exhibit "DD" at 67:8-24. |
| 116.   It was the understanding of the defense during the underlying prosecution that Jones was "helping on multiple homicides." | 116.   *Anthony* Criminal Trial Transcript, Exhibit "AA" at 980:1-4; Thomason Depo., Exhibit "CC" at 102:18-21, 112:25-115:5, 264:19-21. |

| UNCONTROVERTED MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| 117.   Had Jones denied any of the facts set forth in Uncontroverted Facts Nos. 105-115 above, DDA Castello fully understood that he would have had an obligation to correct the testimony. | 117.   Castello Decl., ¶ 21. |
| 118.   DDA Castello did not correct Jones' testimony that he did not receive "special treatment" because DDA Castello believed that Jones' testimony was based on Jones' view that being arrested on the pimping and pandering charge months after he had come forward as a witness in Plaintiff and Cole's murder investigation was not "special treatment." | 118.   Castello Decl., ¶ 17. |
| 119.   DDA Castello also did not correct Jones' testimony on re-direct because he believed that Plaintiff's defense team and fully and exhaustively impeached him before the jury on cross-examination. | 119.   Castello Decl., ¶¶ 18-22. |

33

| UNCONTROVERTED MATERIAL FACTS: | SUPPORTING EVIDENCE: |
| --- | --- |
| 120.   After Jones was impeached by the defense, DDA Castello believed that Plaintiff's defense team hammered home to the jury that, in March, 1994, Jones had been engaging in illegal activity involving the collection of money for prostitution activity. | 120.   Castello Decl., ¶ 20. |
| 121.   After Jones was impeached by the defense, DDA Castello believed that Plaintiff's defense team hammered home to the jury that Jones was arrested and charged with pimping and pandering sometime after he came forward as a percipient witness in the murder case. | 121.   Castello Decl., ¶ 20. |
| 122.   After Jones was impeached by the defense, DDA Castello believed that Plaintiff's defense team hammered home to the jury that the LAPD had requested leniency in the pimping and pandering case because of Jones' prior assistance to the LAPD in addition to the assistance he provided in the murder case. | 122.   Castello Decl., ¶ 20. |

| UNCONTROVERTED MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| 123.   After Jones was impeached by the defense, DDA Castello believed that Plaintiff's defense team hammered home to the jury that Jones had received a reduced sentence on his pimping and pandering charge following the LAPD's request for leniency. | 123.   Castello Decl., ¶ 20. |
| 124.   In closing arguments, the defense argued that Jones was motivated to identify and testify against Plaintiff in the murder trial in order to avoid a mandatory six-year prison sentence on his pimping and pandering charge. | 124.   *Anthony* Criminal Trial Transcript, Exhibit "AA" at 1120:10-15; 1121:6-13; Thomason Depo., Exhibit "CC" at 263:13-264:14; Tom Depo., Exhibit "DD" at 70:9-71:20. |
| 125.   The criminal defense further argued in their closing statements that Jones had helped the police on other cases as an "informant." | 125.   *Anthony* Criminal Trial Transcript, Exhibit "AA" at 1122:3-6; Thomason Depo., Exhibit "CC" at 263:13-264:14. |
| 126.   On August 1, 1995, the jury found Plaintiff and Cole guilty of the murder of Felipe Angeles Gonzalez and other crimes. | 126.   *Anthony* Criminal Trial Transcript, Exhibit "AA" at 1213-1220. |

| UNCONTROVERTED MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| 127.  Following the guilty verdict, DPD Tom spoke to at least two of the jurors to find out what they were thinking when they decided to convict. | 127.   Exhibit "AA" at Tom Depo., Exhibit "DD" at 71:24-72:3. |
| 128. The jurors that DPD Tom spoke informed him that "their main determining factor" in deciding to convict was their belief that Plaintiff had lied on the stand, which they considered "pretty damning." | 128.   Tom Depo., Exhibit "DD" at 72:4-75:25, 142:13-22. |
| 129. Plaintiff was sentenced on November 2, 1995 to life in prison without the possibility of parole. | 129.   *Anthony* Criminal Trial Transcript, Exhibit "AA" at 1245:12-15. |

## II.    UNCONTROVERTED MATERIAL FACTS THAT THE CONDUCT AT ISSUE WAS ON BEHALF OF THE STATE OF CALIFORNIA.

| UNCONTROVERTED MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| 130.   Defendants incorporate herein by reference Uncontroverted Material Facts Nos. 1-130. | 130.   Defendants incorporated herein by reference the Supporting Evidence to Uncontroverted Material Fact Nos. 1-130. |

| UNCONTROVERTED MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| 131.   It is Plaintiff's allegation that John Jones, purported "false testimony was sponsored by the prosecution, inasmuch as **the prosecution was aware that the testimony was false,** but nevertheless allowed it to go uncorrected, undermined the defense's efforts to prove it was false, and argued to the jury that it was true." | 131.   Complaint, Exhibit "B" at ¶ 7 (emphasis added.) |

III.   **UNCONTROVERTED MATERIAL FACTS RELEVANT TO NO GENUINE ISSUE OF MATERIAL FACT THAT THE CONSTITUTIONAL VIOLATION, IF ANY, WAS CAUSED BY A POLICY, PRACTICE, OR CUSTOM OF "DELIBERATE INDIFFERENCE" BY EITHER THE COUNTY OR THE DA'S OFFICE .**

| UNCONTROVERTED MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| 132.   Defendants incorporate herein by reference Uncontroverted Material Fact Nos. 1 – 131. | 132.   Defendants incorporated herein by reference the Supporting Evidence to Uncontroverted Material Fact Nos. 1-131. |

37

| UNCONTROVERTED MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| 133.   All applicants for the position of prosecutor with the DA's Office undergo a substantial vetting process in which, among other things, their backgrounds are checked and they are asked a series of hypothetical questions to ascertain how they would respond to various situations involving ethical questions that they may face as a prosecutor. | 133.   Lustig Decl, ¶ 3; Castello Decl., ¶ 3. |
| 134.   The hypotheticals presented to the applicants could typically include situations involving prosecutors' responsibilities under *Brady*. | 134.   Lustig Decl., ¶ 3. |
| 135.   Applicants to the DA's Office who indicate any potential ethical shortcomings during the hiring process are not even hired. | 135.   Lustig Decl., ¶ 3. |

| UNCONTROVERTED MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| 136.   It is encouraged from the moment a prosecutor is hired by the DA's Office to err on side of caution when fulfilling obligations under *Brady* and to disclose any information that could potentially exculpate a criminal defendant or impeach the credibility of a prosecution witness. | 136.   Lustig Decl., ¶¶ 2, 14, 20; Castello Decl., ¶¶ 4, 6; Chun Decl., ¶¶ 20-21; various GOMs, Special Directives and portions of the Legal Policies Manual regarding training as well as prosecutors' discovery obligations including, but not limited to, prosecutors' obligations under *Brady*, Exhibit "Z". |
| 137.   All applicants hired by the DA's Office are given a copy of the DA's Office Legal Policies Manual and Personnel Policies Manual. | 137.   Lustig Decl., ¶ 4; Castello Decl., ¶ 4. |
| 138.   The Legal Policies Manual and Personnel Policies Manual lay out both the legal and ethical obligations of all prosecutors in the DA's Office. | 138.   Lustig Decl., ¶¶ 4, 20; Castello Decl., ¶ 4; Exhibits "N" and "Z". |
| 139.   Once an applicant is hired by the DA's Office, they are first required to complete a formal training program. | 139.   Lustig Decl., ¶ 4; Castello Decl., ¶ 3. |
| 140.   The DA's Office formal training program in the early 1990s was three weeks long. | 140.   Lustig Decl., ¶ 4; Castello Decl., ¶ 3. |

| UNCONTROVERTED MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| 141.   The training was in a classroom setting in which a variety of topics would be covered, including, but not limited to, prosecutors' discovery obligations (including discovery obligations under *Brady*). | 141.   Lustig Decl., ¶ 4; Castello Decl., ¶ 3. |
| 142.   Prosecutors at the DA's Office are not allowed to handle cases in court without direct supervision until the initial formal training program is completed. | 142.   Lustig Decl., ¶ 4. |
| 143.   Once the formal training program is completed, the majority of new prosecutors are initially assigned to a misdemeanor calendar court. | 143.   Lustig Decl., ¶ 5. |
| 144.   Each new prosecutor assigned to a misdemeanor court is supervised by a Deputy-in-Charge ("DIC") who becomes that prosecutor's mentor and provides on-the-job training. | 144.   Lustig Decl., ¶ 5. |

| UNCONTROVERTED MATERIAL FACTS: | SUPPORTING EVIDENCE: |
| --- | --- |
| 145.   In addition to training received while on-the-job, prosecutors receive periodic formal training such as Saturday seminars throughout their prosecutorial career with the DA's Office. | 145.   Lustig Decl., ¶¶ 5-6. |
| 146.   These Saturday seminars include training to prosecutors on their ethical and disclosure obligations, including, but not limited to, obligations required under the United States Supreme Court decision, *Brady v. Maryland*. | 146.   Lustig Decl., ¶ 6. |
| 147.   In the early 1990s, most prosecutors at the DA's Office, on average, spent a year or two at their first assignment before being transferred to their second assignment. | 147.   Lustig Decl., ¶ 6. |
| 148.   For most DDAs, the second assignment is to a juvenile court. | 148.   Lustig Decl., ¶ 6. |
| 149.   Once transferred to juvenile court, prosecutors are once again assigned to a supervising DIC who provides additional on-the-job training. | 149.   Lustig Decl., ¶ 6. |

41

| UNCONTROVERTED MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| 150.   In the early 1990s, prosecutors assigned to the juvenile unit typically spent at least one year there before they were eventually transferred to a felony assignment. | 150.   Lustig Decl., ¶ 6. |
| 151.   Once assigned to handle felony cases, prosecutors are then reassigned to a new supervising DDA who continues to provide on-the-job training. | 151.   Lustig Decl., ¶ 7. |
| 152.   The supervising DDAs in the felony courtrooms are typically are more senior prosecutors holding the titles of calendar deputy, assistant head deputy and head deputy district attorney. | 152.   Lustig Decl., ¶ 7. |
| 153.   Prosecutors assigned to the felony unit are first assigned to non-violent felonies before working their way up to violent felonies, including homicide cases. | 153.   Lustig Decl., ¶ 7. |
| 154.   In order to be assigned to violent felony cases such as homicide cases, generally a prosecutor must attain the level of a Grade III DDA. | 154.   Lustig Decl., ¶¶ 7-8. |

| UNCONTROVERTED MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| 155.   Before becoming a Grade III DDA, all prosecutors are required to pass what is basically a mini bar examination that focuses on all of the duties and obligations of a prosecutor. | 155.   Lustig Decl., ¶ 7. |
| 156.   Unless a prosecutor excels on the Grade III examination and receives a supervisor rating of outstanding, they will remain at a Grade II level and will generally not be allowed to handle the more serious cases. | 156.   Lustig Decl., ¶ 7. |
| 157.   Once a prosecutor is promoted to Grade III DDA, s/he can handle homicide cases, including those involving death and life without parole sentences. | 157.   Lustig Decl., ¶ 8. |
| 158.   In the early 1990s, a typical prosecutor was employed with the DA's Office for at least four  years before reaching the level of Grade III DDA. | 158.   Lustig Decl., ¶ 8. |

| UNCONTROVERTED MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| 159.   In addition to the formal and on-the-job training referenced above, the DA's Office has a motto that "Every Day is a Training Day."  In fact, this motto is set forth on the internal webpage for the DA's Office. | 159.   Lustig Decl., ¶ 9; Exhibit "S." |
| 160.   The DA's Office makes available to its DDAs various materials such as "One Minute Briefs," videos on the DA's Office webpage, the Caselog publication periodic Special Directives ("SDs") and General Office Memorandums issued by the DA's Office as well as the EthicsLine and DALINE publications which provide additional guidance and updates on changes in the law. | 160.   Lustig Decl., ¶¶ 9-10, samples of various "One Minute Briefs" addressing subject matters such as leniency and *Brady* obligations, Exhibit "T"; *Brady* Plus: Preservation, Disclosure & Discovery of Evidence publication, Exhibit "U"; various "EthicsLine" publications, Exhibit "V"; various DALINE publications, Exhibit "W"; example of Caselog publication, Exhibit "X"; Castello Decl., ¶ 4. |
| 161.   Among the various topics covered by these materials are prosecutors' discovery obligations (including, but not limited to, obligations under *Brady*) as well as handling leniency requests. | 161.   Lustig Decl., ¶¶ 9-10; Exhibits "N", "S"-"Z". |

| UNCONTROVERTED MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| 162.   Among the training prosecutors at the DA's Office receive is how to access various databases that have either been implemented by the DA's Office or are used by the DA's Office to obtain relevant information to their cases and to facilitate and expedite compliance with discovery obligations, including, but not limited to, obligations under *Brady*. | 162.   Lustig Decl., ¶ 11; Operations Manual of the *Brady* Compliance Unit of the DA's Office, Exhibit "Y". |

| UNCONTROVERTED MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| 163.   The various databases, files and indices that prosecutors are trained to access include RAP sheets (containing the summary criminal history of an individual), PIMS (which contains information about all cases filed by the DA's Office), the Consolidated Criminal History Reporting System ("CCHRS") (which contains additional information on the criminal history of individuals including, but not limited to, new arrest data, case management and disposition data and juvenile data), the Trial Court Information System ("TCIS") (the court's database which contains information on all cases filed in court, including all minute orders) as well as the Jailhouse Informant Litigation Team ("JILT") database (which contains information on jailhouse informants who, like peace officer witnesses and other government employees, may be recurring witnesses in different prosecutions). | 163.   Lustig Decl., ¶ 11. |

| | UNCONTROVERTED MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|---|
| 164. | In addition to the aforementioned databases, files and indices utilized by prosecutors, there is an entire sub-division of the DA's Office called the *Brady* Compliance Unit which established a separate database called the *Brady* Alert System ("BAS") which contains potential impeachment information on peace officers and forensic experts. | 164.  Lustig Decl., ¶ 12; Exhibit "Y". |
| 165. | The purpose of the BAS is to facilitate prosecutors' ability to comply with their disclosure obligations under *Brady*. | 165.  Lustig Decl., ¶ 12; Exhibit "Y." |
| 166. | With respect to percipient witnesses in criminal cases who may obtain leniency or some other favorable disposition in separate prosecutions against them, this type of information is available to prosecutors in the individual case files as well as the PIMS database. | 166.  Lustig Decl., ¶ 13. |

| UNCONTROVERTED MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| 167.   In the situation where a percipient witness in one criminal matter is also a criminal in a separate matter, it is incumbent on the prosecutor handling the prosecution of a witness to turn over any potential exculpatory information to the prosecutor handling the case in which the percipient witness might testify. | 167.   Lustig Decl., ¶ 14. |
| 168.   With respect to this, all prosecutors in the DA's Office are required to run the criminal histories of all of the witnesses that they are going to call in a case. | 168.   Lustig Decl., ¶ 14. |
| 169.   So, for example, if a prosecutor runs the criminal history of a witness and learns that there is a pending prosecution against that witness, the prosecutor merely needs to obtain the file of the case against the witness to obtain the details about the witness' status in that criminal case. | 169.   Lustig Decl., ¶ 14. |

| UNCONTROVERTED MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| 170.   It is the policy, practice, and custom of the DA's Office to disclose all potential material and exculpatory information regarding witnesses in any case. | 170.   Lustig Decl., ¶ 14. |
| 171. Unlike percipient witnesses (who are generally not likely to be a recurring witness in future prosecutions), law enforcement witnesses, government employees and jailhouse informants are all more likely to testify in multiple prosecutions.  For this reason, there simply is not the same the need for a similar index or database for percipient witnesses as the Brady Alert System (for peace officer witnesses and government experts) and JILT list (for jailhouse informants). | 171.   Lustig Decl., ¶16. |

49

| UNCONTROVERTED MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| 172. Moreover, maintaining a separate centralized index or database for all percipient witnesses would simply not be feasible because of the sheer number of percipient witnesses that the DA's Office deals with on an annual basis. | 172.   Lustig Decl., ¶ 17. |
| 173.  For example, from 1996 through 2013, there have been a total of 3,161,711 combined felony and misdemeanor cases filed by the DA's Office for an average of 175,650 cases per year. | 173.   Lustig Decl., ¶ 17. |
| 174.  Taking into account the fact that there are usually multiple witnesses in each prosecution, maintaining a separate centralized index or database for hundreds of thousands of individuals each year would be an extremely onerous process. | 174.   Lustig Decl., ¶ 17. |

| UNCONTROVERTED MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| 175.  Even if the database were limited to only those individuals who settled their criminal cases through a plea deal or otherwise, it would still require a significant diversion of resources at the DA's Office because, during that same time period (1996 through 2013), the annual average of criminal defendants who resolved their cases through a plea was 143,244. | 175.   Lustig Decl., ¶¶ 13, 18. |
| 176.  Approximately 80% of cases which plea out are as a result of a negotiated plea with the DA's Office (as opposed to the situation where a defendant enters a guilty or no contest plea on his own). | 176.   Lustig Decl., ¶ 18. |
| 177.  Thus, to create a database limited to individuals who enter into plea deals would still require a significant diversion of resources because this would entail creating entries for roughly 114,595 individuals annually. | 177.   Lustig Decl., ¶ 18. |

| UNCONTROVERTED MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| 178.  More importantly, the amount of information that could feasibly be included in such a centralized database or index would pale in comparison to the amount of information that is already contained regarding such persons in any individual case file and PIMS. | 178.    Lustig Decl., ¶ 18. |
| 179.  DAPD Thomason has handled approximately 3,000 cases over his career as a public defender. | 179.    Thomason Depo., Exhibit "CC" at 40:10-19. |
| 180.     Of the approximately 3,000 cases DAPD Thomason has handled over his career as a public defender, other than the prosecution of Plaintiff, he is not aware of any other case overturned for an alleged failure by the DA's Office to comply with their *Brady* obligations. | 180.    Thomason Depo., Exhibit "CC" at 40:21-41:1. |

| UNCONTROVERTED MATERIAL FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| 181.    Of the approximately 3,000 cases DAPD Thomason has handled over his career as a public defender, other than the prosecution of Plaintiff, he is not aware of any other case overturned for an alleged failure to correct false testimony at trial. | 181.   Thomason Depo., Exhibit "CC" at 41:2-9. |
| 182. DPD Tom handled thousands of cases over his 30+ years as a public defender. | 182.   Tom Depo., Exhibit "DD" at 43:4-15. |
| 183. Of the thousands of cases DPD Tom handled, the instant case in the only one he is aware of ever being overturned on habeas. | 183.   Tom Depo., Exhibit "DD" at 43:16-21. |
| 184.  Of the thousands of cases DPD Tom handled, he is not aware of a single case that was reversed on direct appeal. | 184.   Tom Depo., Exhibit "DD" at 45:2-6. |

## CONCLUSIONS OF LAW

1.  The court views the record in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  However, the non-moving party has the "burden of [pointing] to 'specific facts showing that there is genuine issue for trial…' [I]t is not the district court's job to sift through the record to find admissible evidence in support of the non-moving party's case." *Claar v. Burlington N.R.R.*, 29 F.3d 499, 504 (9th Cir. 1994) (quoting *Celotex*

53

*Corp. v. Catrett,* 477 U.S. 317, 324 (1986)) *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574 587 (1986) ("Where the record taken as whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial'"); *Guatay Christian Fellowship v. County of San Diego*, 670 F.3d 957, 972 (9th Cir. 2011).

2.  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment. *Scott v. Harris*, 550 U.S. 372, 380 (2007) (no "genuine issue for trial" under the *Matsushida* standard where opposing parties submitted two different accounts of the facts, but the record (a videotape) so utterly discredited the respondent's version that no reasonable jury could have believe responded); *Wilkison v. Torres*, 610 F. 546, 549 (9th Cir. 2010).

3.  The court may disregard "visible fiction" in cases where the responding party's "version of events is so utterly discredited by the record that no reasonable jury could have believe him." *Id.* at 380-81 ("Even on a motion for summary judgment, a court is not compelled to give weight to an allegation that is incontrovertibly demonstrated to be false.")

4.  Under *Brady v. Maryland*, 373 U.S. 83 (1963), a criminal defendant is denied his due process right to a fair trial, and the government violates its constitutional duty to disclose material evidence where (1) the evidence in question is favorable to the accused in that it is exculpatory or impeachment evidence, (2) the government willfully or inadvertently suppresses this evidence, and (3) prejudice ensues from the suppression (i.e., the evidence is "material"). *Strickler v. Greene,* 527 U.S. 263, 281-82 (1999); *Kyles v. Whitley,* 514 U.S. 419, 433 (1995).

5.  The evidence which was "suppressed" must have been "material". The Ninth Circuit explained that in *Stricker v. Greene*, the Supreme Court stated that

54

"strictly speaking, there is never a real 'Brady violation' unless the nondisclosure was so serious that there is a **reasonable probability that the suppressed evidence would have produced a different verdict**." *Smith v. Almada*, 640 F.3d 931, 939 (9th Cir. 2011); *see also*, *United States v. Bagley*, 473 U.S. 667, 682 (1985) ("The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."); *Kyles v. Whitley,* 514 U.S. 419, 433 (1995) (the failure to disclose is prejudicial if "there [was] a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."); *Smith v. Cain*, ___ U.S. ___, 132 S.Ct. 627, 630 (2012) (a reasonable probability exists if the likelihood of a different result is great enough to undermine confidence in the outcome of the trial).

6.  There is no meaningful "suppression" within the meaning of *Brady* "if the means of obtaining the exculpatory evidence has been provided to the defense". *United States v. Dupuy*, 760 F.2d 1492, 1502 (9th Cir. 1985); *United States v. Griggs,* 713 F.2d 672, 674 (11th Cir. 1983) ("Where defendants ... had within their knowledge the information by which they could have ascertained the supposed *Brady* material, there is no suppression by the government."); *Sommer v. United States*, 2011 WL 4592788, *7 (S.D. Cal. 2011) ("*Brady* violation does not occur if the defendant knew or should have know[n] the **essential facts** permitting him to take advantage of any exculpatory information.").

7.  Because it is undisputed that, prior to the underlying July, 1995 trial, Plaintiff's defense team had all of the information they needed to prove that (1) in March, 1994, Jones had been engaging in illegal activity involving the collection of money for prostitution activity, (2) sometime after he became a percipient witness in the murder case, he was arrested and charged with pimping and pandering, (3) he was facing prison time as a result of these charges, (4) based on his prior assistance to the LAPD as well as his assistance in the pending murder

case, the LAPD had requested leniency in his pimping and pandering case and (5) that he had received a reduced sentence on his pimping and pandering charge following the request for leniency by the LAPD, there was no suppression of exculpatory and material evidence by the County or DA's Office.

8.   Furthermore, because Jones' testimony that he did not receive "special treatment" was based on his subjective belief that he should have never been arrested in the first place because he had come forward as a percipient witness months before he "was arrested" and "hauled into court", but he was nonetheless thoroughly and exhaustively impeached about that testimony,[1] there was no "actual prejudice" from any alleged *Brady* violation against the County or DA's Office.  *Hovey v. Ayers*, 458 F.3d 892, 920 (9th Cir. 2006) ("Given that the defense impeached the informants' credibility to this extent and the jury still convicted Hovey, **it is not reasonably probable that the additional evidence of actual leniency** with regard to one of the two informants **would have altered the outcome of the trial**.")  (Emphasis added).  This is especially true here where the jurors questioned by the defense following their decision to convict indicated that "their main determining factor" was their belief that Plaintiff had lied.

---

[1] This includes the following evidence presented by Plaintiff's counsel to the jury: (1) on the date of the murder, Jones was renting rooms to prostitutes at his building, (2) he was collecting money from the prostitutes as "visitor's fees", (3) his collection of "visitor's fees" from the prostitutes who were renting rooms in his building was the basis for the pimping charge against him, (4) he pled guilty in the pimping case, (5) based on the charges and other allegations he was "facing a mandatory minimum under the law of six years in state prison", (6) sometime previously, he had worked with the LAPD on a whole other case, (7) the LAPD submitted two letters on September 8, 1994 and October 12, 1994, respectively, requesting leniency for him based on his assistance in the various matters, which were both submitted into evidence, (8) he purportedly received a "deal" in his pimping case, (9) at the time of his sentencing on the pimping charge, it was changed from pimping to a lesser charge of sale of persons for immoral purposes and (10) while the pimping charge would have carried a mandatory minimum of six years in state prison, the charge he was ultimately convicted of only resulted in a sentence of time served plus probation and Cal Trans work.

9.  In order for Plaintiff to prove his claims under Section 1983 against the County (premised on alleged misconduct by the DA's Office) and/or the DA's Office itself, it must be determined that the District Attorney acts as a policymaker of the County when "investigating and proceeding with criminal prosecutions." *See, Monell v. New York City Dept. of Soc. Services*, 436 U.S. 658, 694 (1978) (a local governmental entity is a person for purposes of Section 1983 and may be sued for constitutional violations caused by its official policies or customs); *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 fn. 10 (1989) (neither states nor state officials acting in their official capacities are "person[s]" within the meaning of Section 1983 when sued for damages); *see also, Weiner v. San Diego County*, 210 F.3d 1025, 1030 (9th Cir. 2000).

10. In *Monell, supra*, 436 U.S. at 694, the United States Supreme Court addressed the question of whether local governmental units could be treated as a "person" for Section 1983 purposes and held that such treatment is appropriate only under certain circumstances.  Specifically, the Supreme Court held that governmental bodies may be sued directly under Section 1983 if the action that is alleged to be unconstitutional was carried out as part of an official policy, practice or custom of "deliberate indifference" on behalf of that particular governmental body.  *Id. at* 690-91*; see also, City of Canton v. Harris*, 489 U.S. 378, 389 (1989) ("a municipality can be liable under §1983 only where its policies are the 'moving force [behind] the constitutional violation.'")

11. The Supreme Court explained further that local governments may not be sued "for an injury inflicted solely by its employees or agents" and that "it is when execution of a governmental policy or custom, **whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy**, inflicts the injury that the government as an entity is responsible under § 1983." *Monell, supra*, 436 U.S. at 694 (emphasis added); *see also, McMillian v. Monroe County, Ala.*, 529 U.S. 781, 785 (1997) (the plaintiff must

establish that the official (1) had final policymaking authority "concerning the action alleged to have caused the particular constitutional or statutory violation at issue" and (2) was the policymaker for the local governing body for the purposes of the particular act); *Penbaur v. Cinncinati*, 475 U.S. 469, 481 (1986) ("Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered."); *Polk County v. Dodson*, 454 U.S. 312, 326 (1981) (the plaintiff must allege that the policies formulated by the defendant official were the "moving force of the constitutional violation.")

12.  Whether the DA's Office acts on behalf of the County or the State when engaging in certain conduct, is a question dependent on state law.  *McMillian v. Monroe County, Ala., supra*, 529 U.S. at 786.

13.  The California Supreme Court is the ultimate interpreter of California state law.  *Weiner v. San Diego County, supra,* 210 F.3d at 1028-29.

14.  In *Weine*r, the Ninth Circuit referred to California law, including the California Supreme Court, and acknowledged that "[a]ll relevant California cases, including *Pitts [v. Kern County,*17 Cal.4th 340 (1998)], have held that District Attorneys are state officers for the purpose of **investigating and proceeding with criminal prosecutions**." *Id.* at 1030 (emphasis added.)

15.  Besides the fact that it is redundant for Plaintiff to be suing the County along with a sub-department of the County (see Conclusion of Law No. 14, *infra*), the analysis is still the same because of the crux of the *Weiner/Pitts* analysis is the fact that the State Attorney General's Office, not the County Board of Supervisors, has ultimate control and supervision over certain policymaking functions of the various district attorney's offices throughout the State.  *See, e.g., Nazir v. County of Los Angeles, et al.*, 2011 WL 819081 at *6-8 (C.D. CA 2011); *Neri v. County of Stanlislaus, et al.,* 2010 WL 3582575 at *4, 9 (E.D. CA 2010); *see also*, *Jackson v. Barnes*, 749 F.3d 755, 767 (9th Cir. 2014) ("With respect to

the Ventura County District Attorney's Office, Jackson alleges, in effect, that the District Attorney's Office is liable for Murphy's unlawful prosecutorial conduct. The District Attorney's Office, however, acts as a state office with regard to actions taken in its prosecutorial capacity, and is not subject to suit under § 1983. *Weiner,* 210 F.3d at 1030.")

16.  Based on the evidence and *Weiner,* Plaintiff's claims are barred against the County and DA's Office because the alleged wrongful conduct was carried out on behalf of the State of California.

17.  Even assuming, *arguendo,* that there is sufficient evidence the conduct at issue was not carried out on behalf of the State of California, to prove that the County or DA's Office had a custom which caused his constitutional rights to be violated, Plaintiff must show that the practices are "persistent and widespread . . . permanent and well-settled [and] deeply imbedded." *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 167-68 (1970).

18.  Courts have proven to be particularly sensitive to claims that a government entity maintains an unspoken, wrongful "custom" of violating civil rights.  In *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823-824 (1985), the United States Supreme Court found that a Section 1983 plaintiff cannot recover under a "custom" theory by simply producing evidence of isolated incidents of alleged misconduct directed toward him.  Based on *Tuttle,* the lower courts have repeatedly required a Section 1983 plaintiff to support their "custom" allegations with evidence of multiple, similar past incidents -- thereby demonstrating official knowledge and tacit approval of a wrongful course of conduct by municipal employees.  *Rodriguez v. Avita,* 871 F.2d 552, 555 (5th Cir. 1989).  In the absence of an overwhelming showing of numerous prior similar incidents -- involving numerous other citizens and officers -- a section 1983 plaintiff proceeding on a tacit, wrongful "custom" theory fails to make a prima facie case against a governmental entity.

19.  Indeed, as many as 12 prior incidents have been held insufficient to constitute evidence of a "pattern" for purposes of Section 1983.  *See*, *Hamilton v. Rogers*, 791 F.2d 439, 443 (5th Cir. 1986) (approximately 12 racial employment incidents in two and-a-half years at fire department insufficient to constitute pattern for purposes of civil rights laws); *Carter v. District of Columbia*, 795 F.2d 116, 123-24 (D.C. Cir. 1986) (plaintiff produced evidence of approximately 11 prior incidents in an effort to establish municipal custom; court enters directed verdict for city: "This catalog of disquieting events is not sufficient to demonstrate a pervasive pattern of police officer use of force, persisting in a district because of (supervisory) tacit approval . . . "); *Ramos v. City of Chicago*, 707 F.Supp. 345, 347 (N.D. Ill. 1989) (six prior incidents fail to make up prima facie case under Section 1983 against municipality); *Sloman v. Tadlock*, 21 F.3d 1462 (9th Cir. 1994) (court overturns jury finding of <u>Monell</u> liability for lack of evidence indicating that misconduct was widespread on police force; "habitual" harassment of plaintiff by one officer in sufficient as a matter of law).

20.  "[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Board of Comm'rs of Bryan Cty. v. Brown,* 520 U.S. 397, 410 (1997).

21.  Here, because Plaintiff has no evidence of a policy, practice or custom of not conveying information to plea deals offered to persons who are witnesses in a separate criminal proceeding and/or a policy, practice or custom of failing to correct false testimony, Plaintiff is relying on the "single-incident" liability hypothesized by the Supreme Court in *Canton v. Harris, supra,* 489 U.S. at 389.

22.  "It does not follow that, because *Brady* has gray areas and some *Brady* decisions are difficult, prosecutors will so obviously make wrong decisions that failing to train them amounts to 'a decision by the city itself to violate the Constitution.'" *Connick v. Thompson*, 131 S. Ct. 1350, 1365 (2011) (quoting *Canton, supra,* 489 U.S., at 395 (O'Connor, J., concurring in part and dissenting

1  in part)).

2      23.  "To prove deliberate indifference, [Plaintiff needs] to show that

3  [Defendants were] was on notice that, absent additional specified training, it was

4  "highly predictable" that the prosecutors in [their] office would be confounded by

5  those gray areas and make incorrect *Brady* decisions as a result." *Connick v.*

6  *Thompson*, *supra*, 135 S.Ct. at 1365.

7      24.  "In fact, [Plaintiff has] to show that it was *so* predictable that failing to

8  train the prosecutors amounted to *conscious disregard* for [Plaintiff's] *Brady*

9  rights."  *Connick*, *supra*, 135 S.Ct. at 1365 (citing *Board of Comm'rs of Bryan*

10  *Cty. v. Brown, supra,* 520 U.S. at 409; *Canton, supra,* at 389.)

11      25.  Given the undisputed evidence that it is the practice of prosecutors at the

12  DA's Office to run the criminal histories of all witnesses they are going to call in

13  a case, combined with maintenance of detailed information regarding plea deals

14  in the individual case files and PIMS, has resulted in an effective safeguard to

15  ensure that prosecutors comply with their obligation to communicate information

16  regarding plea deals to the defense in criminal cases, the lack of a separate

17  "witness" or "plea deal" database does not rise to the level of "deliberate

18  indifference."

19      Moreover, because both DDA Castello and Plaintiff's defense team were fully

20  aware of the details of Jones' plea, including the reason why leniency was granted,

21  summary adjudication in favor of the County and DA's Office is warranted on this

22  additional basis.

23

24  Dated: December 8, 2014      LAWRENCE BEACH ALLEN & CHOI, PC

25

26               By / s/ *Michael D. Allen*
                   Michael D. Allen

27                     Attorneys for Defendants
                   COUNTY OF LOS ANGELES and

28                     LOS ANGELES COUNTY DISTRICT
                   ATTORNEY'S OFFICE

1  PAUL B. BEACH, State Bar No. 166265
   pbeach@lbaclaw.com
2  MICHAEL D. ALLEN, State Bar No. 198126
   mallen@lbaclaw.com
3  LAWRENCE BEACH ALLEN & CHOI, PC
   100 West Broadway, Suite 1200
4  Glendale, California  91210-1219
   Telephone No. (818) 545-1925
5  Facsimile No. (818) 545-1937

6  Attorneys for Defendants
   COUNTY OF LOS ANGELES and
7  LOS ANGELES COUNTY DISTRICT ATTORNEY'S OFFICE

8                    **UNITED STATES DISTRICT COURT**

9                    **CENTRAL DISTRICT OF CALIFORNIA**

10

11  REGGIE COLE,                      )  Case No. CV 11-03241-CBM (AJWx)
                                      )  (*Cole Action*)
12            Plaintiff,             )
                                      )  Case No. CV 12-01332-CBM (AJWx)
13      vs.                           )  (*Anthony City Action*)
                                      )
14  CITY OF LOS ANGELES, et al.,      )  Case No. CV 13-07224-CBM (AJWx)
                                      )  (*Anthony County Action*)
15            Defendants.            )
    _____     )  Honorable Consuelo B. Marshall
16                                    )
    OBIE S. ANTHONY, III,             )
17                                    )  **[PROPOSED] JUDGMENT**
              Plaintiffs,            )
18      vs.                           )  [Motion for Summary Judgment,
                                      )  Separate Statement of Uncontroverted
19  CITY OF LOS ANGELES, et al.,      )  Facts and Conclusions of Law,
                                      )  Declarations and Exhibits filed
20            Defendants.            )  concurrently herewith]
    _____     )
21                                    )
    OBIE S. ANTHONY, III,             )  Date:        January 13, 2015
22                                    )  Time:        10:00 a.m.
              Plaintiff,             )  Courtroom: 2
23      vs.                           )
                                      )
24  COUNTY OF LOS ANGELES, et al.     )
                                      )
25            Defendants.            )
    _____     )
26

27       The Motion for Summary Judgment by Defendants COUNTY OF LOS

28  ANGELES and LOS ANGELES COUNTY DISTRICT ATTORNEY'S OFFICE

                                    1

("Defendants") came on regularly for hearing in Courtroom 2 of this Court, Consuelo B. Marshall, District Judge, presiding.

After full consideration of the evidence, the Separate Statement of Uncontroverted Facts and Conclusions of Law, and the authorities submitted by counsel, as well as counsel's argument, the Court finds there is no triable issue of material fact in this case with regard to the claims against Defendants COUNTY OF LOS ANGELES and LOS ANGELES COUNTY DISTRICT ATTORNEY'S OFFICE and these Defendants are entitled to summary judgment as a matter of law.

IT IS HEREBY ADJUDGED AND ORDERED that the Motion for Summary Judgment is granted and that judgment shall be entered in favor of Defendants COUNTY OF LOS ANGELES and LOS ANGELES COUNTY DISTRICT ATTORNEY'S OFFICE and against Plaintiff OBIE S. ANTHONY and that these Defendants shall be entitled to costs of suit incurred herein.

DATED:  January _____, 2015        _____

                                   HONORABLE CONSUELO B. MARSHALL
                                   United States District Judge
                                   Central District of California

Submitted by:
LAWRENCE BEACH ALLEN & CHOI, PC

By ___/s/ *Michael D. Allen*_____
        Michael D. Allen
Attorneys for Defendants
COUNTY OF LOS ANGELES
and LOS ANGELES COUNTY DISTRICT ATTORNEY'S OFFICE